# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| ANNETTE RICHARDSON, | ) | |
| DEBORAH BOWMAN, | ) | |
| LIZA HORSLEY, | ) | |
| DEBRA POE | ) | |
| DINO RIOJAS, | ) | |
| ARLENE SIMMONS, and | ) | |
| STEPHANIE THOMAS | ) | |
| | ) | |
| On behalf of themselves and all others | ) | |
| similarly situated, | ) | Civil No.  1:17-cv-09447 |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CLASS ACTION |
| | ) | |
| CITY OF NEW YORK, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## I.  INTRODUCTION

1.      For well over a century, the Fire Department of New York (the "FDNY") has engaged in a pattern or practice of systemic, continuous, and intentional discrimination against African American emergency medical services ("EMS") and non-uniformed ("Civilian") employees and job applicants in hiring, placement, advancement, and compensation decisions. For about 100 years after the Civil War, white men, primarily of Irish and Italian descent, controlled the FDNY at all levels, from upper management to staff.  Token integration began during the civil rights movement of the 1960s, but African Americans remained severely underrepresented at all levels of the agency and in all types of jobs.

2.      As a result of the broad pattern of racial discrimination, the percentage of African American employees in FDNY as a whole is far less than in other agencies of the New York City government, the percentage of African American employees in higher paying EMS and Civilian

jobs in FDNY is far less than in lower compensated jobs, and African American Civilian employees are paid lower salaries or wages than white employees in the same job positions.

3.      The interaction of four factors produces these racial disparities in job selections and compensation.  First, despite knowing of the statistical racial disparities, FDNY leadership has failed to adopt or implement systematically widely accepted human resources practices that reduce the opportunity for discrimination, including policies and practices in connection with performance appraisals, posting of vacant positions, and monitoring of decisions for patterns of racially skewed outcomes.  Second, a culture of in-group favoritism under which white decision-makers favor people with similar backgrounds to themselves has infected the FDNY for generations.  Third, a very small group of decision-makers, most notably the Assistant Commissioner for Human Resources and the Assistant Commissioner for Budget & Finance, have contributed to the racial disparities through their decisions to approve or disapprove most proposed job selection and compensation decisions for EMS and Civilian FDNY employees. Finally, the Mayor's office and other City offices and agencies have failed to exercise control over FDNY's human resources and diversity practices despite myriad lawsuits, unfavorable reports, and other beacons shining light on the racial discrimination at FDNY.  These factors reflect intentional racial discrimination against African American employees, and FDNY's practices have had a disparate impact on the hiring, advancement, and compensation of African American employees.

4.      Plaintiffs bring this action on behalf of themselves and three classes of African Americans defined more precisely in paragraph 136 below – the "Job Selection Class", the "Compensation Class," and the "EMS Lieutenant Class." They claim that the FDNY's racial

discrimination violates 42 U.S.C. § 1983 and the New York City Human Rights Law ("NYHRL"), N.Y.C. Admin. Code § 8-101 *et seq*.

## II.  JURISDICTION AND VENUE.

5.      The jurisdiction of this Court over the claims under 42 U.S.C. § 1983 is invoked pursuant to 28 U.S.C. § 1343(a)(4), which confers original jurisdiction upon this Court in a civil action to recover damages or to secure equitable relief or other relief under any Act of Congress providing for protection of civil rights; pursuant to 28 U.S.C. § 1331, which confers original jurisdiction upon this Court in a civil action arising under the Constitution or laws of the United States; and pursuant to 28 U.S.C. § 1337, which confers original jurisdiction upon this court in a civil action arising under any Act of Congress regulating commerce.

6.      The jurisdiction of this Court over the claims under the NYHRL is invoked pursuant to 28 U.S.C. § 1367(a), which confers supplemental jurisdiction upon this Court over claims "that are so related to claims in the action within [its] original jurisdiction that they for part of the same case or controversy . . . ."

7.      Venue is proper in this Court under 28 U.S.C. § 1391 because Defendant resides in this judicial district and because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

## III.  PARTIES

8.      Plaintiff Annette Richardson is African American and has worked for the FDNY from 2006 until the present.  She is currently employed as an Associate Staff Analyst and is a representative of the Job Selection Class and the Compensation Class.

9.      Plaintiff Deborah Bowman is African American and has worked for the FDNY from 1987 until the present.  She is currently employed as an Administrative Manager.  While

her position includes the word "Manager," she is classified as non-managerial.  She is a representative of the Job Selection Class and the Compensation Class.

10.    Plaintiff Liza Horsley is African American and has worked for the FDNY from 1998 until the present.  She is currently employed as a Clerical Associate and is a representative of the Job Selection Class and the Compensation Class.

11.    Plaintiff Debra Poe is African American and has worked for the FDNY from 2006 until the present.  She is currently employed as an Administrative Manager.  While her position includes the word "Manager," she is classified as non-managerial.  She is a representative of the Job Selection Class and the Compensation Class.

12.    Plaintiff Dino Riojas is African American and has worked for the FDNY from 1982 until the present.  He is currently employed as a Computer Specialist.  He is a representative of the Job Selection Class and the Compensation Class.

13.    Plaintiff Arlene Simmons is African American and has worked for the FDNY from 1993 until the present.  She is currently employed as an EMS Lieutenant and is a representative of the EMS Lieutenant Class.

14.    Plaintiff Stephanie Thomas is African American and has worked for the FDNY from 1988 until the present.  She is currently employed as a Computer Specialist and Project Manager and is a representative of the Job Selection Class and the Compensation Class.

15.    The law of the State in which the district court is located determines a party's amenability to suit.  Under the New York City Charter, "all actions and proceedings for the recovery of penalties for the violation of any law shall be brought in the name of the City of New York and not in that of any agency, except where otherwise provided by law." The FDNY is an agency of the City Government of New York.  Because the FDNY is an agency of the City, the

4

City is the named Defendant, but the Complaint focuses on the racial discrimination committed by the FDNY.

16.     The FDNY is the agency charged with protecting the lives and property of the people of New York City through prevention, education, fire suppression, medical services and other related emergency and non-emergency activities.  The Fire Commissioner, who heads the agency, is appointed by and reports directly to the Mayor of the City of New York.

### IV.   FDNY'S WORKFORCE

17.     According to the Workforce Profile Report for FY 2015 prepared by the Department of Citywide Administrative Services for the City of New York ("2015 Workforce Report"), the FDNY had about 16,300 full time and about 100 part time employees at the end of Fiscal Year 2015.

18.     The 2015 Workforce Report reflects that FDNY had over 8,400 firefighters and over 2,600 firefighter supervisors at that time.  Together, these two groups comprised about 2/3 of the FDNY workforce in 2015.

19.     Racial discrimination was especially blatant against African Americans aspiring to become firefighters.  In 2015, only about 8% of firefighters and about 2% of firefighter supervisors were African-American, and those pitifully small percentages would have been even lower but for the litigation, *United States v. City of New York* in the Eastern District of New York, discussed in subsection V.E below.  Because of the continuing jurisdiction of the Eastern District over the injunctive relief contained in the settlement that resolved that lawsuit, African-American firefighter employees and job applicants are not part of any of the proposed Classes.

20.     The 2015 Workforce Report also shows that that over 3,800 employees worked in the EMS section of FDNY, about 22% of all FDNY employees.  The EMS employees primarily

consisted of over 2,400 EMTs, about 900 paramedics, and over 500 EMT supervisors

(collectively, the "EMS Positions").

21.     Over 50% of the EMS employees were minorities in 2015, and about 23% (over

850 employees) were African Americans.  Indeed, the City merged EMS into the FDNY in the

1990s to give the appearance of racial (and gender) diversity in the FDNY, rather than actually

attempting to diversify the almost exclusively white firefighter workforce. But even though

African Americans are employed in EMS in higher percentages than as firefighters, they still

experience discrimination in hiring, as discussed below.

22.     The EMS employees also were paid far less than firefighters in 2015 (and all

other years).  On average their salaries averaged only about 63% of firefighters' average salaries.

23.     The percentage of African Americans among the remaining 1,600 employees,

who are characterized as Civilian employees in this Complaint, has risen slowly since the 1960s,

but not evenly.  The positions occupied by Civilian employees (the "Civilian Positions") are

divisible into seven subgroups.  According to the 2015 Workforce Report, four subgroups had

over 50% white employment in 2015 and under 25% African-American employment.  The other

three subgroups had well under 50% white employment and 33% or more African-American

employment.  Not surprisingly, the four subgroups with greater white and smaller African-

American employment had much higher average salaries or wages (not including overtime)

($85,223) in 2015 than the other three subgroups ($52,709).  The average salaries or wages in the

primarily minority jobs were only 62% of the average salaries or wages in the primarily white

jobs:

**Primarily White Civilian Jobs Receive Much Higher Compensation at FDNY
Than Do Primarily Minority Jobs (2015)**

| Position | Number | Percent White | Percent Black | Percent Other | Average Salary/Wages |
|---|---|---|---|---|---|
| **Primarily White Jobs** | | | | | |
| Administrators/Managers | 148 | 63% | 18% | 19% | $117,831 |
| Professionals (Science, Health, Lawyers) | 183 | 53% | 14% | 33% | $ 92,877 |
| Craft/Operators | 342 | 72% | 12% | 16% | $ 79,870 |
| Management Specialists | 263 | 56% | 21% | 23% | $ 68,508 |
| Subtotals for White Jobs | 936 | 62% | 16% | 22% | $ 85,223 |
| **Primarily Minority Jobs** | | | | | |
| Para Professionals | 50 | 33% | 35% | 32% | $ 54,858 |
| Clericals/Clerical Supervisors | 437 | 42% | 33% | 25% | $ 52,515 |
| Other (primarily Laborers and Transportation) | 62 | 41% | 34% | 25% | $ 52,345 |
| Subtotals for Minority Jobs | 549 | 41% | 33% | 26% | $ 52,709 |
| Total | 1,485 | 54% | 22% | 24% | $ 73,203 |

24.     Overall, about 330 Civilian Employees in 2015 were African American, about 22% of the total number of Civilian Employees.

## V.   FDNY'S JOB SELECTION DECISIONS

**A.     FDNY Manipulates the City's Standardized Processes for Filling Vacant Positions Through Outside Hires or Promotions to Select Persons from Favored Groups**

25.     Most or all EMS Positions and Civilian Positions are civil service positions. Candidates for most but not all civil service positions must take and pass an exam before they can be hired. The positions for which tests are required are called the "competitive class." Each civil service job title has a different exam.  These exams, which are administered by NYC's Department of Citywide Administrative Services ("DCAS"), are supposed to test individuals on the skills and abilities that they need to do the job.

26.     There are two different types of civil service exams:  open competitive exams open to members of the public; and promotion exams open only to current City employees. Incumbent employees are not supposed to have any priority in receiving notice of or in filling positions subject to open competitive exams.  However, certain positions above entry level are limited to incumbent FDNY employees and are not open to the public.  For example, EMS positions above the entry-level EMT position are regarded as promotions, and are limited to EMS employees in lower positions.

