UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ANNETTE RICHARDSON, et al., *on behalf of themselves and all others similarly situated*,

Plaintiffs,

-v-

CITY OF NEW YORK,

Defendant.

17-CV-9447 (JPO)

OPINION AND ORDER

---

J. PAUL OETKEN, District Judge:

Six African American Fire Department of New York ("FDNY") employees ("Plaintiffs") have filed a putative class action complaint against the City of New York ("the City") on behalf of themselves and certain other African American FDNY employees, alleging that FDNY's hiring, job-placement, and compensation practices discriminate against African Americans in violation of 42 U.S.C. §§ 1981 and 1983 ("Section 1981" and "Section 1983") and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-101 *et seq.* The City has moved to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a cognizable legal claim, and has also moved for an order staying discovery pursuant to Federal Rule of Civil Procedure 26(c). (Dkt. No. 11.) For the reasons that follow, the motion to dismiss is granted in part and denied in part, and the motion to stay discovery is denied as moot.

## I.     Background

### A.     Factual Background

The following facts are drawn from the complaint and are assumed to be true for purposes of resolving the City's motion to dismiss.

FDNY's roughly 16,400-person workforce is made up of three types of employee: (1) firefighters and firefighter supervisors, who together make up about two-thirds of the workforce, (2) emergency medical services ("EMS") personnel, who make up about one-fifth of the workforce, and (3) non-uniformed "civilian" personnel, who make up the remainder.[1] (Dkt. No. 4 ("Compl.") ¶¶ 17–18, 20, 23.) According to the complaint, discrimination against African Americans has affected hiring, job-placement, and compensation decisions within all three categories, but the present suit involves only civilian employees.[2] (Compl. ¶¶ 19, 21–23.) At the heart of Plaintiffs' allegations lies a supposed "pattern or practice of systemic, continuous, and intentional discrimination" on the part of FDNY that, Plaintiffs contend, has produced observable racial disparities in the "hiring, placement, advancement, and compensation" of civilian employees "[f]or well over a century." (Compl. ¶ 1.)

### 1. The Underlying Disparities

The complaint's discrimination claims center on three alleged disparities: (1) FDNY hires disproportionately few African Americans into its civilian staff in the first place; (2) those

---

[1] All employment figures reported in this opinion derive from fiscal year 2015 unless otherwise noted, but the complaint alleges that these figures are representative for every year from at least 2004 to the present. (Compl. ¶ 43.)

[2] The complaint also purports to bring discrimination claims on behalf of a class of EMS employees, but the only named plaintiff representing this class voluntarily dismissed her claims without prejudice on January 9, 2018. (Compl. ¶¶ 8–14; Dkt. No. 7.) In the nearly nine months since then, Plaintiffs have neither moved to amend the complaint nor sought to substitute another named plaintiff to represent the EMS class. Further, in opposing the City's motion to dismiss, Plaintiffs make no mention whatsoever of their EMS class claims, asserting only that "FDNY has systematically discriminated against African American *civilian* employees and applicants." (Dkt. No. 17 at 1 (emphasis added).) To the extent that Plaintiffs have not abandoned their EMS class claims, those claims are dismissed as moot. *Cf. Phillips v. Ford Motor Co.*, 435 F.3d 785, 787 (7th Cir. 2006) (holding that "a dismissal of the named plaintiffs' claims" prior to class certification "should end the case" absent a prompt effort to substitute a different named plaintiff); *Jobie O. v. Spitzer*, No. 03 Civ. 833, 2007 WL 4302921, at *4 (S.D.N.Y. Dec. 5, 2007) ("As a general rule, if the named plaintiff's claims become moot prior to class certification, the entire action becomes moot and the case is dismissed.").

African Americans who are hired are disproportionately hired into, and made to remain within, lower-paying job positions; and (3) among those employees who occupy identical job positions, African Americans receive disproportionately low compensation.  (Compl. ¶ 2.)

### i.    Disparities in Hiring

To be eligible for certain job positions at City agencies—including most civilian positions at FDNY—applicants must usually pass a position-specific competitive exam administered by the City's Department of Citywide Administrative Services ("DCAS").  (Compl. ¶¶ 25, 28.)  Following each exam, DCAS creates an "eligible to hire" list of the passing applicants, ranked by score.  (Compl. ¶ 27.)  When an agency wishes to fill an open position, it interviews applicants from the associated "eligible to hire" list in order of their rank.  (*Id.*)

For most civilian positions, FDNY hires off the same "eligible to hire" lists that other City agencies use when filling comparable positions.  (Compl. ¶ 28.)  But although FDNY and other City agencies utilize identical ranked lists, five out of FDNY's seven civilian job categories contain a noticeably lower proportion of African American employees than do the corresponding categories viewed across all City agencies.  (Compl. ¶¶ 30, 40.)  For example, 27% of City agencies' administrators and managers—but only 18% of FDNY's—are African American. (Compl. ¶ 40.)  Similarly, 28% of City agencies' designated "professionals" are African American, compared to only 14% of FDNY's.  (*Id.*)  All told, only 22% of FDNY's civilian employees are African American, as against 33% of similarly titled employees across all City agencies.  (*Id.*)

### ii. Disparities in Job Placement

According to the complaint, this comparative dearth of African American employees is, as a result of FDNY's initial job-placement and promotion decisions, particularly pronounced within the highest-paid civilian job categories.

There are only two civilian job categories in which African American workers make up a greater proportion of the workforce at FDNY than they do in City agencies generally, and those categories are two of the three lowest-paying. (Compl. ¶¶ 23, 40.) For example, African Americans' representation at FDNY among laborers and transportation workers—whose annual salary averages $52,709—exceeds their representation in similar positions at City agencies overall by 3%. (*Id.*) In contrast, among administrators and managers, whose annual salary averages $117,831, African American representation at FDNY undershoots African American representation at City agencies overall by 33%. (*Id.*) All in all, African American representation across the four highest-paid civilian job categories at FDNY is 43% lower than it is across those categories in City agencies overall, whereas African American representation across the three lowest-paid civilian job categories at FDNY is only 15% lower than it is across those categories in City agencies overall.[3] (Compl. ¶ 45.)

To illustrate these statistical disparities, the complaint describes the experiences of a few individual FDNY employees. For example, Yvonne Moore, who is African American, and Marina Ryappo, who is white, were hired around the same time to perform similar civilian job duties. (Compl. ¶ 52.) Ryappo, however, was given a job title corresponding to an annual salary 25% greater than Moore's, even though Moore has proven to be the more capable employee.