27.     After each exam, DCAS creates an "eligible to hire" list.  This list has all candidates who passed the exam, ranked in score order.  When a New York City agency has a hiring need, it is supposed to contact candidates for that civil service job title for interviews in order of their ranked scores.

28.     While some civil service job titles in the New York City government are unique or virtually unique to FDNY, such as the EMS positions, most of the Civilian job titles are not. Thus, the "eligible to hire" lists provided to FDNY based on open competitive exams (as opposed to promotion only exams) should be identical to the "eligible to hire" lists provided to other government agencies seeking to fill positions with the same job titles.

29.     The manager of an organizational unit seeking to fill a vacancy generally receives the "eligible to hire" list, directly or indirectly, from DCAS.  Typically, FDNY, like other city agencies, conducts interviews of the candidates with the highest scores on the exams.  This interview typically includes not only the unit head and/or the unit head's representative, but also a representative of FDNY's Human Resources unit.  The HR representative generally is Donay Queenan, the head of the unit since 2004, or one of her direct reports to whom she delegates participation in the interview.

30.     Because DCAS refers the same pool of candidates to FDNY and to other agencies seeking to fill Civilian positions with the same civil service titles, the percentages of African American employees in the Civilian civil service positions at FDNY should be similar to the percentages of African American employees in the identical positions at other city agencies. But, as discussed in subsections V.B and C below, the percentages of African Americans in FDNY are far lower than in other agencies in the New York City government.  The gaps between the percentages of African American employees in FDNY and in other New York City agencies are especially pronounced in higher paying jobs.  Reasons for these disparities are set out in subsections V.E through V.G.

31.     In addition, FDNY management can, and frequently does, circumvent these standardized process by creating a particularized business title for a position and posting qualifications for that position that are tailored to the person whom management has predetermined should fill the position.  Often, the favored person is someone with the firefighter title who is unable to perform the functions of that position and is assigned to a different position on a "provisional" or "temporary" basis.  After posted qualifications for the business title are tailored to the provisional employee, that "firefighter" typically is offered the position after going through the interview process.

32.     Sometimes the skewing of the process through job qualifications is not individualized, as in the case of Fire Marshals.  Fire Marshals are among the highest paid job titles in FDNY; with overtime, many Fire Marshals earn in excess of $200,000 per year.

33.     In the 1970s, a requirement was added to the list of Fire Marshal qualifications that a candidate have previously served as a firefighter.  This qualification was added at a time that the FDNY began to integrate, but when virtually every firefighter was white.  Because of

this requirement and the FDNY's strong, decades-long resistance to black firefighters, Fire Marshal ranks remain virtually lily-white.

34.     Most Fire Marshals conduct investigations, like police detectives, while others provide security to Fire Department Headquarters, facilities, Fire Chiefs and the Fire Commissioner. Firefighters do not receive training in these duties.  Accordingly, new Fire Marshals are sent to an academy and are given extensive training before beginning to function as Fire Marshals.

35.     If the goal were to limit Fire Marshals to job titles that provided exposure to the duties of Fire Marshals, then the approximately 150 lowly paid Fire Protection Inspectors, most of whom are African American, should be eligible.  They have much more extensive exposure and training concerning causes of fires and fire prevention than does the average firefighter.

36.     This arbitrary, exclusionary policy has the effect of keeping African Americans, whether in or outside the FDNY, from attaining this prestigious, high paying position.

37.      Another means by which FDNY circumvents the City's efforts to create a race-neutral hiring process is to hire heavily into civil service positions for which DCAS has not created a standardized test.  For example, the City does not have a standardized test for Community Coordinators.  Although many clerical employees possess the qualifications to serve as Community Coordinators, which are higher-paying paraprofessional jobs, FDNY promotes very few clerical employees into Community Coordinator positions.  Instead, it fills most of the Community Coordinator positions with outside hires who have not had to pass a DCAS examination; these hires often are white.  As described later in this Complaint, for example, FDNY has twice passed over Plaintiff Liza Horsley's applications for promotion to Community

Coordinator positions in favor of hires of outside white candidates, even though she has not only a Bachelor's but also a Master's degree.

38.     In still another strategy, the Bureau of Technology and Development Systems within FDNY hired a group of "temporary," primarily non-African American, computer consultants, but converted many of them to permanent positions in FDNY.

39.     Although the strategies may vary somewhat, the purpose and effect is the same: to keep the FDNY the most racially discriminatory agency in the City.

**B.      FDNY Employs Much Lower Percentages of African Americans Than Other Agencies Throughout the New York City Government**

40.     Although the tests and job selection processes that FDNY are supposed to use to fill vacant positions are the same as those that the other agencies of the New York City government are supposed to use, the results are very different.  The table below compares the numbers and percentages of white and African American employees in each of the seven types of Civilian jobs listed in paragraph 23 above in the City government as a whole and in the FDNY, according to the 2015 Workforce Report.  The final column is calculated by dividing the percentage of African Americans in each of the seven job groups in FDNY, as well as overall, by the percentage of African Americans in the corresponding group for the City government as a whole, and thus reflects the shortfall in African Americans at FDNY (if any) as judged by this comparator group:

**Shortfalls in Employment of African Americans in Civilian Positions
at FDNY in 2015**

| Job Category | FDNY | | | NYC | | | Shortage of Black Employees |
|---|---|---|---|---|---|---|---|
| | Number | White % | Black % | Number | White % | Black % | |
| **Primarily White Jobs** | | | | | | | |
| Administrators/Managers | 148 | 63% | 18% | 23,526 | 48% | 27% | -33% |
| Professionals (Science, Health, Lawyers) | 183 | 53% | 14% | 26,026 | 34% | 28% | -50% |
| Craft/Operators | 342 | 72% | 12% | 10,431 | 59% | 19% | -37% |
| Management Specialists | 263 | 56% | 21% | 13,003 | 33% | 37% | -43% |
| Subtotals for White Jobs | 936 | 62% | 16% | 72,986 | 42% | 28% | -43% |
| **Primarily Minority Jobs** | | | | | | | |
| Para Professionals | 50 | 33% | 35% | 41,388 | 25% | 33% | +6% |
| Clericals/Clerical Supervisors | 437 | 42% | 33% | 32,652 | 23% | 46% | -28%% |
| Laborers and Transportation | 62 | 41% | 34% | 2,179 | 42% | 33% | +3% |
| Subtotals for Minority Jobs | 549 | 41% | 33% | 76,219 | 25% | 39% | -15% |
| Totals | 1,485 | 54% | 22% | 149,205 | 33% | 33% | -33% |

41.     The City's own numbers, set out in the 2015 Workforce Report, thus show that overall the FDNY employed only 67% of the expected number of African Americans in 2015 in Civilian jobs, using employment throughout the City government to determine the expected numbers.  Because there were 1,485 Civilian employees in 2015, this means that FDNY employed approximately 160 fewer African Americans than expected in Civilian jobs.

42.     The 2015 Workforce Report also reflects egregious underemployment by FDNY of African Americans in EMS.  As alleged above, the 2015 Workforce Report classifies EMS employees as Technicians, and the numbers reflect that virtually all FDNY Technicians were EMS employees.  The table below compares the racial demographics of Technicians at FDNY to the corresponding numbers for the remainder of the City Government.  The second column shows the number of Technicians and the percentages of white and black Technicians at FDNY. The third column shows the corresponding numbers for the remainder of the City Government. The final column reflects the ratio of the white percentage of the FDNY Technicians compared to the white percentage of Technicians in the remainder of the City Government and then the corresponding ratio for African American Technicians.

12

**Shortfall in Employment of African Americans in EMS Positions at FDNY in 2015**

|  | Technicians in FDNY | Technicians in Rest of City Government | Shortage of Black Employees |
|---|---|---|---|
| Number | 3,851 | 9,809 |  |
| African Americans | 23% | 52% | -56% |

Thus, based on the numbers for the City Government (not including FDNY), FDNY employed only about 44% of the expected number of African American EMS employees. Instead of 886 African American EMS employees, FDNY should have employed about 2,003 African Americans based on the City-wide numbers, a shortfall of about 1,117 African American EMS employees. Conversely, instead of 1,694 white EMS employees, FDNY should have employed only about 616 based on the City-wide numbers, an overemployment of about 1,078 whites in EMS positions.

43.    Upon information and belief, the disparities between the percentages of African Americans employed by the New York City government and FDNY in each job category and overall were as large or larger in 2004 (and earlier years) as they were in 2015. The disparities also were similar in each year between 2004 and 2015 and up to the present.

44.    The disparities between the percentages of African Americans employed by the New York City government and FDNY were largely a product of FDNY's racial discrimination in hiring. In 2014, the only year for which the City has reported comparative data in its Workforce Profiles, 41% of its hires overall were white employees and 27% were African Americans. But at FDNY, 59% were white and only 14% were African American. In other words, FDNY hired African Americans at only about half of the rate at which other City agencies did.

C.   **FDNY's Employment of African Americans Is Particularly Low in Higher Compensated Positions**

45.     The shortage of African Americans in FDNY's Civilian jobs alleged in paragraph 40 above is not uniform.  FDNY employed African Americans at only 57% of the expected rates in the four primarily white higher-paying job categories (Administrators/Managers, Professionals, Craft/Operatives, and Management Specialists) and at 85% of the expected rates in the three primarily minority lower-paying job categories (Para Professionals, Clericals/Clerical Supervisors, and Laborers and Transportation).  This difference reflects both that hiring discrimination at FDNY is more pronounced in the higher paying job categories than the lower paying job categories, and that FDNY discriminates in advancement of African Americans from the lower paying job categories to the higher paying job categories.

46.     Even within job categories, African Americans tend to be found disproportionately in lower paying jobs.  For example, in 2015 Clerical Associates were paid on average about $42,000, while Principal Administrative Associates were paid about $56,500 on average, *i.e.*, about 33% more.  There were approximately four times (400%) as many African American as white employees with the Clerical Associate job title in 2015, but only 50% as many African American as white employees with the Principal Administrative Associate job title that year.

47.     As another example, Computer Associates averaged about $10,000 less in compensation than Computer Specialists in 2015.  There were about equal numbers of white and African American Computer Associates in 2015, but four times as many white as African Americans in the higher-paying Computer Specialist position in 2015.

48.     The same pattern exists among EMS employees.  The hierarchy of principal EMS jobs, from lowest paid to highest, is emergency medical technician, paramedic, lieutenant, and

14

captain.  About 20-25% of EMTs, paramedics, and lieutenants are African American.  But, by Plaintiffs' count, only three of about 60 EMS captains, or 5%, are African-American.  Because of FDNY's extreme reluctance to promote an African American to a captain position, African-American EMS Lieutenants refer to themselves as "life-long lieutenants."  Unlike lower level promotions, which depend on passing a test administered by DCAS, advancement to a captain's position requires that a lieutenant be invited to interview for becoming a captain.  It thus combines a tap-on-the-shoulder system with a subjective evaluation process.  Not surprisingly, African Americans find that they seldom are invited to interview and regularly do not do well enough in the perception of the white officers who administer the interviews to be offered a captain's position.