---

[3] The complaint also briefly alleges that even within any given civilian job category at FDNY, African American representation tends to be concentrated in that category's lowest-paying jobs. (Compl. ¶¶ 46–47.)

(*Id.*)  Similarly, Liza Horsley, who is African American, started as a civilian employee in 1998 but in 2014 was denied a higher-paying position for which she was qualified; the position instead went to a white woman who had thirteen years' less experience at FDNY than Horsley did. (Compl. ¶ 54.)  These and other instances, the complaint alleges, exemplify FDNY's practice of concentrating its African American civilian employees in lower-paying positions.

### iii.    Disparities in Compensation Within a Given Job Position

Finally, the complaint alleges that even within a single job position at FDNY, African American employees generally receive lower pay than white employees do.  (Compl. ¶¶ 111, 116–17.)  While collective-bargaining agreements ("CBAs") dictate the minimum salary or wage rate for most civilian job positions at FDNY, employees are eligible for discretionary pay increases that exceed the minimum required by the CBAs.  (Compl. ¶¶ 106–07.)  According to the complaint, FDNY awards large discretionary raises disproportionately to white employees, with the result that African American workers end up receiving lower pay than their similarly situated white peers.  (Compl. ¶ 110.)

As evidence of this disparity, the complaint points out that in 2016 the median pay of the twenty-five Administrative Staff Analysts known to be white was around $125,000, whereas the median pay of the seven Administrative Staff Analysts known to be African American was around $87,000.  (Compl. ¶ 112.)  Similarly, in 2016, the median pay of the thirteen Computer Associates known to be white was around $74,605, whereas the median pay of the seven Computer Associates known to be African American was around $62,490.  (Compl. ¶ 115.)

Here too, the complaint supplements its quantitative data with anecdotal evidence.  For example, when Annette Richardson, an African American employee, was promoted to fill a position that had previously been occupied by a white male, she received a starting salary 33%

lower than the salary her predecessor had been paid.  (Compl. ¶ 118.)  And, to take another

example, FDNY's only two African American Computer Specialists, Stephanie Thomas and

Dino Riojas, have received no discretionary pay increases in their (respectively) twenty-nine and

thirty-five years on the job, despite watching their colleagues enjoy raises as high as 25%.[4]

(Compl. ¶¶ 120–21.)

According to the complaint, "it is reasonable to believe" based on the quantitative and

anecdotal evidence "that statistically significant disparities exist between the compensation of

white and African American employees in many job titles."  (Compl. ¶ 116.)

### 2.      The Alleged Causes of These Disparities

The complaint attributes these disparities to the combination of four factors.

First, the complaint alleges that FDNY's human resources practices are inadequate to

identify and prevent racially motivated job-placement and compensation decisions.  (Compl.

¶ 3.)  In particular, the complaint identifies four ways in which FDNY's practices have allegedly

fallen short:  (1) prior to 2010, FDNY failed to conduct performance appraisals that could form

the basis for objective promotion and compensation decisions and, even after FDNY initiated

performance reviews in 2010 at the behest of DCAS, the reviews have been inconsistently

administered and insufficiently objective (Compl. ¶¶ 87–89, 128); (2) FDNY often forestalls

open competition for vacant positions by failing to post available positions publicly or by pre-

selecting an employee to fill a publicly posted position (Compl. ¶¶ 91–92); (3) FDNY produces

no written rationales for its job-placement decisions (Compl. ¶ 93); and (4) FDNY lacks a

---

[4] Thomas and Riojas, along with their colleagues, have received the 7.2% raises
mandated by their CBA.  (Compl. ¶¶ 120–21.)

mechanism for monitoring job-placement and compensation decisions for racial disparities[5] (Compl. ¶¶ 94–95, 128).

Second, the complaint alleges that FDNY is characterized by "a culture of in-group favoritism under which white decision-makers favor people with similar backgrounds to themselves." (Compl. ¶ 3.) In support of this claim, the complaint points to two previous class-action lawsuits involving FDNY's hiring practices for filling firefighter positions. (Compl. ¶ 65–66, 69.) The first of these lawsuits concluded in 1973 with a remedial injunction based on a judicial determination that these practices had an impermissible disparate impact on African American applicants. *See Vulcan Soc'y of the N.Y.C. Fire Dep't, Inc. v. Civil Serv. Comm'n of the City of N.Y.*, 360 F. Supp. 1265 (S.D.N.Y. 1973), *aff'd in relevant part*, 490 F.2d 387 (2d Cir.). By 2007, though—thirty years after that injunction lapsed—African American representation among FDNY's firefighters was no greater than it had been when the 1970s lawsuit was filed. (Compl. ¶ 67.) This stagnation prompted a second litigation, which included a charge of intentional racial discrimination. (Compl. ¶ 69.) This second lawsuit ended in a settlement rather than a final merits judgment (Compl. ¶ 75), but the district judge presiding over the case had, prior to the settlement, highlighted the existence of "convincing evidence that the City, its agencies, and relevant decisionmakers have been aware that the FDNY's hiring procedures discriminate against black [firefighter] applicants and have nonetheless refused to take steps to remedy this discrimination," *see United States v. City of New York* ("*City of New*

---

[5] In 2015, FDNY created a new executive position, the Chief Diversity and Inclusion Officer ("CDIO"), responsible for promoting diversity at FDNY (Compl. ¶ 97), but the complaint alleges that the position has consistently been filled by people who lack the "skills and/or experience to be effective in that position" (Compl. ¶ 99). Likewise, the complaint alleges that FDNY's Equal Employment Opportunity office, which reports to the CDIO, has been poorly funded and is principally concerned with investigating one-off complaints rather than engaging in systemic review of FDNY's practices. (Comp. ¶¶ 100–03.)

*York I*"), 683 F. Supp. 2d 225, 250 (E.D.N.Y. 2010), *vacated*, 717 F.3d 72 (2d Cir. 2013).

Although these two lawsuits involved firefighter applicants, not civilian employees, the

complaint here contends that they show "the resistance to integration exhibited by high levels of

the FDNY."  (Compl. ¶ 65.)

　　　　Third, the complaint alleges that most job-placement and compensation decisions for

FDNY's civilian employees require approval by "a very small group of decision-makers."

(Compl. ¶ 3.)  As of 2016, there were only about 50–100 department heads within FDNY who

provided input into hiring, promotion, and compensation decisions involving civilian employees,

and nearly all of these department heads identify as white.  (Compl. ¶¶ 78–79.)  Further

channeling FDNY's employment decisions, any department head must secure approval from the

Bureau of Human Resources head, Donay Queenan, and the Assistant Commissioner for Finance

& Budget, Steve Rush, before creating a new position or filling a vacant position.  (Compl. ¶ 80.)