49.     FDNY is fully aware from litigation of the difficulty that African Americans (and women) experience in attaining the rank of EMS captain.  In 2006, five female EMS lieutenants sued FDNY for discrimination because of repeated denials of promotion to the EMS Captain position.  The suit ultimately was settled, supposedly for multimillions of dollars.  Additionally, in 2011, a black female EMS Lieutenant filed a discrimination lawsuit charging that the FDNY repeatedly denied her promotion to the EMS Captain's position. The City also settled that case.

50.     While using interviews to block African American advancement in the EMS ranks, FDNY facilitated the advancement of white employees through a policy change in 2010 that has continued thereafter.  An employee has to be certified as a Paramedic before being promoted to a Lieutenant.  In 2010 FDNY began offering EMTs who had passed the test to be a Lieutenant but were not qualified as Paramedics a nine-month Paramedic training program.  The primary beneficiaries of the training were white employees (often serving as Chiefs' Aides).  The FDNY held up promotions for others who had passed the Lieutenant test until the Paramedic

15

training was complete, and then promoted the graduates to Lieutenant positions.  As a result, many white employees who never served as Paramedics were promoted over employees with years of experience as Paramedics, disproportionately racial minorities.

51.     Upon information and belief, in 2004 the disparity between the expected rates at which FDNY employed African Americans (measured by the employment rates of the New York City Government) and FDNY's actual rates of employment of African Americans in higher paying job categories was, as in 2015, greater than the disparity between the expected and actual rates at which FDNY employed African Americans in lower paying job categories.  The same was true for all years in between 2004 and the present.  The persistence of these disparities over time reflects a continuing pattern of racial discrimination in job selection decisions, especially into higher paying jobs.

**D.     The Experiences of the Plaintiffs and Class Members Reflect Discrimination in Job Selection Decisions Against Outside and Internal African American Applicants**

52.     African Americans who managed to be hired by FDNY frequently are assigned initially to job positions that pay less than the positions to which white employees are assigned. For example, Civilian class member Yvonne Moore and white employee Marina Ryappo were hired within a year of each other, in 2012 and 2013.  Although they were supposed to perform similar job duties, Ryappo was given a different job title, presumably as justification for a salary that then was about $18,000 more than Moore's, $82,361 to $64,463.  Despite being paid about 25% less, Moore often has to do the work of Ryappo, who spends a lot of her time out of the office shopping. Their supervisor, Assistant Commissioner Michelle Maglione, told Moore that she has to do Ryappo's work because "Marina does not get it."  As shown by the fact that she is performing Ryappo's duties, Moore is qualified to perform those duties.  Nothwithstanding

Moore's qualifications and Ryappo's poor job performance, Ryappo's salary in 2016 now

exceeds Moore's by almost $20,000:  $88,228 to $68,414.

      53.    African American employees also find it very difficult to advance at FDNY.  In

many instances, they apply unsuccessfully for posted vacant positions.  For example, when

Plaintiff Liza Horsley was hired as a clerical employee at FDNY in 1998, she did not have a

college degree.  While continuing to work full-time, she earned a Bachelor's degree in 2000 and

a Master's degree in Social Work in 2012.  During her 19 years at FDNY, she has applied

unsuccessfully for about ten positions for which she was qualified, including several positions at

the medical office directly related to her Masters in Social Work, but only twice even received

interviews.  She thus remains an overqualified Clerical Associate, with a salary of only $44,619

in 2016.

      54.    Horsley, like other African Americans, also finds it difficult to advance within her

own unit.  In 2014, she applied for a Community Coordinator position that opened within her

Fire Alarm unit.  The position was awarded to a white female who joined FDNY as a temporary

employee in 2011 and was earning about $37,000 as a Community Associate position in 2013.

As a result of the promotion, the successful applicant's salary jumped to $52,457 in 2014.

Horsley was denied despite her educational achievements, her 13 years of additional seniority,

and the fact that she was fully qualified for the position.  In 2016 the successful applicant had a

salary of $56,229, about $12,000 more than Horsley.  Horsley applied for a Community

Coordinator position within her unit again in 2017, but FDNY selected a white female who came

from an outside agency.

      55.    Plaintiff Stephanie Thomas has been stuck at the Computer Specialist I level since

she joined FDNY in 1989, despite her impressive credentials.  She holds a BA Degree in

Computer Science from Winston-Salem State University, and a Master's Degree in Project Management from Keller Graduate School of Management.  Before joining the FDNY, Thomas was employed as a Computer Consultant to some of the leading IT companies in the United States:  Burroughs Corporation, Pitney Bowes, Wang Corporation and Arthur Anderson.  Since joining the FDNY, Thomas has received The George F. Mand Administrative Award (awarded to an FDNY member whose services led to the improvement of the agency's services) and the NYC Excellence in Technology award (awarded to NYC technology employees who have performed in a stellar fashion; in Thomas' case, she served as Project Manager in a multimillion, City-wide, multi-agency technology project).  She also has received advanced training, such as the Installation and Deployment in Microsoft Dynamics and the DCAS-Project Management Professional Certification Training.  But all of her efforts to advance, even to move up to a Computer Specialist II or III level, have been rebuffed.  Prior to 2015, she applied for approximately seven promotions for which she was qualified, received only two interviews, and never was offered a position.

56.     Thomas recognized the need for management of projects involving technology before FDNY management did and obtained training in project management, and she has the office title of a project manager.  But her training and awards in project management have no more resulted in promotions than her training and awards in information technology.  Within the past two years alone, she has applied for seven different project management positions for which she was qualified that would have represented promotions and resulted in pay increases.  To the best of her knowledge, FDNY has filled five of the positions, all of them with white candidates.  At least one of the successful white candidates had only a high school degree.  Nor is Thomas the only African American so rebuffed.  At least three other FDNY African American employees

applied for three senior project manager positions posted October 25, 2016 but were not hired for either of the positions that have been filled.

57.     Similarly, Civilian class member John Dove has been an associate inspector in the Bureau of Fire Prevention, reporting to white director Alex Spektor, since he joined FDNY in 2008.  Over the years he has applied for promotions to three vacant positions, but in each instance the positions have been awarded to white applicants.  Two of the successful applicants, James Chiarchiaro in 2009 and Mark Remolino in 2012, were also associate inspectors.  The third successful applicant, Tara Anand, had joined FDNY only in 2012 and was not in the Bureau of Fire Prevention before her promotion in 2014 to the Bureau's Associate Project Manager position.  When Anand received the promotion, Spektor asked Dove to train her. Chiarchiaro and Remolino, who even before their elevation earned larger salaries than Dove, received 8% salary increases upon their promotions.  Anand saw her pay rate jump by about 50%, from $48,126 to $72,383.  By contrast, the pay rate of Dove, who has not had the benefit of any promotions or discretionary increases, has inched up from $54,141 in 2009 to only $58,046 in 2016, despite a series of outstanding ratings on his performance reviews.

58.     Plaintiff Arlene Simmons became an EMS lieutenant near the end of 2012. Having waited the required four years to apply, Simmons applied for a promotion to a captain position in September 2017.  She does not expect to be promoted.  As stated above, over 20% of lieutenants are African American but only about 5% of captains are.

59.     In other cases, it has been pointless for African Americans to apply because FDNY has preselected a white employee for a posted position.  For example, in June 2016, the Fiscal Services unit posted a new position for a Minority and Woman Owned Business Enterprise Manager.  Plaintiff Deborah Bowman, who had been employed by FDNY since 1987

and worked in that unit, met the posted qualifications and was interested in applying.  However, when she inquired about the position, she was informed that Fiscal Services Director Barry Greenspan was going to give the job to Shannon Cardone, a white employee who had been hired into the FDNY in 2012.  Bowman knew that she had little chance because the "fix was in." Indeed, Cardone received the position, and her salary jumped from $73,943 in 2015 to $88,700 in 2016, an increase of 20%.  Bowman, who has been an FDNY employee for 30 years, saw her salary increase from $64,463 to $66,075, an increase of 2.5%.  This was just one example of the difficulties that Bowman faced in receiving a promotion.  She applied unsuccessfully for at least seven promotions within FDNY between 2004 and the present.  The only promotion that she received she did not apply for.  In 2012 FDNY changed her title from Principal Administrative Associate to Administrative Manager because she passed a DCAS promotional test automatically entitling her to the Administrative Manager title, not as a result of a competitive posting.  At that time, she received an approximately 8% salary increase that seems, in general, to be the limit for African American employees – but not white employees such as Cardone – receiving a promotion.

60.     Plaintiff Debra Poe, like Bowman, is an Administrative Manager whose only promotion at FDNY came six years ago after she passed the DCAS promotional test (but received only a 4.5% pay boost).  Poe is interested in an Executive Assistant position, and has the qualifications because most of the Executive Assistants are either Principal Administrative Associates or Administrative Managers.  However, she knows that there is no need to apply because the positions are preselected if they are even posted.

61.     Preordained promotions for white employees would occur even more frequently but for occasional concerted actions by disfavored black employees.  In 2016, the FDNY posted

a job announcement for "Deputy Director, Public Certification and Testing" in the unit of Bureau of Fire Prevention Director of Public Certification Steven Ertrachter.  Civilian class member Brenda McKiver expressed interest in the position to Ertrachter, who responded, "Brenda, you can apply for it, but you're not going to get it."  McKiver soon learned that the position had been created for a white employee, Maryana Chouchereba, that FDNY's Assistant Commissioner for Finance & Budget Steve Rush had already approved a title change and salary increase for her, and that Chouchereba had her new business cards printed with the "Deputy Director, Public Certification and Testing" title even though no one had been interviewed for the position and no selection had been announced.  McKiver complained to McKavanagh.  Presumably as a result of the complaints of McKiver and other employees, the FDNY rescinded the job posting.  But FDNY gave Chouchereba a consolation prize, an increase in her salary from $65,417 to $75,620, an increase of about 15.6%.

62.     Sometimes white employees are promoted without FDNY going through the charade of a posting.  In 2014, white employee Natalia Zorina was promoted to a new supervisory position within the pension unit under Assistant Commissioner for Budget & Finance Rush.  Civilian class member Debra Person had been responsible for many years for many of the duties of the supervisory position.  However, Person never had an opportunity to apply for the new position because it was never posted.  Zorina, whose salary already was about $3,600 greater than Person's, received an 8% increase as a result of the promotion, further increasing the pay gap between them.  Person raised the lack of a posting with Director Mary Basso, to which Basso responded, "Well, that's my decision."

63.     On other occasions, FDNY denies African Americans promotions that reflect the job duties that they actually are performing.  For example, in 2015 Civilian class member Carline

Germain was promoted to a position with the office title of Executive Assistant for the Chief of

Fire Prevention with the provisional civil service title of Administrative Manager.  Within weeks

of her appointment, she began assuming a plethora of responsibilities in addition to the duties in

her job description.  In mid-2016, her unit head, Ronald Spadafora, requested that her office title

be changed from Executive Assistant to Director of Special Projects and Events (while retaining

her Administrative Manager civil service title) and her salary increased to $95,000 from about

$62,500 annually.  Germain was informed that FDNY's Assistant Commissioner for Finance &

Budget Steve Rush denied the request without explanation.  Several weeks later, her direct

supervisor, Acting Chief of Fire Prevention Thomas McKavanaugh, submitted a second request

again asking that her office title be changed to "Director of Special Projects and Events," and

that her salary be increased to $87,000.  Again, Rush denied the request without explanation.  To

date she has continued to perform a laundry list of responsibilities in addition to the duties

anticipated when she was hired for the position.  She still has not received a raise commensurate

with her responsibilities.