Moreover, Rush—typically in consultation with Queenan—must approve any salary or wage rate

that exceeds the minimum required by an employee's CBA.  (Compl. ¶¶ 82, 108, 127.)

According to the complaint, Rush claims that he will not authorize discretionary pay raises that

exceed 8%, but although he and Queenan "wield the 8% limit like a cudgel against African

Americans to hold down their increases, [they] frequently ignore the supposed limit for white

employees."  (Compl. ¶ 110.)

　　　　The fourth and final factor that the complaint identifies as a contributor to racial disparity

is the failure of the Mayor's office or other City agencies to "exercise control over FDNY's

human resources and diversity practices" despite widespread publicity of persistent racial

disparities among FDNY's civilian employees.  (Compl. ¶ 3.)

## B.        Procedural Background

On December 1, 2017, Plaintiffs Annette Richardson, Deborah Bowman, Liza Horsley, Debra Poe, Dino Riojas, and Stephanie Thomas—all African American civilian employees at FDNY—filed a putative class action complaint against the City.[6]  (Dkt. No. 1; Compl. ¶¶ 8–12, 14.)  Plaintiffs seek to represent two classes of FDNY employees or job applicants:  (1) a class asserting discrimination in hiring and job placement (whether through initial job assignment or promotion decisions), consisting of (a) all African Americans who have, since December 1, 2014, qualified for a posted civilian vacancy at FDNY, applied, and been rejected, and (b) all African Americans who have been employed full-time at FDNY in certain civilian positions at any time since December 1, 2013; and (2) a class asserting discrimination in compensation decisions, consisting of all African Americans who have been employed full-time at FDNY in certain civilian positions at any time since December 1, 2013.[7]  (Compl. ¶ 136.)

Plaintiffs' complaint asserts two counts against the City.  Count One alleges that FDNY has engaged in a pattern or practice of intentional racial discrimination in hiring, job-placement, and compensation decisions that violates Section 1981 by impairing Plaintiffs' right to make and enforce contracts on the same terms as white citizens, with relief pursuant to Section 1983.  (Compl. ¶¶ 155–61.)  Count Two alleges that FDNY's hiring, job-placement, and compensation practices additionally violate NYCHRL, either by intentionally discriminating against African Americans or at least by having an adverse, disparate impact on African Americans.  (Compl.

_____

[6] The complaint names a seventh plaintiff, Arlene Simmons, who is an African American EMS employee at FDNY (Compl. ¶ 13), but she has voluntarily dismissed her claims against the City without prejudice (Dkt. No. 7).

[7] The complaint also expresses Plaintiffs' intention to represent a third class, consisting of all African Americans who have been employed full-time at FDNY in certain EMS positions at any point since December 1, 2013.  (Compl. ¶ 136.)  But, as explained above, Plaintiffs' claims on behalf of this class are moot.  *See supra* note 2.

¶¶ 162–67.)  In addition to monetary damages, Plaintiffs seek an injunction requiring the City to take steps toward addressing the systemic disparities identified in the complaint.  (Compl. at 57–58.)

Presently before the Court are two motions the City filed on February 5, 2018.  First, the City moves to dismiss the complaint pursuant to Rule 12(b)(6) for failure to state a legally cognizable claim.  (Dkt. No. 11.)  Second, the City moves to stay discovery pursuant to Rule 26(c) pending resolution of its motion to dismiss.  (*Id.*)  Because today's ruling on the City's motion to dismiss obviates the City's stay motion, the latter motion is denied as moot.[8] The Court therefore turns to the principal matter before it, the City's motion to dismiss.

## II.  Legal Standard

To state a legal claim, a complaint must contain factual allegations sufficient "to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations and footnote omitted).  In other words, the complaint's allegations must "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

This standard does not require the plaintiff to plead facts that, if true, would cement the defendant's liability.  Instead, "it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal[ity]."  *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (alteration in original) (quoting *Twombly*, 550 U.S. at 556).  In the context of employment discrimination in particular, "the pleading requirements . . . are very lenient, even

---

[8] The Court notes in any event that discovery in this case has already long been stayed pending resolution of the City's Rule 12(b)(6) motion.  (Dkt. No. 24.)

*de minimis*." *Robinson v. Gucci Am.*, No. 11 Civ. 3742, 2012 WL 259409, at *3 (S.D.N.Y. Jan. 27, 2012) (quoting *Deravin v. Kerik*, 335 F.3d 195, 200 (2d Cir. 2003)). Still, a plaintiff's allegations must at least "permit the court to infer more than the mere possibility of misconduct." *Iqbal*, 556 U.S. at 679.

## III. Discussion

The City makes two principal arguments in support of its motion to dismiss. First, it argues that the complaint's factual allegations are insufficient to render Plaintiffs' discrimination claims plausible. (Dkt. No. 12 at 14–25.) Second, it argues that even if Plaintiffs' claims are plausible, they are partially time-barred. (Dkt. No. 12 at 8–14.)

### A. Plausibility of Plaintiffs' Discrimination Claims

Plaintiffs assert two distinct theories of liability. First, they claim that the City's hiring, job-placement, and compensation practices reflect a pattern or practice of intentional racial discrimination against African Americans in violation of both Section 1981 and NYCHRL. (Dkt. No. 17 at 1.) Second, they claim that those practices have an adverse—even if unintended—disparate impact on African Americans in violation of NYCHRL alone. (*Id.*)

#### 1. Pattern-or-Practice Claims (Intentional Discrimination)

##### i. Section 1981

Section 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a). The right thus protected "includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." *Id.* § 1981(b). To assert a pattern or practice that violates Section 1981, a plaintiff must plausibly allege that intentional "'racial discrimination was the [defendant's] standard operating procedure[,] the regular rather

than the unusual practice,' and that the discrimination was directed at a class of victims." *United States v. City of New York* ("*City of New York II*"), 717 F.3d 72, 83 (2d Cir. 2013) (second alteration in original) (citation omitted) (quoting *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 336 (1977)).