        64.     FDNY even demotes African Americans in situations in which white employees

are not.  After working for seven years as a provisional Administrative Staff Analyst, Plaintiff

Annette Richardson was demoted in April 2017 to an Associate Staff Analyst Level I and her

salary was reduced by about $1,000.  This reduction occurred even though her job duties

remained the same and her performance was not deficient.  FDNY could have given her another

provisional title, as it did Jack Gridley, her predecessor as the head of the Human Resources

Information Services function, but instead it chose to demote and reduce her compensation.  .

**E.**     **FDNY's History and Culture of In-Group Favoritism and Racial Discrimination**

65.     The underemployment of African Americans in EMS and Civilian jobs and the experiences of the Plaintiffs are consistent with FDNY's long history of discriminating against African Americans as firefighters.  During the past 50 years, two large, successful class action lawsuits against the City of New York have claimed that the FDNY has discriminated against African Americans and Hispanics in the hiring of firefighters.  Although the lawsuits involved applicants for firefighter positions rather than EMS and Civilian employees and applicants, the lawsuits are relevant because of the resistance to integration exhibited by high levels of the FDNY.

66.     Almost 45 years ago, in 1973, Judge Weinfeld of the Southern District of New York after a bench trial held that the City's written and physical examinations for entry-level firefighters violated the Equal Protection Clause because of their discriminatory impact on African American and Hispanic applicants.  *See Vulcan Society of New York City Fire Dep't, Inc. v. Civil Serv. Comm'n*, 360 F. Supp. 1265, 1269 (S.D.N.Y.), *aff'd in relevant part*, 490 F.2d 387 (2d Cir. 1973).  The Vulcan Society, the plaintiff, was established in 1940 by a group of Black firefighters to provide mutual support necessitated by the blatant segregation of the FDNY.  The judge ordered that at least 25% of the new hires for firefighter positions be racial minorities, and ordered defendants to create a new examination that did not discriminate against African Americans and Hispanics. *Vulcan Society of New York City Fire Dep't, Inc. v. Civil Serv. Comm'n*, 490 F.2d at 391.

67.     The efforts to integrate the firefighters ended with the expiration of the *Vulcan Society* injunction:

> The Vulcan Society injunction lapsed in 1977.  That year, the City abandoned the 3:1 hiring ratio and instituted a hiring procedure that required applicants to take a

cognitive examination and demonstrate minimum appointment requirements such
as college credits, a driver's license, and certified first responder with
defibrillation training.

The subsequent history of the FDNY demonstrates that whatever practical effect
Judge Weinfeld's injunction may have had on minority hiring dissipated shortly
after the injunction expired. Indeed, the history suggests that any such effect
constituted little more than a brief departure from an otherwise relentless pattern.
In 1963, ten years before the Vulcan Society litigation, 4.15% of all FDNY
employees (including non-uniformed employees) were black. In 1971, that
number was essentially unchanged. At the time of the Vulcan Society litigation,
blacks and Hispanics constituted 32% of the City's population, but only 5% of the
Department. In 1990, almost two decades later, blacks made up 29% of the City's
population, but only 4% of firefighters. In 2002, 25% of the City's residents were
black, compared to only 2.6% of its firefighters. Between 1991 and 2007, black
firefighters never constituted more than 3.9% of the force, and by the time this
case was filed in 2007, the percentage of black firefighters in the FDNY had
dropped to 3.4%.

*United States v. City of New York*, 683 F. Supp. 2d 225, 241 (E.D.N.Y. 2010) (citations

omitted).

68.    During the 30 years between 1977 and 2007, the employment of African

American firefighters in the FDNY lagged far behind the employment of African Americans in

other uniformed services in New York, such as the police. *Id.* at 233.

69.    In response to the ongoing discrimination, the United States brought suit in May

2007 in the Eastern District of New York against the City under Title VII alleging that the City's

procedures for screening and selecting applicants for entry-level firefighter positions

discriminated against black and Hispanic applicants under a disparate impact theory. *United

States v. City of New York*, 683 F. Supp. 2d 225, 233 (E.D.N.Y. 2010) (summarizing procedural

history). In September 2007, the court permitted the Vulcan Society and three individuals to

intervene. The intervenors differed from the United States by claiming that defendants had

engaged in a pattern or practice of intentional discrimination against black applicants. *Id.* at 234

(discussing procedural history).

70.     In July 2009, Judge Garaufis granted the motion for summary judgment filed jointly by the United States and intervenors on their prima facie case of disparate impact and on the City's business necessity defense, thereby establishing that the City was liable for disparate impact discrimination under Title VII. *United States v. City of New York*, 637 F. Supp. 2d 77, 82-83, 132 (E.D.N.Y. 2009).

71.     The next year, Judge Garaufis granted the intervenors' motion for summary judgment on their pattern-or-practice claims as well. Although the Second Circuit later reversed and remanded, concluding that there were disputed issues as to some facts, it did not disturb Judge Garaufis' finding that the Vulcan Society and other intervenors presented

> convincing evidence that the City, its agencies, and relevant decisionmakers have been aware that the FDNY's hiring procedures discriminate against black applicants and have nonetheless refused to take steps to remedy this discrimination. Over several years, the EEPC [the City's Equal Employment Practices Commission, an independent, non-mayoral entity charged with monitoring the compliance of City agencies with the City's EEO policies] repeatedly informed Commissioner Scoppetta and his predecessor that the preliminary results of Exam 7029 revealed a wide disparity between the pass rates of white and black test-takers . . . .  Neither Commissioner took corrective action, despite a municipal law requiring them to assess the discriminatory impact of the FDNY's hiring practices and to explore viable alternatives. When the EEPC sent a report documenting the FDNY's hiring disparities and compliance failures to Mayor Bloomberg, he responded that he was satisfied with the FDNY's efforts.

*United States v. City of New York*, 683 F. Supp. 2d at 250-51 (citations omitted).

72.     Mayors as well as FDNY executives ignored the information provided by the EEPC discussed above, New York City's Public Advocate and multiple other high-ranking government officials concerning racial discrimination during the hiring process and entreaties to these officials to treat black applicants equally. *See United States v. City of New York*, 2011 U.S. Dist. LEXIS 115074, at *16-21 (E.D.N.Y. Oct. 5, 2011). Judge Garaufis summarized that the FDNY had engaged in "34 years of intransigence and deliberate indifference, bookended by

identical judicial declarations that the City's hiring policies are illegal." *United States v. City of New York*, 683 F. Supp. 2d at 262.

73.     The intransigence and deliberate indifference continued even in 2010 while the litigation was ongoing.  The City administered a new test afflicted with the same defects as the old one, and not surprisingly, it again had an adverse impact on African American and Latino applicants.  Judge Garaufis gave the City five alternatives to modify the results so that its hiring more closely approximated the percentages of various minority groups taking the test.  *United States v. City of New York*, No. 07-CV-2067 (NGG) (RLM), 2010 U.S. Dist. LEXIS 95083 (E.D.N.Y. Sept. 13, 2010).  But instead of adopting one of these alternatives, the City stated that "[e]very one of the five proposals from which the Court [was] allowing the city to select involve[d] some form of race-based quota" and stated that it would not hire at all until it developed a new test.  Hal Budnick, *Smoking Out Racism in the FDNY: The Dwindling Use of Race-Conscious Hiring Remedies*, 77 Brook. L. Rev. 1249, 1270 (2015), available at: http://brooklynworks.brooklaw.edu/blr/vol77/iss3/9.

74.     The City appealed the grant of summary judgment on the disparate treatment claim, and the Second Circuit reversed in 2013 on the basis that the City had articulated a nondiscriminatory reason for its continued use of the tests that was sufficient to survive summary judgment.  The appeals court remanded for a trial on the issue of whether the FDNY had intended to discriminate against African American and Latino applicants for firefighter positions.  *United States v. City of New York*, 717 F.3d 72, 91 (2d Cir. 2013).

75.     Two years later, in 2015, the parties entered into a settlement concerning both monetary relief and injunctive relief.  The settlement concerning injunctive relief includes creation of the position of Chief Diversity and Inclusion Officer, discussed below.  Under the

settlement the percentage of black firefighters has increased, but African American EMS and Civilian Employees have not experienced similar gains.

76.     Until the settlement of the *United States v. City of New York* litigation, FDNY leadership and rank-and-file were overwhelmingly of Irish and/or Italian descent, and had been for a century or more.  Irish and Italian administrators and managers tended to select young adults whose parents, ancestors and/or neighbors had worked in the agency for employment in the "family" business.  As a result, African Americans and other racial minorities were largely excluded, as even authors sympathetic to those Irish and Italian administrators and firefighters recognized.  *See* Tom Deignan, "Is the FDNY Racist?", at

http://www.irishabroad.com/news/irishinamerica/columnists/Sidewalks/isthefdnyracist.asp;

Terry Golway, "The Irish are forever in the ranks of New York's bravest," at

http://belfastmediagroup.com/the-irish-are-forever-in-the-ranks-of-new-yorks-bravest; Niall

O'Dowd, "End of an era of Irish domination in NY Fire Department," at

www.irishcentral.com/opinion/niallodowd/end-of-an-era-of-irish-domination-in-ny-fire-department.

77.     While Mayor de Blasio made some changes at the top of FDNY in response to the settlement of the *United States v. City of New York* litigation, including most notably the replacement of Salvatore Cassano with Daniel Nigro as the head of the FDNY in 2014, these changes have not significantly altered the makeup of the managers engaged in job selection decisions or the culture of in-group favoritism and discrimination against African Americans. Indeed, Nigro, who had retired from the FDNY in 2002, still consults Cassano concerning important decisions affecting the FDNY.

**F.      The Existence of a Small Group of Decision-Makers, Almost None of Whom Is African-American, Facilitates Racially Discriminatory Job Selection Decisions**

78.      The FDNY has approximately 30 bureaus and offices, most of them with multiple units.  The bureaus and offices are typically headed by employees with titles such as assistant commissioner, deputy commissioner, or "chief" of something, such as chief of operations, chief fire marshal, or chief medical director.  Many of the larger units within bureaus and offices also are headed by persons with these or other managerial titles.  Employees who provide input into job selection and pay decisions, who are collectively called "Department Leaders," are not included within the proposed class.  Plaintiffs estimate that in 2016 there were between 50 and 100 department leaders in FDNY over departments with Civilian and EMS employees.

79.      Throughout the period from 2004 until the present, very few of the Department Leaders have identified as African American.  Almost all Department Leaders identify as non-Hispanic white, although the head of the Bureau of Human Resources throughout this period, Donay Queenan, identifies as biracial.

80.      As discussed above, before a Departmental Leader can create a new position or fill a vacant position, he or she requires approval from Queenan and Assistant Commissioner for Budget & Finance Rush.