When bringing a Section 1981 pattern-or-practice claim, "the plaintiff bears the initial burden of presenting a prima facie case," which requires that the plaintiff produce "sufficient evidence to create a rebuttable presumption of the existence of . . . the employer's pervasive practice of intentional discrimination." *Id.* To make this prima facie showing, "the plaintiff need not initially show discrimination against any particular present or prospective employee." *Id.* at 84. Rather, "a statistical showing of disparate impact might suffice." *Id.* Once the plaintiff has made this showing, "the burden then shifts to the employer 'to rebut the presumption of discrimination.'" *Id.* (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981)).

To survive a motion to dismiss, though, "a complaint need not establish a prima facie case of employment discrimination." *Barbosa v. Continuum Health Partners, Inc.*, 716 F. Supp. 2d 210, 215 (S.D.N.Y. 2010). Instead, the complaint need only carry the "minimal burden" of "provid[ing] 'at least minimal support for the proposition that the employer was motivated by discriminatory intent.'" *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 85 (2d Cir. 2015) (quoting *Littlejohn v. City of New York*, 795 F.3d 297, 310 (2d Cir. 2015)).

Here, Plaintiffs' complaint contains three types of evidence that support their pattern-or-practice claim: (1) statistical evidence showing that (a) FDNY employs proportionally fewer African American civilian workers than other City agencies employ in similar job categories, (b) African American underrepresentation in FDNY civilian positions is most pronounced in the

highest-paid job categories, and (c) the median pay of a sampling of FDNY's African American civilian employees in at least two job positions is lower than the median pay of a sampling of FDNY's white employees in identical job positions; (2) citation to prior class-action litigations that produced evidence that FDNY's hiring practices for firefighters have had a discriminatory racial impact; and (3) anecdotal accounts of African American civilian employees who were denied sought-after job positions or pay raises.

In moving to dismiss, the City attacks the persuasiveness of each of these three categories of evidence. As to Plaintiffs' statistics, the City argues that Plaintiffs have pleaded insufficient facts to plausibly suggest that the disparities they have identified are attributable to intentional discrimination rather than to some other cause. (Dkt. No. 12 at 16–19.) As to the prior class actions, the City argues that their consideration of discrimination in FDNY's hiring practices for *firefighters* has no bearing on FDNY's employment practices for *civilian* employees. (Dkt. No. 12 at 14–15.) And as to the individual anecdotes, the City argues that they are too conclusory to establish that the African American employees denied promotions or raises had qualifications comparable to those of their more successful white colleagues. (Dkt. No. 12 at 21–22.)

Finally, the City contends in addition that Plaintiffs' own allegations rebut any inference that the City acted with an intent to discriminate. Specifically, the City highlights as demonstrative of FDNY's racial inclusivity the complaint's allegations that FDNY's civilian workforce is 22% African American (Dkt. No. 12 at 16) and that Bureau of Human Resources head Donay Queenan, who plays a significant role in approving hires, promotions, and pay raises, is biracial (Dkt. No. 12 at 20).

The Court concludes that Plaintiffs have adequately pleaded some, but not all, of their federal discrimination claims. In particular, the Court concludes that Plaintiffs have alleged

sufficient facts to raise a plausible inference that the City's hiring and job-placement practices are influenced by impermissible racial discrimination, but that the same cannot be said for their claims regarding the City's compensation decisions.

### a. Hiring and Job Placement

Plaintiffs' hiring and job-placement claims satisfy the standard required to survive a motion to dismiss. To be sure, no one of Plaintiffs' allegations constitutes a smoking gun, nor does the complaint taken as a whole compel the conclusion that the City has exhibited a practice of intentional racial discrimination in deciding whom to hire or promote into which positions. But Plaintiffs need not prove their case at this stage. Indeed, they need not even make out a prima facie case of discrimination. *See Barbosa*, 716 F. Supp. 2d at 215. Instead, they need only "raise a reasonable expectation that discovery will reveal evidence of illegal[ity]." *Arista Records*, 604 F.3d at 120 (alteration in original) (quoting *Twombly*, 550 U.S. at 556).

Plaintiffs have done so. Most critically, their statistical evidence is compelling. Unlike in *Burgis v. New York City Department of Sanitation*, 798 F.3d 63 (2d Cir. 2015), upon which the City relies, Plaintiffs have done more than produce "only the raw percentages of [white and black] individuals at each employment level," *id.* at 70. Rather, in addition to those raw numbers, Plaintiffs have shown that African Americans are underrepresented at FDNY—and particularly in higher-paying job categories—when FDNY's workforce is compared to that of other City agencies that have filled comparable positions from the exact same ranked applicant lists that FDNY uses. The City responds that "[n]either the Supreme Court nor the Second Circuit has ever held that the employer's overall workforce . . . provides the appropriate basis of comparison in a pattern or practice hiring case." (Dkt. No. 12 at 17.) And it is true enough that racial disparities across a large employer's various divisions might not in every case be probative

of any one division's discriminatory intent.  Here, though, Plaintiffs have adequately alleged that

FDNY is similarly situated to other City agencies, in that the City "refers the same pool of

candidates to FDNY and to other agencies seeking to fill [c]ivilian positions with the same civil

service titles."  (Compl. ¶ 30.)  Under such circumstances, it is highly suggestive that "the

percentages of African Americans in FDNY are far lower than in other agencies in the New York

City government."  (*Id.*)  Perhaps discovery will reveal that factors other than intentional

discrimination account for the relative underrepresentation of African Americans at FDNY.  But

absent some "obvious alternative explanation," *Iqbal*, 556 U.S. at 682 (quoting *Twombly*, 550

U.S. at 567), Plaintiffs' statistical showing of racial disparity goes a long way toward

"permit[ting] the court to infer more than the mere possibility of misconduct," *id.* at 679.

Moreover, and again unlike in *Burgis*, Plaintiffs do not rely on "statistics alone" to raise

an inference of discriminatory intent.  *Burgis*, 798 F.3d at 69.  In addition to their statistical

evidence, Plaintiffs point to a 2010 United States district court opinion concluding that an

organization of African American firefighters had presented evidence that was "plainly sufficient

to establish a prima facie case" of intentional discrimination against African American applicants

for firefighter positions at FDNY.  *City of New York I*, 683 F. Supp. 2d at 249; *see also City of*

*New York II*, 717 F.3d at 88 (leaving that conclusion undisturbed on appeal).  The court reached

this conclusion only after considering a "voluminous" summary judgment record that

represented "the fruits" of "extensive discovery."  *City of New York I*, 683 F. Supp. 2d at 244.