81.      Queenan, or somebody from the HR unit whom she designates, often participates in the evaluation of candidates (both internal and external) to fill the positions, including in any interviews of the candidates.  The decision about which candidate to select usually involves the Departmental Leader, possibly other participants from the unit, and Queenan or another human resources employee whom she has designated.

82.     To the extent that the salary or wage rate of the selected candidate is not dictated by a collective bargaining agreement, as discussed in Part VI below, Rush must approve that salary or wage rate.

83.     No individual or unit oversees or reviews the decisions reached by these decision-makers.  A Personnel Review Board has reviewed the decisions concerning firefighters, but not the personnel decisions for EMS and Civilian employees.

84.     In sum, between 2004 (and before) and the present, a small number of managers, almost all of whom identify as white, has made job selection decisions for EMS and Civilian positions at FDNY.  Other than through retirements, these decision-makers have experienced little turnover since 2004.  The decision-makers overwhelmingly have shared or acquiesced in a culture that favors Irish, Italian, and other employees of European origin and fosters resistance to and discrimination against African Americans.

**G.     FDNY's Failure to Adopt or Systematically Implement Established Human Resources Techniques Also Facilitate Racially Discriminatory Job Selection Decisions**

85.     FDNY has failed to adopt or systematically implement at least four human resource practices that other organizations have widely adopted to try to ensure fair and non-discriminatory decisions.  The failure to adopt these practices has facilitated the pattern of discriminatory job selection decisions discussed above.

86.     *Performance Reviews.*  First, FDNY has failed to implement a rigorous performance appraisal system.  As a result, the agency does not have a record of unbiased evaluations to review when an employee seeks advancement, making it easy to inject subjective and biased factors into the decision-making process.

87.     FDNY almost never conducted performance appraisals until approximately 2010, when the City's Department of Citywide Administrative Services ("DCAS"), which is

responsible for supporting City agencies' workforce needs in recruiting, hiring and training City employees, insisted that FDNY adopt a program of annual performance appraisals.

88.    Since then, FDNY has implemented a performance appraisal system, but since adoption it has been flawed in design in multiple ways, including but not limited to:

- FDNY does not require appraisals for administrators and managers, only non-managerial employees;

- FDNY does not provide training or meaningful guidance on how to write objectives for an employee for a year in a S.M.A.R.T. (specific, measurable, achievable, results-focused, and time-bound) manner so as to enhance objectivity in measurement;

- FDNY requires that an employee should receive one of five ratings on each objective (outstanding, very good, good, conditional, and unsatisfactory), but provides no clear means of distinguishing between these ratings.  For example, FDNY explains that an outstanding performance "far exceeded the standards" while a very good performance "significantly exceeded the standards," without explaining how to distinguish between "far" and "significantly" exceeded the standards;

- FDNY then completely undermines the rating process by providing that the overall rating should take into account "individual task ratings," "priority of the different tasks," "lateness patterns," "absence patterns," "interactions with co-workers," "unanticipated projects that were undertaken," and "contribution to unit or organization goals," without providing any guidance as to how to evaluate or factor into the overall rating the last six of those factors;

30

- Except in rare instances, such as promotion to EMS captain, FDNY does not define how ratings should be factored into job placement decisions, if at all.  Only otherwise qualified persons who have received an "excellent" or "very good" overall performance evaluation from the previous year will be considered for promotion to EMS captain.  As a result of the many deficiencies in the design and implementation of the performance appraisal system, relatively few African American lieutenants can meet this rating requirement.

89.     FDNY also has implemented the appraisal system in a flawed manner since 2010. Many, if not most, African Americans still do not receive annual performance evaluations.  For example, Civilian class members Brendan Mahon and Frances Dempsey have not received performance evaluations in the past four years, while Yvonne Moore received an evaluation in 2015 – her only evaluation in the past four years – but only because she wrote it and her supervisor then signed it.  And Civilian class member Brenda McKiver received an evaluation in 2016, the only one she has received for the past twenty years!  FDNY simply does not monitor to ensure that managers engage in the mandated evaluation process.  Without regular reviews for all employees, FDNY cannot effectively use reviews in job placement decisions, even if the review process was well designed.

90.     FDNY's failure to give annual performance evaluations to African American employees can severely impede those employees' ability to advance or receive discretionary pay increases.  For example, the collective bargaining agreement between the City and the Organization of Staff Analysts, the union representing Associate Staff Analysts such as Plaintiff Annette Richardson, and the collective bargaining agreement between the City and Communication Workers of America Local 1180, the union representing Clerical Associates,

Principal Administrative Associates, and Administrative Managers such as Plaintiffs Deborah

Bowman, Liza Horsley, and Debra Poe and provide that discretionary increases are "limited to

employees with above-average ratings on their annual performance evaluations. A copy of the

performance evaluation must be submitted to the Department of Personnel and the Mayor's

Office with the Monthly Planned Action Report." Thus, an employee who does not receive an

annual performance evaluation is not entitled to a discretionary increase no matter what his or

her level of performance.

91.     *Posting of positions.*  DCAS requires FDNY to post all vacant non-managerial

positions so that all interested employees and potential employees can submit a timely

application.  This is not peculiar to the City of New York; posting is generally accepted among

human resource professionals, partly to avoid the bias and favoritism associated with a tap-on-

the-shoulder system.  But as the experiences of Plaintiffs and Class members show, FDNY

frequently has not posted vacant, non-managerial positions (and never posts vacant managerial

positions to which Class members may aspire) since 2004 (if not before) or has prepared and

posted them in a manner that precludes a fair competition for vacant positions.

92.     FDNY circumvents fair competition through posting of open positions in at least

three ways.  Sometimes it does not post vacant positions that it intends to fill and just taps an

employee to fill them.  Sometimes postings are a sham because managers have preselected the

person to fill the position.  And sometimes it decides to give a job permanently to an employee

who has been filling a position provisionally on the excuse that the employee already knows how

to perform the job duties.  Almost inevitably, FDNY gives white employees – not African

Americans – positions without requiring open competitions for them.

32

93.     *Reducing reasons for selections to writing.*  Human resource professionals also urge that decision-makers be required to reduce to writing the reasons for selecting a person to fill a vacant position.  Although the stated reasons may be pretextual, the requirement of written reasons somewhat controls discriminatory decision-making when a rejected candidate has superior qualifications based on the factors that the decision-maker identifies as determinative.  To the best of Plaintiffs' knowledge, FDNY has not required decision-makers to reduce their reasons for selecting a particular candidate to writing at any time between 2004 (and before) and the present.

94.     *Monitoring of decisions for discrimination.*  A properly functioning human resources department monitors both individual job selection decisions and the statistical pattern of decisions over a period of time, such as annually.  Because, to the best of Plaintiffs' knowledge, FDNY does not require decision-makers to reduce their reasons for each decision to writing, it would be very difficult for the agency to review job selection decisions for possible illegal discrimination.  As it is, FDNY makes no effort to review those decisions proactively, only after the fact if a passed-over employee chooses to complain internally or to initiate legal proceedings.

95.     FDNY also does not monitor the statistical pattern of job selection decisions on an annual or other basis.  In view of the judicial findings about the discrimination in which the FDNY engaged in hiring firefighters, the need for monitoring to prevent similar discrimination against African American and other minority employees in EMS and Civilian positions has been obvious.  The failure to implement a rigorous monitoring program is, at best, reckless, and at worst evidence of tolerance of intentional discrimination at the highest ranks of FDNY.

96.     For many years, FDNY has not cared enough about discrimination to create an office responsible to and capable of engaging in necessary monitoring.  The Bureau of Human Resources in 2017 had approximately 70 employees, but half of them are engaged in investigations of outside applicants for employment and none of them engages in monitoring duties.  Instead, in addition to investigations, HR employees are engaged in activities such as managing applications for leave, personnel files, and the human resources information systems.

97.     The Settlement Agreement that ended the litigation in 2015 provided for a new executive FDNY position, the Chief Diversity and Inclusion Officer ("CDIO"), to report directly to the Fire Commissioner, the head of the FDNY.  The Agreement provides that the CDIO will be responsible, among other duties, for "promoting diversity in the FDNY and expanding awareness of the value of full inclusion of firefighters from all racial and ethnic groups."  The Agreement contemplates that the CDIO will, among other tasks, oversee the FDNY's internal EEO Office, including identifying EEO resource and enforcement problems in order to improve the EEO system. *United States v. City of New York*, 308 F.R.D. 53, 66-67 (E.D.N.Y. 2015).

98.     Judge Garaufis welcomed the creation of the CDIO position, explaining that

enhanced minority recruitment is an appropriate remedy in this case; accordingly, efforts by a high-ranking FDNY official to encourage such enhanced recruitment would also be welcome. The court has previously discussed deficiencies of the FDNY's EEO Office, and required in the Modified Remedial Order that the City reassess the FDNY's EEO program in order to make substantial changes. Any help in that process by an FDNY executive tasked with promoting diversity would also be welcome.

*United States v. City of New York*, 308 F.R.D. 53, 67 (E.D.N.Y. June 5, 2015) (citations omitted).

99.     Fire Commissioner Nigro, under direction from the Mayor's office, has selected two persons, first Pamela Lassiter and then Cecilia Loving, to fill the position of CDIO.  Neither of them has the skills and/or experience to be effective in that position.  When Lassiter was terminated after less than a year on the job, she had done nothing to monitor or address statistical

disparities in the rates at which whites and African Americans had been selected to fill EMS and Civilian job positions, let alone racial disparities in compensation.  Loving similarly has not attempted to monitor, let alone address, any racial disparities in job selections or compensation.

100.    The FDNY's EEO office, which reports to the CDIO, is no more capable of monitoring.  In 2011, Judge Garaufis found that the FDNY's EEO Office was "woefully under-funded and fails to effectively carry out its responsibilities to ensure the FDNY's compliance with the EEO laws."  *United States v. City of New York*, 2011 U.S. Dist. LEXIS 115074, at *46 (E.D.N.Y. Oct. 5, 2011).

101.    After giving testimony in the *United States v. City of New York* litigation that put the FDNY in an unfavorable light, Lyndelle Phillips, who had served as the Assistant Commissioner of EEO for four years, was demoted in 2011 and terminated in 2012.  She never was allocated sufficient budget to monitor the job placement decisions throughout the FDNY.  Phillips sued the City for racial discrimination and retaliation.  Phillips was replaced by Margo Ferrandino, who quietly transferred to a different agency in early 2015.  The position remained vacant until 2016, when Don Nguyen was appointed to the position.

102.    As the New York Daily News reported, "The FDNY's EEO office has always been a sore spot within the agency . . . .  Many firefighters and EMS personnel — of all races and genders — have been frustrated by slow investigations and ongoing probes that don't seem to yield clear conclusions . . . ."

103.    The EEO unit's budget has been increased under Nguyen, but its focus remains almost exclusively on investigating complaints rather than also monitoring to determine whether the statistical pattern of job placement and compensation decisions is adverse to African Americans or other protected minorities.  Most of its approximately 14 employees in 2017 were

lawyers engaged in investigations of individual discrimination allegations by employees and not on monitoring.

104.    As a result of the long-standing failures in the mission and capabilities of the FDNY's EEO office and of the failure of the CDIO to effect the types of changes contemplated by Judge Garaufis, FDNY has allowed the types of discrimination in job placement decisions discussed above to proceed unabated.