To be sure, that case did not involve civilian employees, and it settled prior to any

ultimate factual determination on the question of discrimination.  But the fact that the extensive

discovery in that case produced statistical and historical evidence that a court in this Circuit

deemed sufficient to make out a prima facie case that FDNY has engaged in discrimination

against African American firefighter applicants supports a "reasonable expectation that discovery" related to a different group of job-seekers at that same agency, *i.e.*, civilian job applicants and hopefuls for promotion, could turn up comparable "evidence of illegal[ity]." *Arista Records, LLC*, 604 F.3d at 120 (alteration in original) (quoting *Twombly*, 550 U.S. at 556). At the very least, that earlier case's identification of a "long-standing pattern of low minority participation" at FDNY that has persisted since the 1970s without meaningful abatement notwithstanding the imposition of a remedial injunction, *City of New York II*, 717 F.3d at 88, further bolsters the plausibility of Plaintiffs' contention that the statistical disparities identified in the complaint arise out of an agency-wide pattern of discrimination.

Further still, Plaintiffs' complaint here supplements its statistical evidence of racial disparity with anecdotal evidence designed to "bring[] 'the cold numbers convincingly to life.'" *EEOC v. Bloomberg L.P.*, 778 F. Supp. 2d 458, 469 (S.D.N.Y. 2011) (quoting *Teamsters*, 431 U.S. at 339). To be sure, not all of the complaint's individual examples hold much persuasive value. For instance, while the complaint relates that Plaintiff Liza Horsley, who is African American, has over the course of nineteen years applied for about ten positions for which she was qualified and yet has been unsuccessful each time (Compl. ¶ 53), it contains no allegations about the race and qualifications of the people ultimately selected to fill those positions, and thus provides no basis for attributing Horsley's lack of success to racial discrimination. Others of Plaintiffs' examples, however, more effectively buttress an inference of discrimination. Take, for instance, Plaintiff Stephanie Thomas, who holds a master's degree in project management and who during her nearly thirty years at FDNY has received advanced training and awards for her performance. (Compl. ¶ 55.) Despite her qualifications, Thomas received none of the seven project management positions for which she applied over the course of two years; instead, she

watched those positions either remain unfilled or go to white applicants, one of whom had only a high-school degree. (Compl. ¶ 56.) Similarly, the complaint relates the story of John Dove, an African American civilian employee, who has been denied three promotions, each of which instead went to a white applicant notwithstanding the fact that Dove was so qualified that his director asked him to train one of the promotions' recipients. (Compl. ¶ 57.) Such instances, while perhaps insufficient on their own to create a plausible inference that FDNY engages in a pattern or practice of racial discrimination in filling civilian positions, at least nudge Plaintiffs' pattern-or-practice claim ever so slightly further toward plausibility when taken together with Plaintiffs' other allegations.

Nor is the Court persuaded by the City's contention that Plaintiffs' own allegations in fact undercut any inference of discrimination by establishing FDNY's racial inclusivity. Given that African American representation at FDNY so markedly undershoots African American representation elsewhere among City agencies that draw from the exact same applicant pool for similar jobs, the fact that FDNY's civilian workforce is 22% African American does not, as the City would have it, necessarily point to a lack of discrimination. (Dkt. No. 12 at 16.) Nor is it especially relevant that Bureau of Human Resources head Donay Queenan, who approves job-placement decisions, is biracial. (Compl. ¶ 79.) Even assuming the City's dubious implicit proposition that somebody who is biracial cannot be moved to discriminate against African Americans, "[a]lmost all" of the 50–100 department heads who have a hand in hiring and promotion decisions are alleged to be white. (*Id.*)

In sum, the allegations here include Plaintiffs' strong statistical evidence of African Americans' underrepresentation at FDNY relative to their representation at other City agencies hiring from the same applicant pool, a sibling court's conclusion after full discovery that

adequate evidence supported an inference of intentional discrimination elsewhere within FDNY, and anecdotal evidence plausibly relating individual instances of discrimination. Those allegations, considered together, are sufficient to support a conclusion that it is at least plausible that FDNY stands out among City agencies for its comparatively low African American representation—particularly within higher-paid job categories—as a result of systemic, intentional racial bias. Certainly, Plaintiffs have hardly proven the point. But at this stage, they need not. Right now, the question for the Court is whether Plaintiffs have created a "reasonable expectation" that discovery will prove fruitful. *Arista Records*, 604 F.3d at 120 (quoting *Twombly*, 550 U.S. at 556). As to their federal hiring and job-placement claims, the Court concludes that they have.

### b. Compensation

Plaintiffs' claim that the City's compensation decisions reflect intentional racial bias does not fare as well. In contrast to the statistical evidence that plausibly demonstrates African Americans' underrepresentation among FDNY's civilian ranks, the statistical evidence Plaintiffs adduce to support their compensation-based claims is inadequate to bring the inference of an agency-wide pattern or practice of pay discrimination "from possible to plausible." *Biro v. Conde Nast*, 963 F. Supp. 2d 255, 287 (S.D.N.Y. 2013). The complaint points to race-linked pay disparities in only two of the many civilian job positions available at FDNY and asserts, without any stated justification, that these potentially isolated disparities make it "reasonable to believe that statistically significant disparities exist between the compensation of white and African American employees in many job titles." (Compl. ¶ 116.) What is more, even within the two civilian job positions that the complaint does address, Plaintiffs allege only that the median pay of the known white employees in each position is higher than the median pay of the known

African American employees in the same position. (Compl. ¶¶ 112, 115.) In doing so, Plaintiffs make no effort to demonstrate that the white and African American employees being compared are similarly situated with respect to anything other than their job titles, and Plaintiffs further provide no indication of how many employees holding these job titles are of unknown race and are therefore not reflected in the data. (*See id.*) Such sparse and decontextualized data points fail to plausibly suggest systemic disparity in the first place, let alone that "non-discriminatory explanations" for those disparities that do exist are "very unlikely." *Burgis*, 798 F.3d at 69.

Nor does Plaintiffs' anecdotal evidence—which Plaintiffs themselves recognize plays but a "limited role" in a pattern-or-practice claim (Dkt. No. 17 at 14)—adequately buoy their underwhelming statistical evidence. For example, Plaintiff Annette Richardson notes that upon being promoted to a position that had previously been filled by a white man, she was offered a salary 33% lower than her predecessor's. (Compl. ¶ 118.) But comparing Richardson's *starting* salary to the salary her predecessor was receiving by the time of his retirement is not especially telling, particularly absent any allegations regarding Richardson's and her predecessor's relative experience and seniority. Similarly, Plaintiffs Dino Riojas and Stephanie Thomas point to the fact that they have never received a discretionary pay raise, whereas colleagues who are not African American have been more fortunate. (Compl. ¶¶ 120–21.) But the complaint never describes the comparative qualifications of Riojas and Thomas and those employees who have received discretionary raises. Even if others of Plaintiffs' individual anecdotes have slightly more meat on the bones, such isolated instances, even when viewed alongside Plaintiffs' scattershot glimpses of statistical pay disparity, are insufficient to create a plausible inference that racial discrimination in compensation was the City's "standard operating procedure[,] the

regular rather than the unusual practice." *City of New York II*, 717 F.3d at 83 (alteration in original) (quoting *Teamsters*, 431 U.S. at 336).