105.    The City has not stepped into the breach caused by the inadequacies of FDNY's Human Resources, CDIO, and EEO office to monitor FDNY personnel decisions for racial discrimination, even though it should know, not only from the *United States v. New York* litigation, but also from its own Workforce Profile reports, that racial employment numbers at FDNY are strikingly different than in the rest of its workforce.

## VI.   COMPENSATION DISPARITIES AND DISCRIMINATION

### A.    A Small Group of Decision-Makers Makes or Approves Discretionary Pay Decisions at FDNY

106.    Each of the EMS and Civilian class members, as well as their counterparts of other races, is subject to a collective bargaining agreement between the City and one of several different unions.  These CBAs prescribe minimum salaries or wage rates for each job title covered by the CBA.  Many of the CBAs provide minimum salaries or wage rates for each level within each job title covered by the CBA.  For example, there are four levels of Principal Administrative Associates, each with a CBA-prescribed minimum salary or wage rate.  In addition, the CBAs prescribe mandatory compensation increases, if any, each year for all employees.

107.    As a result, wage or salary differentiation among employees with the same job title and level can occur at only three times:  when an employee is first hired by FDNY and

FDNY agrees to pay him or her more than the minimum for the position and level; when an FDNY employee changes job titles or levels and FDNY agrees to pay him or her more than the minimum for the position and level; and when FDNY decides to give an employee an increase in pay that exceeds the raise mandated by the applicable CBA for all employees within that position and level.

108.    A Department Leader may recommend a wage rate or salary for a new or promoted employee.  However, the Department Leader may not award that pay level without the approval of Assistant Commissioner Rush.  He typically decides whether to approve a salary, wage rate, or increase in excess of the minimum only after consulting with Queenan.  As a result, Rush has pay-setting power, and Queenan has pay-setting influence, for all newly hired or promoted members of the proposed Classes.  This facilitates discrimination in compensation.

109.    Discretionary increases are made twice a year.  Rush establishes a discretionary increase budget for each department.  The Department Leaders next make recommendations concerning increases for favored employees.  The recommendations are then considered by an approximately four or five person committee that includes Rush and Queenan.  The FDNY bestows increases only on employees and in amounts approved by the committee.

110.    Rush has a stated practice of not permitting increases in prior pay of over 8%, including when an employee is first hired by FDNY, receives a promotion, or receives a discretionary increase.  However, this is not a stated policy or even a regular practice of FDNY.  Rather, Rush and Queenan wield the 8% limit like a cudgel against African Americans to hold down their increases, but frequently ignore the supposed limit for white employees.

**B.**   **Data Reflects Significant Racial Differences in Salaries or Wage Rates for Employees in the Same Position**

111.   Information concerning the job title, salary or wage rate, and total compensation of each FDNY employee in each year from 2008 through 2016 is publicly available.  Although the publicly available information does not contain race information, Plaintiffs have identified the race of many of the employees with certain job titles in order to compare the salaries or wage rates of African American employees in those job titles with the salaries or wage rates of white employees in the same job titles in the same year.  Plaintiffs do not know the race of all employees, but know the race of sufficient percentages to make meaningful comparisons.

112.   The pay of Administrative Staff Analysts provides a flagrant example of huge pay disparities between white and African American employees sharing the same job title.  Plaintiffs were able to identify the race of 25 ASAs in 2016 who were white and seven ASAs that same year who were African American.  The median salary of the 25 white ASAs in 2016 was about $125,000, while the median salary of the seven African American ASAs was about $87,000.  Not one African American ASA has a salary equal to the median salary for the white ASAs.  The difference in median compensation was about 44%.

113.   The meteoric rate at which the compensation of white ASAs can rise is exemplified by white employee Timothy Keppler, who initially joined the FDNY as an Administrative Staff Analyst Trainee on May 26, 2015.  His starting salary was $45,299.  After only about a year, on June 13, 2016, the FDNY promoted Mr. Keppler to the position of Administrative Staff Analyst with an over 25% raise in salary to $57,590.  On June 25, 2017, Keppler was again promoted to the position of City Resident Scientist (a non-civil service title given to him by FDNY HR) and his salary skyrocketed from $57,950 to $90,425, although his civil service title and his essential job duties remained unchanged.  Between May 2015 and June

38

2017 his salary virtually doubled.  The median salary of the seven African American ASAs is about $3,000 less than Keppler's, and they have worked far more years as ASAs for FDNY than has Keppler.

114.    Most black employees at FDNY, even those who have labored for 25 years or more, make a mere fraction of Keppler's current $90,425 salary, regardless of work performance. No Plaintiff, and to the best of Plaintiffs' knowledge no class member, has received close to a 100% increase over the course of two years, or even over the course of ten years.

115.    ASAs are not alone.  Of the 13 Computer Associates whose race Plaintiffs were able to identify in 2015, the median salary in 2015 of six white Computer Associates was $74,605, while the median salary in 2015 of seven black computer associates was $62,490.  The difference in median compensation is about 19%.

116.    Based on these examples, it is reasonable to believe that statistically significant disparities exist between the compensation of white and African American employees in many job titles.

117.    The publicly available records reflect disparities between the compensation of white and African American employees in pay throughout the 2008-15 period.  It is reasonable to infer that the disparities were as large or larger in 2004 (and earlier years) as they were in 2015.

C.    **The Experiences of Plaintiffs and Class Members Illustrate the Compensation Disparities Reflected in the Statistical Data**

118.    Plaintiff Annette Richardson illustrates the compensation discrimination that African Americans face when they first assume a position, creating a disparity with white employees that they may never be able to bridge.  Richardson, who had joined FDNY in 2006, successfully applied in 2009 for the position of Director of Human Resource Information

Systems that had been occupied by Jack Gridley, a white male, until he retired.  Gridley's salary had been about $103,000 annually, and he had the job title of Administrative Community Relations Specialist.  Richardson asked for a comparable salary, but was told that she would not receive more than an 8% salary increase.  FDNY also gave her a different civil service job title, Administrative Staff Analyst.  Richardson acquiesced and assumed the ASA position with the office title of Director, HRIS at the starting salary of $69,971 dollars annually, 33% less than Gridley had been paid.  Subsequently, Richardson learned that many persons who are promoted or hired to fill vacant positions receive salaries comparable to the people they replaced and are not limited to 8% salary increases.  Richardson's salary currently is only about $80,000, still about $23,000 less than Gridley's had been.

119.    Disparities in discretionary pay increases are a frequent issue.  In 2007, Assistant Commissioner James Basile informed Plaintiff Deborah Bowman, who was then working at the FDNY's Fleet Services unit located in Long Island City, that he had requested a 4% discretionary salary increase for her and her co-workers.  Bowman's white co-workers subsequently received their discretionary salary increases, but she did not. Basile informed Bowman that he did not know why her salary increase was not approved by FDNY Headquarters, but later told her that her name had been included on the increase list by mistake.  She then sent an email to Assistant Commissioner Rush asking for an explanation, but he never responded to her email.  FDNY's failure to give Bowman discretionary pay increases has continued, and currently, her pay is in the lower third of Administrative Managers, even though she has a Bachelor's degree, which many Administrative Managers do not, and even though she has been an employee of FDNY for 30 years.

120.     In 2013, Bureau of Technology and Development Systems Chief Information

Officer (CIO) Joel Golub asked Plaintiff Dino Riojas to assist in resolving a vexing database

issue for the agency involving the migration from the use of the Windows XP to the Windows 7

application, which was set for April 8, 2014.  Riojas was tasked with ensuring that data in over

2,800 Access databases was not lost or corrupted in the migration.  He performed this task

without assistance and successfully completed it on time.  Both CIO Golub and Director Cheng

thanked him for a job well done.  The FDNY, however, did not reward him monetarily, which is

not surprising because in his 35 years as a Computer Specialist for FDNY, Riojas has not

received a single discretionary increase.  The impact of the denial of discretionary increases can

be seen by comparing the changes in salaries of the five persons who have worked as Computer

Specialists between 2012 and 2016 whose salaries in 2016 were immediately larger than Riojas'

and the five persons whose salaries in 2016 were immediately lower.  None of these ten

comparators was African American.  The salaries of Riojas and three other employees (Carla

Murphy, Robert Neistein, Ching Tsang) rose only the CBA-mandated approximately 7.2%.  The

salaries of the seven other Computer Specialists (Xueliang Fang, Sam Feldman, Shan Guo, Tuan

Nguyen, Rebecca Qiu, Zemfira Shapiro, and Linda Shang) jumped between 15 and 25% because

of discretionary increases.  The difference for Riojas in 2016 salary between a 25% increase and

a 7% increase was about $17,000.

121.     The only other African-American Computer Specialist, Plaintiff Stephanie

Thomas, not only has been confined to the Computer Specialist I level for almost 30 years as

discussed above, she also has not received any discretionary increases.  Her annual compensation

is stuck at the same level as new Computer Specialists, such as Michael Taylor, Kristen Lee, and

Paul Whittingham.  Between 2014 and 2016, her salary rose the minimum of about 7.2%, while

many Computer Specialists who were earning about the same amount as Thomas in 2014 saw

their compensation increase by about 11.7% (Stephen Chio, Francis Fung, Shakir Gusaroff, and

Lung Li) or over 20% (Wei Gao).

122.    Numerous black employees, like Bowman, Riojas, and Thomas, find it impossible

to receive discretionary increases.  For example, Civilian class member Jo Blackwell, a 38-year

FDNY employee who has worked as a clerical associate in the FDNY's Bureau of Fire

Prevention since 2000, has not received a discretionary increase during those 17 years.  Civilian

class member Brenda McKiver, a 29-year FDNY employee who has worked as a principal

administrative associate in the BFP for about 23 years, also has not received a discretionary

increase.  In response to Blackwell's request for a raise, BFP Director Steven Ertrachter

dismissively responded, "You don't need money. What do you need money for?"  Ertrachter

gave a very similar response to McKiver when she requested an increase.  But he does not

exhibit the same attitude toward their white co-workers such as Maryana Chouchereba, who

received two discretionary increases in the past approximately five years.  As a result, her salary

jumped 25% between year end 2011 and year end 2016, while their salaries increased by only

about 7% over the same period.

123.    Even African American employees who do receive discretionary increases find

that the increases are not sufficient to make their pay comparable to similarly situated white

employees.  For example, while Plaintiff Richardson heads the Human Resources Information

Center and the Absence Control Unit, two of the units of the Human Resources unit, Margaret

Puppa is the second in command of a different HR function, the Candidate Investigation

Division, which investigates the background of candidates for positions.  Richardson's salary

increased 16% between 2010 and 2016, from $69,971 to $80,826, a very large percentage

increase among African American employees who did not receive promotions.  Yet Puppa's salary increased at more than double the rate, 34%, during the same span, from $89,081 to $119,573.  While the function in which Puppa is a manager has more employees than Richardson's function, a 50% pay differential between them is unjustifiable.