Plaintiffs' federal claims are therefore dismissed to the extent that they rely on the theory that FDNY has engaged in a pattern or practice of racial discrimination in its compensation practices.

### ii.    NYCHRL

Plaintiffs' pattern-or-practice claims under NYCHRL must be analyzed "separately and independently from any federal and state law claims." *Mihalik v. Credit Agricole Ceuvreux N. Am., Inc.*, 715 F.3d 102, 109 (2d Cir. 2013). This is because NYCHRL "'explicitly requires an independent liberal construction analysis in all circumstances,' an analysis that 'must be targeted to understanding and fulfilling what the statute characterizes as [its] "uniquely broad and remedial purposes," which go beyond those of counterpart State or federal civil rights laws.'" *Bennet v. Health Mgmt. Sys., Inc.*, 936 N.Y.S.2d 112, 116 (App. Div. 1st Dep't 2011) (italics omitted) (quoting *Williams v. N.Y.C. Hous. Auth.*, 872 N.Y.S.2d 27, 31 (App. Div. 1st Dep't 2009)). To state a claim of intentional discrimination under this liberal standard, a plaintiff "need only show differential treatment—that she is treated 'less well'—because of a discriminatory intent."[9] *Mihalik*, 715 F.3d at 110.

Here, Plaintiffs' NYCHRL pattern-or-practice claims meet the same fate as their federal counterparts. Because Plaintiffs have stated a plausible Section 1981 violation based on the City's hiring and job-placement practices, they have necessarily stated a claim based on those

---

[9] The parties have not identified any federal or state-law authority analyzing the elements of a pattern-or-practice claim under NYCHRL, and this Court has found none. But the parties all assume that such claims are analyzed under the same "treated less well" standard NYCHRL applies to a claim of discrimination against an individual employee, and this Court follows suit. (Dkt. No. 17 at 7–8; Dkt. No. 21 at 9.)

same practices under NYCHRL's more permissive standard. But, for the same reasons discussed above in connection with their Section 1981 claim, Plaintiffs' meager statistical evidence of pay disparity is also insufficient to raise a plausible inference that FDNY's African American civilian employees are systemically "treated 'less well,'" *id.*, in terms of compensation than are their peers of other races. Plaintiffs' NYCHRL claim that FDNY engages in a pattern or practice of pay discrimination is therefore dismissed.

### 2. Disparate-Impact Claims Under NYCHRL

Plaintiffs next claim that even if the disparities identified in the complaint are not the product of intentional discrimination on the part of FDNY, liability may nonetheless attach under NYCHRL because FDNY's "group of [hiring, promotion, and compensation] policies or practices . . . results in a disparate impact to the detriment of" African Americans.[10] N.Y.C. Admin. Code § 8-107(17)(a)(1). To state a disparate-impact claim under NYCHRL, Plaintiffs must plausibly "(1) identify a specific employment practice or policy; (2) demonstrate that a disparity exists; and (3) establish a causal relationship between the two." *Teasdale v. City of New York*, No. 08 Civ. 1684, 2013 WL 5300699, at *8 (E.D.N.Y. Sept. 18, 2013).

With respect to the first element, Plaintiffs' complaint clearly places at issue FDNY's "fail[ure] to adopt or systematically implement at least four" specific, identifiable "human resource practices": conducting regular, objective performance evaluations; publicizing open job positions; producing written explanations for employment decisions; and monitoring employment decisions for racial disparities. (Compl. ¶ 85; *see also* ¶¶ 86, 91, 93–94.) Failure to

---

[10] Unlike Plaintiffs' theory of intentional discrimination, Plaintiffs' disparate-impact theory does not implicate Section 1981. *See Patterson v. Cty. of Oneida*, 375 F.3d 206, 226 (2d Cir. 2004) ("[A] plaintiff pursuing a claimed violation of [Section 1981] . . . under [Section 1983] must show that the discrimination was intentional . . . .").

adopt mechanisms that would limit the potential influence of racial bias in employment decisions is precisely the sort of "employment practice or policy," *Teasdale v. City of New York*, 2013 WL 5300699, at *8, that courts have found sufficient to form the basis for a disparate-impact claim under federal antidiscrimination law, *see, e.g.*, *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 990 (1988) (explaining that an employer's "leaving promotion decisions to the unchecked discretion of lower level supervisors" is an employment practice that can give rise to disparate-impact liability under Title VII if it results in racially disparate outcomes).

Plaintiffs have also sufficiently pleaded the second element of their disparate-impact claim, at least insofar as the claim pertains to FDNY's hiring and job-placement practices. As the Court has already explained, Plaintiffs' allegations plausibly establish African American underrepresentation within FDNY's civilian workforce, particularly at the highest-paying levels.

Finally, Plaintiffs have plausibly alleged that the four human resource practices absent from FDNY's playbook would, if adopted, "reduce the opportunity for discrimination" by rendering employment decisions more objective and subjecting them to greater oversight. (Compl. ¶ 3.) It is reasonable to infer, then, that the absence of those practices "facilitate[s] [a] pattern of discriminatory job selection decisions" and therefore is responsible, at least in part, for the disparate racial impact Plaintiffs have plausibly alleged. (Compl. ¶ 85.)

The City responds that Plaintiffs have failed to allege that the absence of any one of the identified human resource practices—or even the absence of all four of them—"*alone* causes the disparate impact." (Dkt. No. 12 at 24 (emphasis added).) To the extent the City argues that Plaintiffs were obliged to select one from among the four alleged human resource deficiencies as the source of the disparate impact, the argument is foreclosed by NYCHRL's text, which provides that a plaintiff who "demonstrates that a *group* of policies or practices results in a

disparate impact . . . shall not be required to demonstrate which specific policies or practices within the group results in such disparate impact."  N.Y.C. Admin. Code § 8-107(17)(a)(2) (emphasis added).  And to the extent the City argues that Plaintiffs were obliged to plausibly allege that the City's shortcomings in human resource policy are the *only* contributors to racial imbalance at FDNY, the City has pointed to no authority for the unlikely proposition that a plaintiff can establish disparate-impact liability only by pinpointing every last cause of unjustified racial disparity within an employer's workforce.