124.    A second comparator for Plaintiff Richardson is Emily Rahimi, a white woman who also works in the Human Resources unit.  She was promoted in 2013 from the position of Associate Public Information Specialist in FDNY's Public Information Office to an Administrative Manager position in Human Resources and received a $20,000 raise from about $58,000 to $78,000.  Although her responsibility was only to prepare a periodic employee bulletin, she had no staff to manage, and she fills an Administrative Manager position, which generally receives a lower salary than Richardson's Administrative Staff Analyst position, Rahimi's salary was about $8,000 more than Richardson's in 2013.  In 2015 Rahimi was reclassified as an Administrative Staff Analyst, although her job duties did not change.  That title promotion resulted in a 12% increase in pay for her to almost $88,000, almost $12,000 more than Richardson.  While Rahimi was receiving these pay increases, Richardson repeatedly requested raises from her manager, Donay Queenan, without success.  Notably, in 2016, Richardson was given additional duties formerly performed by the Bureau of Technology & Development within FDNY, but again, her request to Queenan for a pay increase was not honored and did not even receive a formal response.  In 2017, Rahimi's pay was bumped again to over $92,000.  Richardson finally received a raise on September 24, 2017, but that still leaves her pay well short of Rahimi's.

125.    Richardson is not alone in being an African American manager of a Human Resources unit whose pay lags far behind Puppa's or Rahimi's.  Plaintiff Debra Poe heads the

Civilian Leave function, with one assistant.  Yet her salary was only about $69,000 in 2016,

almost $20,000 less than Rahimi, who had no reports.

**D.    Many of the Same Factors that Result in Racial Discrimination in Job Selection Decisions Also Result in Racial Discrimination in Compensation Decisions**

126.    As discussed above in the context of job selection decisions, FDNY has a

decades-long history of in-group favoritism toward Irish, Italian, and other job applicants of

European descent and resistance toward African-American applicants.  That same culture also

causes decision-makers to disfavor African Americans in compensation decisions.

127.    Also as discussed above, a small group of almost exclusively white managers

makes job selection decisions.  With respect to compensation decisions, those same individuals

have input, but ultimate decision-making power is even more concentrated in one person,

Assistant Commissioner for Budget & Finance Stephen Rush.

128.    Finally, two of the failures of FDNY to adopt or systematically implement

modern human resources practices contribute directly to compensation disparities.  The first is

the failure to require sufficiently objective performance reviews, to insist that all employees be

reviewed, and to directly tie ratings to discretionary raises.  Second, FDNY fails to monitor

proposed and actual pay decisions each year to assess whether statistical racial disparities exist

and, if so, to conduct further investigations to determine whether the disparities are justified.

129.    FDNY's failure to adopt human resources practices that minimize the opportunity

for discriminatory compensation decisions is of a piece with its general disdain for laws

applicable to compensation of employees.  For many years, for example, Queenan has

discouraged human resources employees from seeking cash when they work overtime.  Instead,

she has pushed them to put in for compensatory time instead of cash.  Collective bargaining

agreements between the City and unions representing employees under Queenan have not

44

authorized this practice, making it illegal under both federal and state law.  The practice has been striking because FDNY employees in firefighter, trade, and certain other job categories work prodigious amounts of overtime – frequently resulting in more overtime compensation than straight-time salary or wages, and yet FDNY has not sought to restrict that overtime.

130.   In September 2017, Rush issued a memorandum to non-firefighter employees directing that any overtime that has not been pre-approved must be recorded as "voluntary" and paid in compensatory time rather than in cash.  The collective bargaining agreements between the City and applicable unions have not authorized this practice, making it illegal under both federal and state law.

131.   Rush's memorandum excludes three groups from the restriction on receipt of cash for "voluntary" overtime:  EMS, fire alarm dispatchers, and trade employees.  The exemption of trade employees blows a hole in efforts to hold down overtime because they receive more overtime on average than any other category of Civilian or EMS employees.  But, as reported above, they have a higher percentage of white employees than any other category of FDNY job outside of firefighters.  The impact, and presumably the intent, of the exemptions is to benefit white employees and harm African Americans.

## VII.  CONTINUING VIOLATION AND DAMAGES

132.   The culture, policies, and practices that have caused FDNY to underhire and underemploy African Americans, confine them largely to lower paying jobs, and set their salaries or wage rates below the compensation of white employees have all been in place since 2004, if not before, and have existed on a continuous basis at all times since then.  The culture, policy, and practices have resulted in systemic and continuing racial discrimination in hiring, advancement, and pay decisions against African Americans in every year since 2004.

133.     FDNY's underhiring and underemployment of African Americans, confining African Americans largely to lower paying jobs, and setting their salaries or wage rates below the compensation of white employees all have caused members of the two proposed Classes to receive far less in salaries and wages than they would have between 2004 (or earlier) and the present absent racial discrimination.

134.     African Americans' discriminatorily low salaries and wages also produce large damages in the form of lost overtime pay.  Employees at FDNY earn prodigious amounts of overtime pay, often more than the amount of regular pay that they receive.  Any salary or wage differential between two employees is increased, generally by 50%, at their overtime rates.

135.     African Americans' discriminatorily low salaries and wages also produce large damages in the form of diminished employee benefits.  For example, the pension benefits to which a retiree is or may become eligible are, with certain limitations and variations, calculated by multiplying the number of years of credited service by the employee's average salary in his or her final three years or highest three years of compensation.  As a result, the higher an employee's salary or wage rate during those three years, the greater the benefits that the employee may receive.

## VIII.   CLASS ALLEGATIONS

136.     Plaintiffs bring this litigation on behalf of themselves and three classes:

- A class of all African Americans who (a) have been employed in a Civilian full-time position in FDNY below the level of Department Leader at any time between four years prior to the filing of this Complaint and the date a class is certified, or (b) passed any applicable DCAS tests, possessed all other posted requirements for any posted FDNY Civilian or EMS vacancy, and applied and were rejected by

46

FDNY for any such position at any time between three years prior to the filing of this Complaint and the date a class is certified ("Job Posting Class");

- A class of all African Americans who have been employed in a Civilian full-time position in FDNY below the level of Department Leader at any time between four years prior to the filing of this Complaint and the date a class is certified ("Compensation Class");

- A class of all African Americans who have been employed in a full-time EMS lieutenant position in FDNY at any time between four years prior to the filing of this Complaint and the date a class is certified ("EMS Lieutenant Class");

Plaintiffs reserve the right to amend these class definitions in any way as the case progresses.

## A.    **The Job Selection Class**

137.    The Job Selection Class is sufficiently numerous that joinder of all of its members in this lawsuit would be impractical.  As alleged above, about 330 Civilian Employees in 2015 were African American.  With turnover, there are probably more than 400 current and former FDNY employees in the Job Selection Class.  According to the 2015 Workforce Report, FDNY hired about 90 Civilian employees and about 500 EMS employees in 2015.  If 2015 was typical, the agency hired about 270 Civilian employees and about 1,500 EMS employees over the past three years.  Plaintiffs cannot know the number of rejected outside applicants who were African American until discovery commences, but almost certainly hundreds if not thousands of African Americans were among the rejected applicants who are also members of the Job Selection Class..

138.    The Class's claims raise numerous common questions of fact or law, including but not limited to:

- Did FDNY promote and hire Class members less frequently than similarly situated white peers?

- Were the job selection decisions adverse to Class members at least in part because of in-group favoritism toward persons of Irish, Italian, or other European descent?

- Were the job selection decisions adverse to Class members made by a small number of overwhelmingly white decision-makers, and if so, has that facilitated the discrimination?

- Has FDNY failed to adopt and/or systematically implement generally recognized HR practices, and if so, has that failure facilitated discrimination against Class Members in job selection decisions?

- Have FDNY executives and officials been aware that Class members receive fewer promotions and/or been hired less frequently than similarly situated whites and done nothing to rectify the disparities?

- Have the Mayor and other City executives and officials failed to exercise control over FDNY's human resources and diversity practices despite myriad forms of notice of the racial discrimination at FDNY?

- Has FDNY had a continuing policy of discrimination against Class Members that entitles them to relief for discriminatory job selection decisions back to 2004 (or earlier)?

139.    Plaintiffs Richardson, Bowman, Horsley, Poe, Riojas, and Thomas are typical of other Class Members in that they have been Civilian employees of FDNY and have claims of pay and promotion discrimination that they suffered as a result of the same three factors that led

to discrimination against Class Members.  Like other Class Members, their claims also give rise to liability under the continuing violations doctrine.

140.    Plaintiffs Richardson, Bowman, Horsley, Poe, Riojas, and Thomas are adequate representatives of the Job Selection Class.  Their claims are typical of the claims of other Class Members; they have no conflicts with the Class Members; and they have retained experienced counsel capable of representing the Class.

141.    Class certification is appropriate under Federal Rule of Civil Procedure 23(b)(2) because FDNY has acted or refused to act on grounds that apply generally to the Job Selection Class such as by allowing a small group of almost exclusively white managers make job selection decisions and failing to adopt and/or systematically implement recognized means of controlling managerial bias.  These actions and failures make appropriate Class-wide injunctive relief, including but not limited to the measures identified in the Prayer for Relief below.

142.    Class certification also is appropriate under Federal Rule of Civil Procedure 23(b)(3).  The common issues identified above will predominate over any purely individual issues.  Moreover, a class action is superior to other means for fairly and efficiently adjudicating the controversy.  After all these years, agency-wide injunctive relief is needed to address the discrimination.  That type of relief would be difficult if not impossible to obtain in a non-class suit brought by one or a small number of plaintiffs.

**B.      The Compensation Class**

143.    The Compensation Class is sufficiently numerous that joinder of all of its members in this lawsuit would be impractical.  As alleged above, about 330 Civilian Employees in 2015 were African American.  With turnover, the Compensation Class probably contains more than 400 members.

144.    The claims of the Class raise numerous common questions of fact or law, including but not limited to:

- Did FDNY pay Class members less than similarly situated white peers?

- Did FDNY give Class members fewer and/or smaller pay increases, including promotional increases, than it gave similarly situated white peers?

- Were the compensation decisions adverse to Class members at least in part because of in-group favoritism toward persons of Irish, Italian, or other European descent?

- Were the compensation decisions adverse to Class members made by a small number of overwhelmingly white decision-makers, and if so, has that facilitated the discrimination?

- Has FDNY failed to adopt and/or systematically implement generally recognized HR practices, and if so, has that failure facilitated discrimination against Class Members in compensation decisions?

- Have FDNY executives and officials been aware that Class members receive lower pay than similarly situated whites and done nothing to rectify the disparities?

- Have the Mayor and other City executives and officials failed to exercise control over FDNY's human resources and diversity practices despite myriad forms of notice of the racial discrimination at FDNY?

- Has FDNY had a continuing policy of discrimination against Class Members that entitles them to relief for discriminatory compensation decisions back to 2004 (or earlier)?

145.    Plaintiffs Richardson, Bowman, Horsley, Poe, Riojas, and Thomas are typical of other Class Members in that they have been Civilian employees of FDNY and have claims of compensation discrimination that they suffered as a result of the same three factors that led to discrimination against other Class Members.  Like other Class Members, their claims also give rise to liability under the continuing violations doctrine.