Plaintiffs have therefore stated a viable disparate-impact claim under NYCHRL on the basis of FDNY's hiring and job-placement decisions.

As for Plaintiffs' compensation-based claims, though, they falter here for the same reason they fail under the pattern-or-practice rubric.  Critically, a disparate-impact claim under NYCHRL requires a showing that one or more identifiable employment practices "results in a disparate impact."  N.Y.C. Admin. Code § 8-107(17)(a)(1).  As the Court has already explained, Plaintiffs' allegations are insufficient to raise a plausible inference that the compensation of FDNY's African American civilian employees meaningfully lags behind that of FDNY's other civilian employees.  Plaintiff's NYCHRL disparate-impact claim based on FDNY's compensation practices is therefore dismissed.

### B.      Whether Plaintiffs' Claims Are Partially Time-Barred

The City contends that even if Plaintiffs have adequately pleaded violations of Section 1981 and NYCHRL, the claims are time-barred to the extent that they accrued prior to December 1, 2014—three years prior to the filing of the complaint.  (Dkt. No. 12 at 8–10; Dkt. No. 25.)  Plaintiffs respond that Section 1981 liability can attach for certain promotion and compensation decisions occurring between December 1, 2013, and December 1, 2014 (Dkt. No. 17 at 16–19), and that none of their NYCHRL claims are time-barred (Dkt. No. 17 at 19–24).

### 1.      Section 1981 Claims

The statute of limitations for a claim brought directly under Section 1981 against a private employer depends on whether or not the claim was cognizable prior to the enactment of the Civil Rights Act of 1991, Pub. L. No. 102-166, 105 Stat. 1071.  That Act extended Section 1981's antidiscrimination protections beyond the time of contract formation to cover an employee's subsequent "enjoyment of all benefits, privileges, terms, and conditions of the [ongoing] contractual relationship."  *Id.* § 101, 105 Stat. at 1072 (codified at 42 U.S.C. § 1981(b)); *see also Patterson v. McLean Credit Union*, 491 U.S. 164, 177 (1989) (holding that the pre-1991 version of Section 1981 did not cover "conduct by the employer after the contract relation has been established").  Where a Section 1981 claim asserts the sort of discrimination in contract formation that would have been actionable prior to 1991, it "is subject to the state statute [of limitations] applicable to personal injury claims," which in New York is three years.  *Tadros v. Coleman*, 898 F.2d 10, 12 (2d Cir. 1990).  But where a Section 1981 claim asserts the sort of post-formation discrimination that is actionable only as a result of the 1991 amendment, it is subject to the four-year statute of limitations applicable to "civil action[s] arising under an Act of Congress enacted after [December 1, 1990]."  28 U.S.C. § 1658; *see also Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 383 (2004).

Here, Plaintiffs accept that Section 1981 claims asserting discrimination in hiring or in conferring the sort of promotion that creates "an opportunity for a new and distinct relation between the employee and the employer" concern contract formation and thus are subject to a three-year limitations period.  (Dkt. No. 17 at 16.)  But they argue that their Section 1981 claims asserting discrimination in connection with compensation and the sort of promotions that establish no "new and distinct" employment relationship concern post-formation conduct and are therefore subject to a four-year limitations period.  *See Butts v. City of N.Y. Dep't of Hous. Pres.*

& *Dev.*, 990 F.2d 1397, 1412 (2d Cir. 1993) (holding that promotions that "create[] a qualitatively different relation between the employer and employee" were covered by Section 1981 prior to 1991 but that "[p]romotions understood by the parties to be given routinely upon satisfactory job performance" were not).

Plaintiffs overlook, however, that they have not—and indeed could not have—brought their federal claims against the City directly under Section 1981, but instead have located their right to relief for the City's alleged Section 1981 violations in Section 1983, which provides a cause of action for statutory violations committed under color of state law. (Compl. ¶¶ 158–59; Dkt. No. 17 at 15–16.) Plaintiffs have proceeded under Section 1983 because, as the Supreme Court has explained, "the express cause of action for damages created by [Section] 1983 constitutes the *exclusive* federal remedy for violation of the rights guaranteed in [Section] 1981 by state governmental units." *Jett v. Dall. Indep. Sch. Dist.*, 491 U.S. 701, 733 (1989) (emphasis added). And claims brought under Section 1983 are "governed by state law, [which] in this case is the three-year period for personal injury actions under New York State law." *Shomo v. City of New York*, 579 F.3d 176, 181 (2d Cir. 2009); *see also Morse v. Univ. of Vt.*, 973 F.2d 122, 126 (2d Cir. 1992) ("[D]iscrimination actions brought pursuant to [Sections 1981 and 1983] are most analogous to personal injury actions under state law . . . .").

Ultimately, because Plaintiffs have brought their Section 1981 claims pursuant to Section 1983, the claims are subject to Section 1983's three-year statute of limitations rather than Section 1981's more variable limitations period. *See City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 124–25 (2005) (explaining that the statute of limitations for a Section 1983 action does not depend on which underlying right the action is brought to enforce); *Duplan v. City of New York*, 888 F.3d 612, 619–21 (2d Cir. 2018) (rejecting plaintiff's effort to bring a claim

against state actors directly under Section 1981 in order to avoid Section 1983's narrower statute of limitations). Plaintiffs' federal claims are therefore dismissed to the extent that they accrued prior to December 1, 2014.

### 2. NYCHRL Claims

Claims under NYCHRL are also generally subject to a three-year statute of limitations. *See* N.Y.C. Admin. Code § 8-502(d). Plaintiffs, however, contend that their effort to seek redress under NYCHRL for "racial discrimination within FDNY in job selection and compensation decisions [that] has been continuing since 2004" faces no timeliness problem. (Compl. ¶ 166; *see also* Dkt. No. 17 at 19.) In making this argument, Plaintiffs invoke the "continuing violation" doctrine, which provides that if a plaintiff makes a discrimination claim "that is timely as to any incident of discrimination in furtherance of an ongoing policy of discrimination, all claims of acts of discrimination under that policy will be timely even if they would be untimely standing alone."[11] *Chin v. Port Auth. of N.Y. & N.J.*, 685 F.3d 135, 155–56 (2d Cir. 2012) (quoting *Lambert v. Genesee Hosp.*, 10 F.3d 46, 53 (2d Cir. 1993), *overruled on other grounds by Greathouse v. JHS Sec. Inc.*, 784 F.3d 105 (2d Cir. 2015)).