146.    Plaintiffs Richardson, Bowman, Horsley, Poe, Riojas, and Thomas are adequate representatives of the Compensation Class.  Their claims are typical of the claims of other Class Members; they have no conflicts with the Class Members; and they have retained experienced counsel capable of representing the Class.

147.    Class certification is appropriate under Federal Rule of Civil Procedure 23(b)(2) because FDNY has acted or refused to act on grounds that apply generally to the Compensation Class, such as by allowing a small group of almost exclusively white managers to make compensation decisions and failing to adopt and/or systematically implement recognized means of controlling managerial bias.  These actions and failures make appropriate Class-wide injunctive relief, including but not limited to the measures identified in the Prayer for Relief below.

148.    Class certification also is appropriate under Federal Rule of Civil Procedure 23(b)(3).  The common issues identified above will predominate over any purely individual issues.  Moreover, a class action is superior to other means for fairly and efficiently adjudicating the controversy.  After all these years, agency-wide injunctive relief is needed to address the discrimination.  That type of relief would be difficult if not impossible to obtain in a non-class suit brought by one or a small number of plaintiffs.

C.   **EMS Lieutenant Class**

149.   The EMS Lieutenant Class is sufficiently numerous that joinder of all of its members in this lawsuit would be impractical.  About 70 EMS Lieutenants currently are African American.  With turnover, the EMS Lieutenant Class probably has over 75 members.

150.   The claims of the Class raise numerous common questions of fact or law, including but not limited to:

- Did Class members receive fewer promotions to captain than did similarly situated white peers?

- Were the promotion decisions adverse to Class members at least in part a product of in-group favoritism toward persons of Irish, Italian, or other European descent?

- Were the promotion decisions adverse to Class members made by a small number of overwhelmingly white decision-makers, and if so, has that facilitated the discrimination?

- Has FDNY failed to adopt and/or systematically implement generally recognized HR practices, and if so, has that failure facilitated discrimination against Class Members in promotion decisions?

- Have FDNY executives and officials been aware that Class members receive fewer promotions than do similarly situated white employees and done nothing to rectify the disparities?

- Have the Mayor's office and other City executives and officials failed to exercise control over FDNY's human resources and diversity practices despite myriad forms of notice of the racial discrimination at FDNY?

- Has FDNY had a continuing policy of discrimination against Class Members that entitles them to relief for discriminatory promotion decisions back to 2004 (or earlier)?

151.    Plaintiff Simmons is typical of other Class Members in that she is an EMS Lieutenant and has claims of promotion discrimination and/or is subject in the future to promotion discrimination resulting from the same three factors that led to discrimination against other Class Members.  Like other Class Members, her claims also give rise to liability under the continuing violations doctrine.

152.    Plaintiff Simmons is an adequate representative of the EMS Lieutenant Class. Her claims are typical of the claims of other Class Members; she has no conflicts with the Class Members; and she has retained experienced counsel capable of representing the Class.

153.    Class certification is appropriate under Federal Rule of Civil Procedure 23(b)(2) because FDNY has acted or refused to act on grounds that apply generally to the Class, such as by allowing a small group of almost exclusively white managers to make promotion decisions and failing to adopt and/or systematically implement recognized means of controlling managerial bias.  These actions and failures make appropriate Class-wide injunctive relief, including but not limited to the measures identified in the Prayer for Relief below.

154.    Class certification also is appropriate under Federal Rule of Civil Procedure 23(b)(3).  The common issues identified above will predominate over any purely individual issues.  Moreover, a class action is superior to other means for fairly and efficiently adjudicating the controversy.  After all these years, agency-wide injunctive relief is needed to address the discrimination.  That type of relief would be difficult if not impossible to obtain in a non-class suit brought by one or a small number of plaintiffs.

# IX.  COUNTS

## A.      Count One:  42 U.S.C. §§ 1981, 1983

155.    Plaintiffs reallege each of the paragraphs above as if they were expressly set out in this paragraph.

156.    The City, through its agency the FDNY, has impaired under color of state and municipal law the right of Plaintiffs and members of each of the three proposed Classes to make and enforce contracts of employment, which under 42 U.S.C. § 1981 shall be the same as the right of white persons, in that the FDNY has (a) discriminatorily failed to select African-American outside and internal candidates to fill vacant positions while instead selecting white candidates with lesser qualifications, and (b) paid African-American employees less than, and given African-American employees smaller pay increases than, similarly situated white employees.

157.    In making its job selection and compensation decisions, FDNY and its officials and managers have acted under color of the statutes, ordinances, regulations, customs, and usages, of the laws of the State of New York which, among other things, delegate authority over these decisions to the City of New York.

158.    The City, through its agency the FDNY, has subjected the Plaintiffs and the members of the proposed Classes to the deprivation of the rights, privileges, or immunities secured by 42 U.S.C. § 1981, as set forth above.

159.    The discrimination in job selection and compensation decisions against Plaintiffs and members of the proposed Classes have been performed pursuant to a policy or custom within FDNY in violation of 42 U.S.C. § 1983.  The discrimination has been so persistent or widespread to constitute a custom or usage with the force of law.  It also has been so manifest as to imply the

constructive acquiescence of senior policy-making officials within FDNY and the City Government. The City's failure to train and supervise its employees adequately has displayed a deliberate indifference to the constitutional rights of African-American job applicants and employees at FDNY.

160.    The policy or custom of racial discrimination within FDNY has been continuing since 2004, if not before.

161.    Plaintiffs and members of the proposed Classes have been damaged by the discrimination in job selection and compensation decisions since 2004 (if not before) or such later date as they were first rejected for employment by FDNY or first became employed by FDNY. This damage takes the form of lost pay and lost employee benefits for members of the Job Selection Class who were not FDNY employees when they were rejected for employment, and for members of the Classes who were FDNY employees at the time of the discriminatory decisions, lost pay and diminishment of those employee benefits tied to pay levels. Class Members also have suffered damage in the form of mental pain and suffering as they have experienced stagnation in job position and compensation while watching equally or lesser qualified white employees rocket past them in position, compensation, or both. Members of all three Classes will be damaged in the future by the discrimination unless injunctive relief is entered.

**B.    Count Two:  New York City Human Rights Law**

162.    Plaintiffs reallege each of the paragraphs above as if they were expressly set out in this paragraph.

163.    The City, through its Agency FDNY, has discriminated against each of the members of the Classes who have been employed or been rejected for employment at FDNY

between three years prior to the filing of this Complaint and the date a class is certified (the "NYCHRL Class Members"), including the Plaintiffs who are members of those Classes, in compensation and/or in terms, conditions or privileges of employment because of their race in violation of NYC Administrative Code § 8-107.1(a)(3).

164.    Through (a) FDNY's failure to adopt or implement systematically widely accepted human resources practices that reduce the opportunity for discrimination, (b) FDNY's culture of in-group favoritism, (c) FDNY's assignment of job selection and compensation decisions to a very small group of almost exclusively white decision-makers who share in the culture of in-group favoritism, and (d) the City's failure to exercise control over FDNY's human resources and diversity practices, the City has engaged in a pattern or practice of discrimination in job selection and compensation decisions against Plaintiffs and the NYCHRL Class Members.

165.    FDNY's failure to adopt or implement systematically widely accepted human resources practices that reduce the opportunity for discrimination and its assignment of job selection and compensation decisions to a very small group of almost exclusively white decision-makers, and the City's failure to exercise control over FDNY's human resources and diversity practices have had a disparate impact against Plaintiffs and the NYCHRL Class Members.

166.    The policy or custom of racial discrimination within FDNY in job selection and compensation decisions has been continuing since 2004, if not before.

167.    Plaintiffs and the NYCHRL Class Members have been damaged by the discrimination in job selection and compensation decisions since 2004 (if not before) or such later date as they were first rejected for employment by FDNY or first became employed by FDNY.  This damage takes the form of lost pay and lost employee benefits for members of the Job Selection Class who were not FDNY employees when they were rejected for employment,

and for NYCHRL Class Members who were FDNY employees at the time of the discriminatory decisions, lost pay and diminishment of those employee benefits tied to pay levels.  NYCHRL Class Members also have suffered damage in the form of mental pain and suffering as they have experienced stagnation in job position and compensation while watching equally or lesser qualified white employees rocket past them in position, compensation, or both.  NYCHRL Class Members will be damaged in the future by the discrimination unless injunctive relief is entered.

## X.  PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court enter a judgment against Defendant and in favor of Plaintiffs and the Class and award the following relief:

A.   An order: certifying this action as a class action pursuant to Federal Rule of Civil Procedure 23; declaring Plaintiffs Richardson, Bowman, Horsley, Poe, Riojas, and Thomas as representatives of the Job Selection Class and the Compensation Class and Plaintiff Simmons as the representative of the EMS Lieutenant Class; and declaring Plaintiffs' counsel as counsel for each Class;

B.   An order granting Plaintiffs and members of the Classes actual damages for violations of 42 U.S.C. § 1981 and 1983 and of the NYCHRL;

C.   An order granting Plaintiffs and the members of the Classes costs of suit, reasonable attorney's fees and expenses;

D.   An order granting Plaintiffs and the Classes appropriate injunctive and declaratory relief for a period of time to be determined by the Court but not less than seven years, including but not limited to:

- Appointing an outside monitor going forward for five years or more to review individual and overall job selection and compensation decisions to

detect individual instances and patterns of racial discrimination and to

train appropriate employees of the FDNY on how to perform such

monitoring after the term of the outside monitor ends;

- Requiring FDNY to create plans to increase the representation of African

Americans in Civilian positions in which African Americans are

underrepresented and in EMS positions above EMS Lieutenant, which

plans shall be reviewed and approved by the outside monitor and

ultimately the Court, and giving the outside monitor access to all

necessary information to monitor FDNY's actions to insure that FDNY

complies with the plans;

- Appointing either the outside monitor or another expert to conduct an

audit of compensation of Civilian employees and adjust the compensation

of any African American employees determined to be underpaid; and

- Requiring FDNY to review its Human Resources practices identified in

this Complaint and modify them as the outside monitor and ultimately the

Court deem appropriate.

E.    An order granting Plaintiffs and the Class such other, further and different relief

as the nature of the case may require or as may be determined to be just, equitable

and proper by this Court.

## XI.  DEMAND FOR A JURY TRIAL

Plaintiffs demand a jury trial on all issues triable as of right by a jury.


Respectfully submitted,


**VALLI KANE & VAGNINI LLP**

Robert J. Valli, Jr.
Sara Wyn Kane
Valli Kane & Vagnini LLP
600 Old Country Road, Suite 519
Garden City, New York 11530
Telephone: (516) 203-7180
Facsimile: (516)706-0248
rvalli@vkvlawyers.com
skane@vkvlawyers.com

**MEHRI & SKALET PLLC**

Cyrus Mehri (*pro hac vice pending*)
Judge U.W. Clemon (*pro hac vice pending*)
Michael D. Lieder (*pro hac vice pending*)
Mehri & Skalet, PLLC
1250 Connecticut Ave., NW, Suite 300
Washington, DC 20036
Telephone: (202) 822-5100
Facsimile: (202) 822-4997
cmehri@findjustice.com
jclemon@findjustice.com
mlieder@findjustice.com