For purposes of Title VII's federal antidiscrimination protections, the continuing violation doctrine is inapplicable where, as here, the employer conduct complained of consists of a series of "[d]iscrete acts such as . . . failure to promote . . . or refusal to hire." *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002). But some courts have held that a "more generous[] continuing violations doctrine" applies to NYCHRL claims, *Sotomayor v. City of New York*, 862 F. Supp. 2d 226, 250 (E.D.N.Y. 2012) (citing *Williams*, 872 N.Y.S.2d at 35), and

---

[11] Plaintiffs have disavowed any intention to argue that the continuing violation doctrine applies to their federal claims. (Dkt. No. 17 at 19.)

the parties assume that these courts are correct[12] (Dkt. No. 12 at 12; Dkt. No. 17 at 19). Under this more permissive standard, a plaintiff can demonstrate a continuing violation "where there is proof of specific ongoing discriminatory policies or practices, or where specific and related instances of discrimination are permitted by the employer to continue unremedied for so long as to amount to a discriminatory policy or practice." *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 766 (2d Cir. 1998) (quoting *Cornwell v. Robinson*, 23 F.3d 694, 704 (2d Cir. 1994)); *see also Dimitracopoulos v. City of New York*, 26 F. Supp. 3d 200, 212 (E.D.N.Y. 2014) (applying this standard to an NYCHRL claim).

As for Plaintiffs' NYCHRL pattern-or-practice claim, it almost *ipso facto* alleges a continuing violation—namely, a longstanding, agency-wide policy of "intentional racial discrimination against African American employees" in hiring, promotion, and compensation decisions. (Compl. ¶ 3.)

The City rejects this straightforward conclusion, arguing that the continuing violation doctrine can apply only where discrimination is attributable to an employer's use of "an 'identifiable policy or practice' such as the 'repeated use of discriminatory seniority lists or employment tests'" and that, here, Plaintiffs attribute the racial disparities at FDNY to the interrelation of several nebulous factors. (Dkt. No. 12 at 12 (quoting *Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 907 (2d Cir. 1997)).) But the gravamen of Plaintiffs' pattern-or-practice claim is that FDNY has embarked on a single continuous and intentional effort to block the advancement of African Americans, even if it has pursued this end through a diverse array of

---

[12] Courts are divided on whether or not claims of a continuing violation under NYCHRL should be analyzed under the standard that applies to Title VII claims. *See Torres v. N.Y. Methodist Hosp.*, No. 15 Civ. 1264, 2016 WL 3561705, at *8 n.10 (E.D.N.Y. Jan. 7, 2016) (acknowledging a split of authority). But because the parties here assume that Title VII's stricter standard does not apply to Plaintiffs' NYCHRL claims, this Court does the same.

means. Where varied but related instances of discrimination "continue unremedied" for a long enough period, discrimination itself can "amount to a . . . policy or practice" that triggers the continuing violation doctrine. *Lightfoot*, 110 F.3d at 907 (quoting *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 713 (2d Cir. 1996)); *see also id.* (observing that allegations of "an ongoing policy of 'victimizing' older employees" are sufficient to state a continuing violation claim); *Port Auth. Police Asian Jade Soc'y of N.Y. & N.J. Inc. v. Port Auth. of N.Y. & N.J.*, 681 F. Supp. 2d 456, 464–65 (S.D.N.Y. 2010) (holding that "intentional discrimination [that] was so pervasive in [an employer's] practices for promotion . . . that it amounted to a discriminatory policy or custom" could form the basis for a continuing violation claim); *Jeudy v. City of New York*, 37 N.Y.S.3d 498, 501 (App. Div. 1st Dep't 2016) (holding that an employer's "standing practice of refusing to promote foreign-accented" employees can form the basis for a continuing violation claim). The continuing violation doctrine therefore applies to Plaintiffs' NYCHRL pattern-or-practice claim based on FDNY's alleged policy of intentionally discriminating against African Americans in its hiring and job-placement decisions.

As for Plaintiffs' disparate-impact claim, it too plausibly alleges a continuing violation under NYCHRL's liberal standard. As explained, Plaintiffs allege that FDNY's failure to effectively implement human resource practices that would lend greater objectivity, consistency, and accountability to promotion decisions has resulted in persistent African American underrepresentation since at least since 2004. In essence, Plaintiffs' disparate-impact claim challenges the ad hoc and subjective way that FDNY is alleged to have long approached its civilian employment decisions. This target is sufficiently precise to constitute an "ongoing discriminatory polic[y] or practice[]." *Quinn*, 159 F.3d at 766 (quoting *Cornwell*, 23 F.3d at 704); *see also Port Auth. Police Asian Jade Soc'y*, 681 F. Supp. 2d at 463 (finding that plaintiffs

adequately "identif[ied] a particular employment practice" where they challenged an employer's insufficiently standardized "practices for promotion"). And even if the specifics of FDNY's allegedly unsystematic process for making employment decisions "were occasionally altered during the relevant period, the overall policy" of allowing the relevant decision-makers largely unguided and unsupervised discretion was alleged to have been "continuously maintained" throughout. *Port Auth. Police Asian Jade Soc'y*, 681 F. Supp. 2d at 463. Plaintiffs have thus plausibly alleged a continuing disparate-impact violation under NYCHRL with respect to their hiring and job-placement claims.

## IV. Conclusion

For the foregoing reasons, the City's motion to stay discovery is DENIED as moot, Plaintiffs' claims are DISMISSED as moot to the extent they allege discrimination against EMS employees, and the City's motion to dismiss is GRANTED as to Plaintiffs' Section 1981 and NYCHRL claims insofar as they allege pay discrimination and as to all federal claims accruing prior to December 1, 2014. The City's motion to dismiss, however, is DENIED as to (1) Plaintiffs' Section 1981 claims accruing after December 1, 2014, insofar as they allege a pattern or practice of intentional discrimination in hiring and job placement; (2) Plaintiffs' NYCHRL claims insofar as they allege a pattern or practice of intentional discrimination in hiring and job placement; (3) and Plaintiffs' NYCHRL claims insofar as they allege that the City's hiring and job-placement practices have a disparate impact on African Americans.

The Clerk of Court is directed to close the motion at Docket Number 11.

SO ORDERED.

Dated: September 28, 2018
      New York, New York

 

_____
J. PAUL OETKEN
United States District Judge