**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| ANNETTE RICHARDSON, | ) | |
| DEBORAH BOWMAN, | ) | |
| DEBRA POE, | ) | |
| DINO RIOJAS, | ) | |
| STEPHANIE THOMAS, | ) | |
| BRENDA McKIVER, | ) | |
| JON WATSON, and | ) | |
| ERICA RICHARDSON | ) | |
| | ) | |
| On behalf of themselves and all others | ) | |
| similarly situated, | ) | Civil No. 17-CV-9447 (JPO) |
| | ) | |
| Plaintiffs, | ) | **AMENDED COMPLAINT** |
| | ) | |
| v. | ) | CLASS ACTION |
| | ) | |
| CITY OF NEW YORK, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## I.  INTRODUCTION

1.      For well over a century, the Fire Department of New York (the "FDNY") has engaged in a pattern or practice of systemic, continuous, and intentional discrimination against African American non-uniformed ("Civilian") employees and job applicants in hiring, advancement, and compensation decisions.  For about 100 years after the Civil War, white men, primarily of Irish and Italian descent, controlled the FDNY at all levels, from upper management to staff.  Token integration began during the civil rights movement of the 1960s, but African Americans remained severely underrepresented at all levels of the agency and in all types of jobs.

2.      As a result of the broad pattern of racial discrimination, the percentage of African American employees in FDNY as a whole is far less than in other agencies of the New York City government, the percentage of African American employees in higher paying Civilian jobs in FDNY is far less than in lower compensated jobs, and African American Civilian employees are paid lower salaries or wages than white employees in the same job positions in the more highly compensated job categories.

3.      The interaction of four factors produces these racial disparities in job selections and compensation.  First, despite knowing of the statistical racial disparities, FDNY leadership has failed to adopt or implement systematically widely accepted human resources practices that reduce the opportunity for discrimination, including policies and practices in connection with performance appraisals, posting of vacant positions, and monitoring of decisions for patterns of racially skewed outcomes.  Second, a culture of in-group favoritism under which white decision-makers favor people with similar backgrounds to themselves has infected the FDNY for generations.  Third, a very small group of decision-makers have contributed to the racial disparities through their decisions to approve or disapprove most proposed job selection and compensation decisions for Civilian FDNY employees.  Finally, the Mayor's office and other City offices and agencies have failed to exercise control over FDNY's human resources and diversity practices despite myriad lawsuits, unfavorable reports, and other beacons shining light on the racial discrimination at FDNY.  These factors reflect intentional racial discrimination against African American employees, and FDNY's practices have had a disparate impact on the hiring, advancement, and compensation of African American Civilian employees.

4.      Plaintiffs bring this action on behalf of themselves and two classes of African Americans defined more precisely in paragraph 134 below – the "Employee Class" and the

"Rejected Applicant Class."  The compensation claims are brought on behalf of a subclass of the

Employee Class, the "Employee Compensation Subclass."  They claim that the FDNY's racial

discrimination violates 42 U.S.C. § 1983 and the New York City Human Rights Law

("NYCHRL"), N.Y.C. Admin. Code § 8-101 *et seq*.

## II.  JURISDICTION AND VENUE.

5.      This Court has jurisdiction over the claims under 42 U.S.C. §§ 1981 and 1983

pursuant to 28 U.S.C. § 1343(a)(4), which confers original jurisdiction upon this Court in a civil

action to recover damages or to secure equitable relief or other relief under any Act of Congress

providing for protection of civil rights; pursuant to 28 U.S.C. § 1331, which confers original

jurisdiction upon this Court in a civil action arising under the Constitution or laws of the United

States; and pursuant to 28 U.S.C. § 1337, which confers original jurisdiction upon this court in a

civil action arising under any Act of Congress regulating commerce.

6.      This Court has jurisdiction over the claims under the NYCHRL pursuant to 28

U.S.C. § 1367(a), which confers supplemental jurisdiction upon this Court over claims "that are

so related to claims in the action within [its] original jurisdiction that they for part of the same

case or controversy . . . ."

7.      Venue is proper in this Court under 28 U.S.C. § 1391 because Defendant resides

in this judicial district and because a substantial part of the events or omissions giving rise to the

claim occurred in this judicial district.

## III.  PARTIES

8.      Plaintiff Annette Richardson is African American and has worked as a Civilian

for the FDNY from 2006 until the present.  She is currently employed as an Associate Staff

Analyst and is a representative of the Employee Class and the Employee Compensation Subclass.

9.      Plaintiff Deborah Bowman is African American and has worked as a Civilian for the FDNY from 1987 until the present.  She is currently employed as an Administrative Manager.  While her position includes the word "Manager," she is classified as non-managerial. She is a representative of the Employee Class and the Employee Compensation Subclass.

10.      Plaintiff Debra Poe is African American and has worked as a Civilian for the FDNY from 2006 until the present.  She is currently employed as an Administrative Manager. While her position includes the word "Manager," she is classified as non-managerial.  She is a representative of the Employee Class and the Employee Compensation Subclass.

11.      Plaintiff Dino Riojas is African American and has worked as a Civilian for the FDNY from 1982 until the present.  He is currently employed as a Computer Specialist.  He is a representative of the Employee Class and the Employee Compensation Subclass.

12.      Plaintiff Stephanie Thomas is African American and has worked as a Civilian for the FDNY from 1988 until the present.  She is currently employed as a Computer Specialist and Project Manager and is a representative of the Employee Class and the Employee Compensation Subclass.

13.      Plaintiff Brenda McKiver is African American and has worked as a Civilian for the FDNY from 1988 until the present.  She is currently employed as a Principal Administrative Associate.  She is a representative of the Employee Class.

14.      Plaintiff Jon Watson is African American and has worked as a Civilian for the FDNY from 1999 until the present.  He is currently employed as an Associate Fire Protection Inspector.  He is a representative of the Employee Class.

15.     Plaintiff Erica Richardson is African American.  She unsuccessfully applied for four Civilian positions with FDNY in 2015 and 2016 – Substance Abuse Counselor, Family Liaison, Community Coordinator, and Academy Administrator – for which she was qualified. She is the representative of the Rejected Applicant Class.

16.     The law of the State in which the district court is located determines a party's amenability to suit.  Under the New York City Charter, "all actions and proceedings for the recovery of penalties for the violation of any law shall be brought in the name of the City of New York and not in that of any agency, except where otherwise provided by law." The FDNY is an agency of the City Government of New York.  Because the FDNY is an agency of the City, the City is the named Defendant, but the Complaint focuses on the racial discrimination committed by the FDNY.

17.     The FDNY is the agency charged with protecting the lives and property of the people of New York City through prevention, education, fire suppression, medical services and other related emergency and non-emergency activities.  The Fire Commissioner, who heads the agency, is appointed by and reports directly to the Mayor of the City of New York.

## IV.  FDNY'S WORKFORCE

18.     According to the Workforce Profile Report for FY 2015 prepared by the Department of Citywide Administrative Services for the City of New York ("2015 Workforce Report"), the FDNY had about 16,300 full time and about 100 part time employees at the end of Fiscal Year 2015.

19.     The 2015 Workforce Report reflects that FDNY had over 8,400 firefighters and over 2,600 firefighter supervisors at that time.  Together, these two groups comprised about 2/3 of the FDNY workforce in 2015.

20.     Racial discrimination was especially blatant against African Americans aspiring to become firefighters.  In 2015, only about 8% of firefighters and about 2% of firefighter supervisors were African-American, and those pitifully small percentages would have been even lower but for the litigation, *United States v. City of New York* in the Eastern District of New York, discussed in subsection V.E below.  Because of the continuing jurisdiction of the Eastern District over the injunctive relief contained in the settlement that resolved that lawsuit, African-American firefighter employees and job applicants are not part of either proposed Class.

21.     However, the 2015 Workforce Report places into the firefighter job category not only firefighters and their supervisors, but also fire protection inspectors.  As discussed below, FDNY employed about 350 fire protection inspectors in 2015 and 2016.  While these inspectors were treated as uniformed for a few purposes, for most purposes, including promotion and compensation, they were treated like civilian employees.  They therefore are included in the proposed employee class and applicants for fire protection inspector positions are included in the applicant class.

22.     The 2015 Workforce Report also shows that that over 3,800 employees worked in the EMS section of FDNY, about 22% of all FDNY employees.  The EMS employees primarily consisted of over 2,400 EMTs, about 900 paramedics, and over 500 EMT supervisors (collectively, the "EMS Positions").  Because no Plaintiff works or applied to work in an EMS position, African American EMS Employees also are not part of either proposed Class in this case.

23.     The percentage of African Americans among the remaining 1,600 employees, who are characterized as Civilian employees in and are the focus of this Complaint, has risen slowly since the 1960s, but not evenly.  The positions occupied by Civilian employees (the

6

"Civilian Positions") are divisible into eight job categories.  Seven of the job categories are identified in the table below.

24.     According to the 2015 Workforce Report, four of the seven listed job categories had over 50% white employment in 2015 and under 25% African-American employment.  The other three job categories had well under 50% white employment and 33% or more African-American employment.  Not surprisingly, the four job categories with greater white and smaller African-American employment had much higher average salaries or wages (not including overtime) ($85,223) in 2015 than the other three categories ($52,709).  The average salaries or wages in the primarily minority jobs were only 62% of the average salaries or wages in the primarily white jobs:

**Employees in Primarily White Civilian Jobs Receive Much Higher Compensation at FDNY Than Do Employees in Primarily Minority Jobs (2015)**

| Job Category | Number | Percent White | Percent Black | Percent Other | Average Salary/Wages |
|---|---|---|---|---|---|
| **Primarily White Jobs** | | | | | |
| Administrators/Managers | 148 | 63% | 18% | 19% | $117,831 |
| Professionals (Science, Health, Lawyers) | 183 | 53% | 14% | 33% | $ 92,877 |
| Craft/Operators | 342 | 72% | 12% | 16% | $ 79,870 |
| Management Specialists | 263 | 56% | 21% | 23% | $ 68,508 |
| Subtotals for White Jobs | 936 | 62% | 16% | 22% | $ 85,223 |
| **Primarily Minority Jobs** | | | | | |
| Para Professionals | 50 | 33% | 35% | 32% | $ 54,858 |
| Clericals/Clerical Supervisors | 437 | 42% | 33% | 25% | $ 52,515 |
| Other (primarily Laborers and Transportation) | 62 | 41% | 34% | 25% | $ 52,345 |
| Subtotals for Minority Jobs | 549 | 41% | 33% | 26% | $ 52,709 |
| Total | 1,485 | 54% | 22% | 24% | $ 73,203 |

25.     Overall, about 330 Civilian Employees in these job categories in 2015 were African American, about 22% of the total number of Civilian Employees in these categories. Because the proposed Employee Class excludes African Americans in the

Administrator/Manager job category and certain other highly compensated individuals, about 300 Civilian Employees in these seven categories in 2015 were members of the proposed Employee Class.

26.     In addition, the proposed Employee Class contains roughly 80 African American fire protection inspectors.  Because the 2015 Workforce Report includes fire protection inspectors with firefighters, for which there is no comparable job in other City agencies, Plaintiffs cannot make the same type of comparison between the percent of African Americans in inspector positions at FDNY and in other agencies that they performed for the other seven job categories.  However, there are other indicators, discussed below, of systemic discrimination against African Americans in fire protection inspector jobs.

## V.  FDNY'S JOB SELECTION DECISIONS

### A.     FDNY Manipulates the City's Standardized Processes for Filling Vacant Positions Through Outside Hires or Promotions to Select Persons from Favored Groups

27.     Most or all Civilian Positions are civil service positions.

28.     Candidates for most but not all civil service positions must take and pass an exam before they can be hired. The positions for which tests are required are called the "competitive class." Each civil service job title has a different exam.  These exams, which are administered by NYC's Department of Citywide Administrative Services ("DCAS"), are supposed to test individuals on the skills and abilities that they need to do the job.

29.     There are two different types of civil service exams:  open competitive exams open to members of the public; and promotion exams open only to current City employees. Incumbent employees are not supposed to have any priority in receiving notice of or in filling positions subject to open competitive exams.  However, certain positions above entry level are limited to incumbent FDNY employees and are not open to the public.

30.     After each exam, DCAS creates an "eligible to hire" list.  This list has all candidates who passed the exam, ranked in score order.  When a New York City agency has a hiring need, it is supposed to contact candidates for that civil service job title for interviews in order of their ranked scores.

31.     While some civil service job titles in the New York City government are unique or virtually unique to FDNY, such as the firefighter and EMS positions, most of the Civilian job titles are not.  Thus, the "eligible to hire" lists provided to FDNY based on open competitive exams (as opposed to promotion only exams) should be identical to the "eligible to hire" lists provided to other government agencies seeking to fill positions with the same job titles.

32.     The manager of an organizational unit seeking to fill a vacancy generally receives the "eligible to hire" list, directly or indirectly, from DCAS.  Typically, FDNY, like other city agencies, conducts interviews of the candidates with the highest scores on the exams.  This interview typically includes not only the unit head and/or the unit head's representative, but also a representative of FDNY's Human Resources unit.  The HR representative generally is Donay Queenan, the head of the unit since 2004, or one of her direct reports to whom she delegates participation in the interview.

33.     Because DCAS refers the same pool of candidates to FDNY and to other agencies seeking to fill Civilian positions with the same civil service titles, the percentages of African American employees in the Civilian civil service positions at FDNY should be similar to the percentages of African American employees in the identical positions at other city agencies. But, as discussed in subsections V.B and C below, the percentages of African Americans in FDNY Civilian positions are far lower than in other agencies in the New York City government. The gaps between the percentages of African American Civilian employees in FDNY and in

other New York City agencies are especially pronounced in higher paying jobs.  Reasons for these disparities are set out in subsections V.E through V.G.

34.    In addition, FDNY management can, and frequently does, circumvent these standardized process by creating a particularized business title for a position and posting qualifications for that position that are tailored to the person whom management has predetermined should fill the position.  Often, the favored person is someone with the firefighter title who is unable to perform the functions of that position and is assigned to a different position on a "provisional" or "temporary" basis.  After posted qualifications for the business title are tailored to the provisional employee, that "firefighter" typically is offered the position after going through the interview process.

35.    Sometimes the skewing of the process through job qualifications is not individualized, as in the case of Fire Marshals.  Fire Marshals are among the highest paid job titles in FDNY; with overtime, many Fire Marshals earn in excess of $200,000 per year.

36.    In the 1970s, a requirement was added to the list of Fire Marshal qualifications that a candidate have previously served as a firefighter.  This qualification was added at a time that the FDNY began to integrate, but when virtually every firefighter was white.  Because of this requirement and the FDNY's strong, decades-long resistance to black firefighters, Fire Marshal ranks remain virtually lily-white.

37.    Most Fire Marshals conduct investigations, like police detectives, while others provide security to Fire Department Headquarters, facilities, Fire Chiefs and the Fire Commissioner. Firefighters do not receive training in these duties.  Accordingly, new Fire Marshals are sent to an academy and are given extensive training before beginning to function as Fire Marshals.

38.     If the goal were to limit Fire Marshals to job titles that provided exposure to the duties of Fire Marshals, then the approximately 350 lowly paid fire protection inspectors, many of whom are African American, should be eligible.  They have much more extensive exposure and training concerning causes of fires and fire prevention than does the average firefighter.

39.     This arbitrary, exclusionary policy has the effect of keeping African Americans, whether in or outside the FDNY, from attaining this prestigious, high paying position.

40.     Another device used to bring favored persons, generally white people who are known by white managers at FDNY, into the department is to use an employment agency to fill a position on a "temporary" basis, but then to make the position permanent after the "temporary" employee has established himself or herself in the position.  Upon information and belief, the manager alerts the favored person to submit his or her resume and other application materials to the employment agency.  Also upon information and belief, the employment agency typically will forward application materials for several candidates but an FDNY manager makes clear to the agency that one of the persons whose materials should be included in the package is the favored person.  The company most frequently used for this type of circumvention of the hiring process is called Adil Business Systems, Inc.  Adil is beholden to FDNY because of a contract under which Adil or an affiliate performs accounting and bookkeeping services for FDNY.  A 2009 report calculated that the accounting contract with Adil cost the Department over $1 million per year.

41.     Another means by which FDNY circumvents the City's efforts to create a race-neutral hiring process is to hire heavily into civil service positions for which DCAS has not created a standardized test.  For example, the City does not have a standardized test for Community Coordinators.  Although many clerical employees possess the qualifications to serve

11

as Community Coordinators, which are higher-paying paraprofessional jobs, FDNY promotes very few clerical employees into Community Coordinator positions.  Instead, it fills most of the Community Coordinator positions with outside hires who have not had to pass a DCAS examination; these hires often are white.  FDNY, for example, has twice passed over Employee Class member Liza Horsley's applications for promotion to Community Coordinator positions in favor of hires of outside white candidates, even though she has not only a Bachelor's but also a Master's degree and many years of experience with FDNY.

42.     In still another strategy, the Bureau of Technology and Development Systems within FDNY hired a group of "temporary," primarily non-African American, computer consultants, but converted many of them to permanent positions in FDNY.

43.     Although the strategies may vary somewhat, their purpose and effect are the same: to keep the FDNY the most racially discriminatory agency in the City.

## B.     FDNY Employs Much Lower Percentages of African Americans Than Other Agencies Throughout the New York City Government

44.     Although the tests and job selection processes that FDNY are supposed to use to fill vacant positions are the same as those that the other agencies of the New York City government are supposed to use, the results are very different.  The table below compares the numbers and percentages of white and African American employees in each of the seven types of Civilian job categories listed in paragraph 23 above in the City government as a whole and in the FDNY, according to the 2015 Workforce Report.  The final column is calculated by dividing the percentage of African Americans in each of the seven job categories in FDNY, as well as overall, by the percentage of African Americans in the corresponding group for the City government as a whole, and thus reflects the shortfall in African Americans at FDNY (if any) as judged by this comparator group:

12

**Shortfalls in Employment of African Americans in Civilian Positions
at FDNY in 2015**

| Job Category | FDNY | | | NYC | | | FDNY Shortage of Black Employees |
|---|---|---|---|---|---|---|---|
| | Number | White % | Black % | Number | White % | Black % | |
| **Primarily White Jobs** | | | | | | | |
| Administrators/Managers | 148 | 63% | 18% | 23,526 | 48% | 27% | -33% |
| Professionals (Science, Health, Lawyers) | 183 | 53% | 14% | 26,026 | 34% | 28% | -50% |
| Craft/Operators | 342 | 72% | 12% | 10,431 | 59% | 19% | -37% |
| Management Specialists | 263 | 56% | 21% | 13,003 | 33% | 37% | -43% |
| Subtotals for White Jobs | 936 | 62% | 16% | 72,986 | 42% | 28% | -43% |
| **Primarily Minority Jobs** | | | | | | | |
| Para Professionals | 50 | 33% | 35% | 41,388 | 25% | 33% | +6% |
| Clericals/Clerical Supervisors | 437 | 42% | 33% | 32,652 | 23% | 46% | -28%% |
| Laborers and Transportation | 62 | 41% | 34% | 2,179 | 42% | 33% | +3% |
| Subtotals for Minority Jobs | 549 | 41% | 33% | 76,219 | 25% | 39% | -15% |
| Totals | 1,485 | 54% | 22% | 149,205 | 33% | 33% | -33% |

45.     The City's own numbers, set out in the 2015 Workforce Report, thus show that overall the FDNY employed only 67% of the expected number of African Americans in 2015 in these seven Civilian job categories, using employment throughout the City government to determine the expected numbers.  Because there were 1,485 Civilian employees in 2015, this means that FDNY employed approximately 160 fewer African Americans than expected in Civilian jobs.

46.     Upon information and belief, the disparities between the percentages of African Americans employed by the New York City government and FDNY in each Civilian job category and overall were as large or larger in 2004 (and earlier years) as they were in 2015.  The disparities also were similar in each year between 2004 and 2015 and up to the present.

47.     The disparities between the percentages of African Americans employed by the New York City government and FDNY were largely a product of FDNY's racial discrimination in hiring.  In 2014, the only year for which the City has reported comparative data in its Workforce Profiles, 41% of its hires overall were white employees and 27% were African Americans.  But at FDNY, 59% were white and only 14% were African American.  In other

words, FDNY hired African Americans at only about half of the rate at which other City agencies did.

**C.**     **FDNY's Employment of African Americans Is Particularly Low in Higher Compensated Positions**

48.     The shortage of African Americans in FDNY's Civilian jobs alleged in paragraph 44 above is not uniform.  FDNY employed African Americans at only 57% of the expected rates in the four primarily white higher-paying Civilian job categories (Administrators/Managers, Professionals, Craft/Operatives, and Management Specialists) and at 85% of the expected rates in the three primarily minority lower-paying job categories (Para Professionals, Clericals/Clerical Supervisors, and Laborers and Transportation).  This difference reflects both that hiring discrimination at FDNY is more pronounced in the higher paying job categories than the lower paying job categories, and that FDNY discriminates in advancement of African Americans from the lower paying job categories to the higher paying job categories.

49.     Even within the same Civilian job categories in FDNY, African Americans tend to be found disproportionately in lower paying jobs.  For example, in 2015 Clerical Associates were paid on average about $42,000, while Principal Administrative Associates were paid about $56,500 on average, *i.e.*, about 33% more.  There were approximately four times (400%) as many African American as white employees with the Clerical Associate job title in 2015, but only 50% as many African American as white employees with the Principal Administrative Associate job title that year.

50.     As another example, Computer Associates averaged about $10,000 less in compensation than Computer Specialists in 2015.  There were about equal numbers of white and African American Computer Associates in 2015, but four times as many white as African Americans in the higher-paying Computer Specialist position in 2015.

14

51.     In still another example, in 2016 FDNY employed 99 Associate Fire Protection Inspectors level 2.  Plaintiffs have been able to determine the race of 95 of them:  46 were African American, 49 were not.  Thus, African Americans comprised 48% of the level 2 inspectors.  By contrast, only 14 of the 52 level 3 inspectors of known race, or about 27%, were African American.  The drop in African-American percentage of the inspector workforce from 48% of the level 2's to 27% of the level 3's is primarily a product of disparities in promotion rates.  Although African Americans comprised 48% of the level 2 inspectors in 2016, only 1 of the 16 persons (6%) promoted to level 3 between 2010 and the present have been African American.  Conversely, white employees were 26% of the level 2 inspectors in 2016, but 56% (9 of 16) of the persons promoted to level 3 between 2010 and the present.  The disparity in the promotion rates of black and non-black employees cannot be attributed to tenure: the average tenure of African-American Associate Fire Protection Inspectors was about a year longer than that of non-African American Fire Protection Inspectors.  And, of course, the difficulty that African American fire protection inspectors faced in achieving promotions had real world consequences.  The salaries of almost all level 2 inspectors were about $56,700, while the salaries of level 3 inspectors generally were about $62,800 – a difference of about $6,100.

52.     Upon information and belief, in 2004 the disparity between the expected rates at which FDNY employed African Americans (measured by the employment rates of the New York City Government) and FDNY's actual rates of employment of African Americans in higher paying Civilian job categories was, as in 2015, greater than the disparity between the expected and actual rates at which FDNY employed African Americans in lower paying job categories. The same was true for all years in between 2004 and the present.  The persistence of these

15

disparities over time reflects a continuing pattern of racial discrimination in job selection decisions, especially into higher paying jobs.

**D.**   **The Experiences of the Plaintiffs and Class Members Reflect Discrimination in Job Selection Decisions Against Outside and Internal African American Applicants**

53.   The experiences of Plaintiffs and class members exemplify why there are fewer African Americans among Civilian Employees at FDNY than in corresponding jobs throughout the City government, and why the disparities are especially large in higher-paying positions.

54.   Plaintiff Erica Richardson applied for a position as a substance abuse counselor at FDNY in late 2015.  She was eminently qualified for the position:  she earned a bachelor's degree in therapeutic recreation from Kean University and another bachelor's degree in psychology from the College of Staten Island.  She has been a licensed substance abuse counselor since 2009.  When she applied to FDNY, she worked as a recreation therapist for a veteran's home operated by the State of New York.  Her qualifications for FDNY's substance abuse counselor position also are established by the fact that the agency interviewed her for the position on January 28, 2016.  She was told that FDNY would make its selection in 30 days, but never was contacted again about the job.

55.   Undeterred, Richardson applied for three positions in 2016, as a family liaison on June 9, 2016, a community coordinator on June 20, 2016, and an academy administrator on August 30, 2016.  She was not interviewed, let alone hired, for any of those three positions.

56.   The positions of substance abuse counselor, family liaison, and academy administrator apparently are FDNY titles rather than civil service titles.  The publicly available payroll records use civil service titles.  Because Plaintiffs do not have access to payroll records with FDNY job titles and because Richardson did not work at FDNY, Plaintiffs do not know

16

whether those positions were filled and, if so, the race and qualifications of the persons hired to fill the jobs for which Richardson applied.

57.     Community coordinator is a civil service job title.  The publicly available payroll records indicate that FDNY hired three community coordinators in 2016 after Richardson's June 20 application:  Adam Lessuck, Katherine Raitz, and Sandra Sanchez.  Upon information and belief, Lessuck and Raitz are non-Latino white employees, and Sanchez is a Latina.  Also upon information and belief, Richardson's two bachelor's degrees and experience working with the public made her a superior candidate to the persons hired.

58.     African Americans who managed to be hired by FDNY frequently are assigned initially to job positions that pay less than the positions to which white employees are assigned. For example, Employee Class member Yvonne Moore and white employee Marina Ryappo were hired within a year of each other, in 2012 and 2013.  Although they were supposed to perform similar job duties, Ryappo was given a different job title, presumably as justification for a salary that then was about $18,000 more than Moore's, $82,361 to $64,463.  Despite being paid about 25% less, Moore often has to do the work of Ryappo, who spends a lot of her time out of the office shopping. Their supervisor, Assistant Commissioner Michelle Maglione, told Moore that she has to do Ryappo's work because "Marina does not get it."  As shown by the fact that she is performing Ryappo's duties, Moore is qualified to perform those duties.  Nothwithstanding Moore's qualifications and Ryappo's poor job performance, Ryappo's salary in 2016 now exceeds Moore's by almost $20,000:  $88,228 to $68,414.

59.     African American employees also find it very difficult to advance at FDNY. Plaintiff Stephanie Thomas has been stuck at the Computer Specialist I level since she joined FDNY in 1989, despite her impressive credentials.  She holds a BA Degree in Computer Science

17

from Winston-Salem State University, and a Master's Degree in Project Management from
Keller Graduate School of Management.  Before joining the FDNY, Thomas was employed as a
Computer Consultant to some of the leading IT companies in the United States:  Burroughs
Corporation, Pitney Bowes, Wang Corporation and Arthur Anderson.  Since joining the FDNY,
Thomas has received The George F. Mand Administrative Award (awarded to an FDNY member
whose services led to the improvement of the agency's services) and the NYC Excellence in
Technology award (awarded to NYC technology employees who have performed in a stellar
fashion; in Thomas' case, she served as Project Manager in a multimillion, City-wide, multi-
agency technology project).  She also has received advanced training, such as the Installation and
Deployment in Microsoft Dynamics and the DCAS-Project Management Professional
Certification Training.  But all of her efforts to advance, even to move up to a Computer
Specialist II or III level, have been rebuffed.  Prior to 2015, she applied for approximately seven
promotions for which she was qualified, received only two interviews, and never was offered a
position.

60.     Thomas recognized the need for management of projects involving technology
before FDNY management did and obtained training in project management, and she has the
office title of a project manager.  But her training and awards in project management have no
more resulted in promotions than her training and awards in information technology.  Within the
past two years alone, she has applied for seven different project management positions for which
she was qualified that would have represented promotions and resulted in pay increases.  To the
best of her knowledge, FDNY has filled five of the positions, all of them with white candidates.
At least one of the successful white candidates had only a high school degree.  Nor is Thomas
the only African American so rebuffed.  At least three other FDNY African American employees

applied for three senior project manager positions posted October 25, 2016 but were not hired for either of the positions that have been filled.

61.     Similarly, Plaintiff Jon Watson, a level 2 fire protection inspector, unsuccessfully applied four times for a promotion to a level 3 position between 2016 and the present.  The latest time three people were promoted, the other times one person was selected.  Watson doesn't know who was selected in 2016, but none of the other five successful applicants was African American.  Three were white (Julius Squillero, Fedor Prokipchuk, and Boris Fourmanov), one was Hispanic (Jose Palacios), and one was Asian (Mohammad Hosen).  Watson's qualifications were comparable to or greater than each of the persons selected for the promotion; for example, he had greater tenure than any of them.  Moreover, other African Americans also applied unsuccessfully for most if not all those positions. FDNY's failure to promote Watson, like its failure to promote Employee Class member John Dove as discussed below, is typical of the experience of other African Americans, as reflected in the fact as discussed above that only one of the 16 promotions to a level 3 inspector during the past eight years has gone to an African American.

62.     Dove has been an Associate Fire Protection Inspector in the Bureau of Fire Prevention reporting to white director Alex Spektor, since he joined FDNY in 2008.  Over the years he has applied for promotions to three vacant positions, but in each instance the positions have been awarded to white applicants.  Two of the successful applicants, James Chiarchiaro in 2009 and Mark Remolino in 2012, were also associate inspectors.  The third successful applicant, Tara Anand, had joined FDNY only in 2012 and was not in the Bureau of Fire Prevention before her promotion in 2014 to the Bureau's Associate Project Manager position. When Anand received the promotion, Spektor asked Dove to train her.  Chiarchiaro and

Remolino, who even before their elevation earned larger salaries than Dove, received 8% salary increases upon their promotions.  Anand saw her pay rate jump by about 50%, from $48,126 to $72,383.  By contrast, the pay rate of Dove, who has not had the benefit of any promotions or discretionary increases, has inched up from $54,141 in 2009 to only $58,046 in 2016, despite a series of outstanding ratings on his performance reviews.

63.     In other cases, it has been pointless for African Americans to apply because FDNY has preselected a white employee for a posted position.  For example, in June 2016, the Fiscal Services unit posted a new position for a Minority and Woman Owned Business Enterprise Manager.  Plaintiff Deborah Bowman, who had been employed by FDNY since 1987 and worked in that unit, met the posted qualifications and was interested in applying.  However, when she inquired about the position, she was informed that Fiscal Services Director Barry Greenspan was going to give the job to Shannon Cardone, a white employee who had been hired into the FDNY in 2012.  Bowman knew that she had little chance because the "fix was in." Indeed, Cardone received the position, and her salary jumped from $73,943 in 2015 to $88,700 in 2016, an increase of 20%.  Bowman, who has been an FDNY employee for 30 years, saw her salary increase from $64,463 to $66,075, an increase of 2.5%.  This was just one example of the difficulties that Bowman faced in receiving a promotion.  She applied unsuccessfully for at least seven promotions within FDNY between 2004 and the present.  The only promotion that she received she did not apply for.  In 2012 FDNY changed her title from Principal Administrative Associate to Administrative Manager because she passed a DCAS promotional test automatically entitling her to the Administrative Manager title, not as a result of a competitive posting.  At that time, she received an approximately 8% salary increase that seems, in general, to be the limit for

20

African American employees – but not white employees such as Cardone – receiving a promotion.

64.   Plaintiff Debra Poe, like Bowman, is an Administrative Manager whose only promotion at FDNY came six years ago after she passed the DCAS promotional test (but received only a 4.5% pay boost).  Poe is interested in an Executive Assistant position, and has the qualifications because most of the Executive Assistants are either Principal Administrative Associates or Administrative Managers.  However, she knows that there is no need to apply because the positions are preselected if they are even posted.

65.   Preordained promotions for white employees would occur even more frequently but for occasional concerted actions by disfavored black employees.  In 2016, the FDNY posted a job announcement for "Deputy Director, Public Certification and Testing" in the unit of Bureau of Fire Prevention Director of Public Certification Steven Ertrachter.  Plaintiff Brenda McKiver expressed interest in the position to Ertrachter, who responded, "Brenda, you can apply for it, but you're not going to get it."  McKiver soon learned that the position had been created for a white employee, Maryana Chouchereba, that FDNY's Assistant Commissioner for Finance & Budget Steve Rush had already approved a title change and salary increase for her, and that Chouchereba had her new business cards printed with the "Deputy Director, Public Certification and Testing" title even though no one had been interviewed for the position and no selection had been announced.  McKiver complained to Acting Chief of Fire Prevention Thomas McKavanagh.  Presumably as a result of the complaints of McKiver and other employees, the FDNY rescinded the job posting.  But FDNY gave Chouchereba a consolation prize, an increase in her salary from $65,417 to $75,620, an increase of about 15.6%.

66.     Sometimes white employees are promoted without FDNY going through the charade of a posting.  In 2014, white employee Natalia Zorina was promoted to a new supervisory position within the pension unit under Assistant Commissioner for Budget & Finance Rush.  Employee Class member Debra Person had been responsible for many years for many of the duties of the supervisory position.  However, Person never had an opportunity to apply for the new position because it was never posted.  Zorina, whose salary already was about $3,600 greater than Person's, received an 8% increase as a result of the promotion, further increasing the pay gap between them.  Person raised the lack of a posting with Director Mary Basso, to which Basso responded, "Well, that's my decision."

67.     On other occasions, FDNY denies African Americans promotions that reflect the job duties that they actually are performing.  For example, in 2015 Employee Class member Carline Germain was promoted to a position with the office title of Executive Assistant for the Chief of Fire Prevention with the provisional civil service title of Administrative Manager.  Within weeks of her appointment, she began assuming a plethora of responsibilities in addition to the duties in her job description.  In mid-2016, her unit head, Ronald Spadafora, requested that her office title be changed from Executive Assistant to Director of Special Projects and Events (while retaining her Administrative Manager civil service title) and her salary increased to $95,000 from about $62,500 annually.  Germain was informed that FDNY's Assistant Commissioner for Finance & Budget Steve Rush denied the request without explanation.  Several weeks later, her direct supervisor, Acting Chief of Fire Prevention Thomas McKavanagh, submitted a second request again asking that her office title be changed to "Director of Special Projects and Events," and that her salary be increased to $87,000.  Again, Rush denied the request without explanation.  To date she has continued to perform a laundry list

22

of responsibilities in addition to the duties anticipated when she was hired for the position.  She still has not received a raise commensurate with her responsibilities.

68.     FDNY even demotes African Americans in situations in which white employees are not.  After working for seven years as a provisional Administrative Staff Analyst, Plaintiff Annette Richardson was demoted in April 2017 to an Associate Staff Analyst Level I and her salary was reduced by about $1,000.  This reduction occurred even though her job duties remained the same and her performance was not deficient.  FDNY could have given her another provisional title, as it did Jack Gridley, her predecessor as the head of the Human Resources Information Services function, but instead it chose to demote and reduce her compensation.

**E.     <u>FDNY's History and Culture of In-Group Favoritism and Racial Discrimination</u>**

69.     The underemployment of African Americans in Civilian jobs and the experiences of the Plaintiffs are consistent with FDNY's long history of discriminating against African Americans as firefighters.  During the past 50 years, two large, successful class action lawsuits against the City of New York have claimed that the FDNY has discriminated against African Americans and Hispanics in the hiring of firefighters.  Although the lawsuits involved applicants for firefighter positions rather than Civilian employees and applicants, the lawsuits are relevant because of the resistance to integration exhibited by high levels of the FDNY.

70.     Almost 45 years ago, in 1973, Judge Weinfeld of the Southern District of New York after a bench trial held that the City's written and physical examinations for entry-level firefighters violated the Equal Protection Clause because of their discriminatory impact on African American and Hispanic applicants.  *See Vulcan Society of New York City Fire Dep't, Inc. v. Civil Serv. Comm'n*, 360 F. Supp. 1265, 1269 (S.D.N.Y.), *aff'd in relevant part*, 490 F.2d 387 (2d Cir. 1973).  The Vulcan Society, the plaintiff, was established in 1940 by a group of Black firefighters to provide mutual support necessitated by the blatant segregation of the

FDNY.  The judge ordered that at least 25% of the new hires for firefighter positions be racial minorities, and ordered defendants to create a new examination that did not discriminate against African Americans and Hispanics. *Vulcan Society of New York City Fire Dep't, Inc. v. Civil Serv. Comm'n*, 490 F.2d at 391.

71.  The efforts to integrate the firefighters ended with the expiration of the *Vulcan Society* injunction:

The Vulcan Society injunction lapsed in 1977.  That year, the City abandoned the 3:1 hiring ratio and instituted a hiring procedure that required applicants to take a cognitive examination and demonstrate minimum appointment requirements such as college credits, a driver's license, and certified first responder with defibrillation training.

The subsequent history of the FDNY demonstrates that whatever practical effect Judge Weinfeld's injunction may have had on minority hiring dissipated shortly after the injunction expired. Indeed, the history suggests that any such effect constituted little more than a brief departure from an otherwise relentless pattern. In 1963, ten years before the Vulcan Society litigation, 4.15% of all FDNY employees (including non-uniformed employees) were black.  In 1971, that number was essentially unchanged.  At the time of the Vulcan Society litigation, blacks and Hispanics constituted 32% of the City's population, but only 5% of the Department. In 1990, almost two decades later, blacks made up 29% of the City's population, but only 4% of firefighters.  In 2002, 25% of the City's residents were black, compared to only 2.6% of its firefighters.  Between 1991 and 2007, black firefighters never constituted more than 3.9% of the force, and by the time this case was filed in 2007, the percentage of black firefighters in the FDNY had dropped to 3.4%. *United States v. City of New York*, 683 F. Supp. 2d 225, 241 (E.D.N.Y. 2010) (citations omitted).

72.     During the 30 years between 1977 and 2007, the employment of African American firefighters in the FDNY lagged far behind the employment of African Americans in other uniformed services in New York, such as the police.  *Id.* at 233.

73.     In response to the ongoing discrimination, the United States brought suit in May 2007 in the Eastern District of New York against the City under Title VII alleging that the City's procedures for screening and selecting applicants for entry-level firefighter positions discriminated against black and Hispanic applicants under a disparate impact theory.  *United States v. City of New York*, 683 F. Supp. 2d 225, 233 (E.D.N.Y. 2010) (summarizing procedural history).  In September 2007, the court permitted the Vulcan Society and three individuals to intervene.  The intervenors differed from the United States by claiming that defendants had engaged in a pattern or practice of intentional discrimination against black applicants.  *Id.* at 234 (discussing procedural history).

74.     In July 2009, Judge Garaufis granted the motion for summary judgment filed jointly by the United States and intervenors on their prima facie case of disparate impact and on the City's business necessity defense, thereby establishing that the City was liable for disparate impact discrimination under Title VII.  *United States v. City of New York*, 637 F. Supp. 2d 77, 82-83, 132 (E.D.N.Y. 2009).

75.     The next year, Judge Garaufis granted the intervenors' motion for summary judgment on their pattern-or-practice claims as well.  Although the Second Circuit later reversed and remanded, concluding that there were disputed issues as to some facts, it did not disturb Judge Garaufis' finding that the Vulcan Society and other intervenors presented convincing evidence that the City, its agencies, and relevant decisionmakers have been aware that the FDNY's hiring procedures discriminate against black applicants and have nonetheless refused to

25

take steps to remedy this discrimination.  Over several years, the EEPC [the City's Equal

Employment Practices Commission, an independent, non-mayoral entity charged with

monitoring the compliance of City agencies with the City's EEO policies] repeatedly informed

Commissioner Scoppetta and his predecessor that the preliminary results of Exam 7029 revealed

a wide disparity between the pass rates of white and black test-takers . . . .  Neither

Commissioner took corrective action, despite a municipal law requiring them to assess the

discriminatory impact of the FDNY's hiring practices and to explore viable alternatives.  When

the EEPC sent a report documenting the FDNY's hiring disparities and compliance failures to

Mayor Bloomberg, he responded that he was satisfied with the FDNY's efforts.  *United States v.*

*City of New York*, 683 F. Supp. 2d at 250-51 (citations omitted).

76.    Mayors as well as FDNY executives ignored the information provided by the

EEPC discussed above, New York City's Public Advocate and multiple other high-ranking

government officials concerning racial discrimination during the hiring process and entreaties to

these officials to treat black applicants equally.  *See United States v. City of New York*, 2011 U.S.

Dist. LEXIS 115074, at *16-21 (E.D.N.Y. Oct. 5, 2011).  Judge Garaufis summarized that the

FDNY had engaged in "34 years of intransigence and deliberate indifference, bookended by

identical judicial declarations that the City's hiring policies are illegal."  *United States v. City of*

*New York*, 683 F. Supp. 2d at 262.

77.    The intransigence and deliberate indifference continued even in 2010 while the

litigation was ongoing.  The City administered a new test afflicted with the same defects as the

old one, and not surprisingly, it again had an adverse impact on African American and Latino

applicants.  Judge Garaufis gave the City five alternatives to modify the results so that its hiring

more closely approximated the percentages of various minority groups taking the test.  *United*

26

*States v. City of New York*, No. 07-CV-2067 (NGG) (RLM), 2010 U.S. Dist. LEXIS 95083

(E.D.N.Y. Sept. 13, 2010).  But instead of adopting one of these alternatives, the City stated that

"[e]very one of the five proposals from which the Court [was] allowing the city to select

involve[d] some form of race-based quota" and stated that it would not hire at all until it

developed a new test.  Hal Budnick, *Smoking Out Racism in the FDNY: The Dwindling Use of

Race-Conscious Hiring Remedies*, 77 BROOK. L. REV. 1249, 1270 (2015), available at:

http://brooklynworks.brooklaw.edu/blr/vol77/iss3/9.

78.     The City appealed the grant of summary judgment on the disparate treatment

claim, and the Second Circuit reversed in 2013 on the basis that the City had articulated a

nondiscriminatory reason for its continued use of the tests that was sufficient to survive summary

judgment.  The appeals court remanded for a trial on the issue of whether the FDNY had

intended to discriminate against African American and Latino applicants for firefighter positions.

*United States v. City of New York*, 717 F.3d 72, 91 (2d Cir. 2013).

79.     Two years later, in 2015, the parties entered into a settlement concerning both

monetary relief and injunctive relief.  The settlement concerning injunctive relief includes

creation of the position of Chief Diversity and Inclusion Officer, discussed below.  Under the

settlement the percentage of black firefighters has increased, but Civilian employment was not

the subject of the settlement and African American Civilian employment has not experienced

similar gains.

80.     Until the settlement of the *United States v. City of New York* litigation, FDNY

leadership and rank-and-file were overwhelmingly of Irish and/or Italian descent, and had been

for a century or more.  Irish and Italian administrators and managers tended to select young

adults whose parents, ancestors and/or neighbors had worked in the agency for employment in

27

the "family" business.  As a result, African Americans and other racial minorities were largely

excluded, as even authors sympathetic to those Irish and Italian administrators and firefighters

recognized.  *See* Tom Deignan, "Is the FDNY Racist?", at

http://www.irishabroad.com/news/irishinamerica/columnists/Sidewalks/isthefdnyracist.asp;

Terry Golway, "The Irish are forever in the ranks of New York's bravest," at

http://belfastmediagroup.com/the-irish-are-forever-in-the-ranks-of-new-yorks-bravest; Niall

O'Dowd, "End of an era of Irish domination in NY Fire Department," at

www.irishcentral.com/opinion/niallodowd/end-of-an-era-of-irish-domination-in-ny-fire-

department.

81.     While Mayor de Blasio made some changes at the top of FDNY in response to the

settlement of the *United States v. City of New York* litigation, including most notably the

replacement of Salvatore Cassano with Daniel Nigro as the head of the FDNY in 2014, these

changes have not significantly altered the makeup of the managers engaged in job selection

decisions or the culture of in-group favoritism and discrimination against African Americans.

Indeed, Nigro, who had retired from the FDNY in 2002, still consults Cassano concerning

important decisions affecting the FDNY.

### F.     The Existence of a Small Group of Decision-Makers, Almost None of Whom Is African-American, Facilitates Racially Discriminatory Job Selection Decisions

82.     The FDNY has approximately 30 bureaus and offices, most of them with multiple

units.  The bureaus and offices are typically headed by employees with titles such as assistant

commissioner, deputy commissioner, or "chief" of something, such as chief of operations, chief

fire marshal, or chief medical director.  Many of the larger units within bureaus and offices also

are headed by persons with these or other managerial titles.  Employees who provide input into

job selection and pay decisions, who are collectively called "Department Leaders," are not

included within the proposed class.  Plaintiffs estimate that in 2016 there were no more than 50

Department Leaders in FDNY over departments with Civilian employees.

83.     For example, the Bureau of Fire Prevention is by far FDNY's largest bureau or

office of Civilian Employees, with approximately 250 employees, including Plaintiff Brenda

McKiver.  It has over 40 units.  But that does not mean that there were 40 Department Leaders in

the BFP.  Instead, only three BFP employees have had significant input into most or all hiring

and promotion decisions within BFP:  the recently deceased Chief of Fire Prevention (Ronald

Spadafora), the Deputy Assistant Chief (Thomas McKavanagh), and the director of the Public

Certification unit (Steven Ertrachter).  Ertrachter has this role in hiring and promotion decisions

for units other than Public Certification, even though, as allegations elsewhere in this Complaint

make clear, he has engaged in actions and made decisions hostile to African American

employees.

84.     Throughout the period from 2004 until the present, very few of the Department

Leaders have identified as African American.  Almost all Department Leaders identify as non-

Hispanic white, although the head of the Bureau of Human Resources throughout this period,

Donay Queenan, identifies as biracial.

85.     As discussed above, before a Departmental Leader can create a new position or

fill a vacant position, he or she requires approval from Queenan and Assistant Commissioner for

Budget & Finance Rush.

86.     Queenan, or somebody from the HR unit whom she designates, often participates

in the evaluation of candidates (both internal and external) to fill the positions, including in any

interviews of the candidates.  The decision about which candidate to select usually involves the

Departmental Leader, possibly other participants from the unit, and Queenan or another human resources employee whom she has designated.

87.     To the extent that the salary or wage rate of the selected candidate is not dictated by a collective bargaining agreement, as discussed in Part VI below, Rush must approve that salary or wage rate.

88.     No individual or unit oversees or reviews the decisions reached by these decision-makers.  A Personnel Review Board has reviewed the decisions concerning firefighters, but not the personnel decisions for Civilian employees.

89.     In sum, between 2004 (and before) and the present, a small number of managers, almost all of whom identify as white, has made job selection decisions for Civilian positions at FDNY.  Other than through retirements, these decision-makers have experienced little turnover since 2004.  The decision-makers overwhelmingly have shared or acquiesced in a culture that favors Irish, Italian, and other employees of European origin and fosters resistance to and discrimination against African Americans.

### G.     FDNY's Failure to Adopt or Systematically Implement Established Human Resources Techniques Also Facilitate Racially Discriminatory Job Selection Decisions

90.     FDNY has failed to adopt or systematically implement at least four human resource practices that other organizations have widely adopted to try to ensure fair and non-discriminatory decisions.  The failure to adopt these practices has facilitated the pattern of discriminatory job selection decisions discussed above.

91.     *Performance Reviews.*  First, FDNY has failed to implement a rigorous performance appraisal system.  As a result, the agency does not have a record of unbiased evaluations to review when an employee seeks advancement, making it easy to inject subjective and biased factors into the decision-making process.

92.     FDNY almost never conducted performance appraisals until approximately 2010, when the City's Department of Citywide Administrative Services ("DCAS"), which is responsible for supporting City agencies' workforce needs in recruiting, hiring and training City employees, insisted that FDNY adopt a program of annual performance appraisals.

93.     Since then, FDNY has implemented a performance appraisal system, but since adoption it has been flawed in design in multiple ways, including but not limited to:

•       FDNY does not require appraisals for administrators and managers, only non-managerial employees;

•       FDNY does not provide training or meaningful guidance on how to write objectives for an employee for a year in a S.M.A.R.T. (specific, measurable, achievable, results-focused, and time-bound) manner so as to enhance objectivity in measurement;

•       FDNY requires that an employee should receive one of five ratings on each objective (outstanding, very good, good, conditional, and unsatisfactory), but provides no clear means of distinguishing between these ratings.  For example, FDNY explains that an outstanding performance "far exceeded the standards" while a very good performance "significantly exceeded the standards," without explaining how to distinguish between "far" and "significantly" exceeded the standards;

•       FDNY then completely undermines the rating process by providing that the overall rating should take into account "individual task ratings," "priority of the different tasks," "lateness patterns," "absence patterns," "interactions with co-workers," "unanticipated projects that were undertaken," and "contribution to unit or organization goals," without providing any guidance as to how to evaluate or factor into the overall rating the last six of those factors; and

31

- Except in rare instances, FDNY does not define how ratings should be factored into promotion decisions, if at all.

94.     FDNY also has implemented the appraisal system in a flawed manner since 2010. Many, if not most, African Americans still do not receive annual performance evaluations.  For example, Employee Class members Brendan Mahon and Frances Dempsey have not received performance evaluations in the past four years, while Yvonne Moore received an evaluation in 2015 – her only evaluation in the past four years – but only because she wrote it and her supervisor then signed it.  And Plaintiff Brenda McKiver received an evaluation in 2016, the only one she has received for the past twenty years!  FDNY simply does not monitor to ensure that managers engage in the mandated evaluation process.  Without regular reviews for all employees, FDNY cannot effectively use reviews in job placement decisions, even if the review process was well designed.

95.     FDNY's failure to give annual performance evaluations to African American employees can severely impede those employees' ability to advance or receive discretionary pay increases.  For example, the collective bargaining agreement between the City and the Organization of Staff Analysts, the union representing Associate Staff Analysts such as Plaintiff Annette Richardson, and the collective bargaining agreement between the City and Communication Workers of America Local 1180, the union representing Clerical Associates, Principal Administrative Associates, and Administrative Managers such as Plaintiffs Deborah Bowman, Brenda McKiver, and Debra Poe, provide that discretionary increases are "limited to employees with above-average ratings on their annual performance evaluations. A copy of the performance evaluation must be submitted to the Department of Personnel and the Mayor's Office with the Monthly Planned Action Report."  Thus, an employee who does not receive an

annual performance evaluation is not entitled to a discretionary increase no matter what his or her level of performance.

96.     *Posting of positions.*  DCAS requires FDNY to post all vacant non-managerial positions so that all interested employees and potential employees can submit a timely application.  This is not peculiar to the City of New York; posting is generally accepted among human resource professionals, partly to avoid the bias and favoritism associated with a tap-on-the-shoulder system.  But as the experiences of Plaintiffs and Class members show, FDNY frequently has not posted vacant, non-managerial positions (and never posts vacant managerial positions to which Class members may aspire) since 2004 (if not before) or has prepared and posted them in a manner that precludes a fair competition for vacant positions.

97.     FDNY circumvents fair competition through posting of open positions in at least three ways.  Sometimes it does not post vacant positions that it intends to fill and just taps a favored employee to fill them.  Sometimes postings are a sham because managers have preselected the person to fill the position.  And sometimes it decides to give a job permanently to an employee who has been filling a position provisionally on the excuse that the employee already knows how to perform the job duties.  Almost inevitably, FDNY gives white employees – not African Americans – positions without requiring open competitions for them.

98.     *Reducing reasons for selections to writing.*  Human resource professionals also urge that decision-makers be required to reduce to writing the reasons for selecting a person to fill a vacant position.  Although the stated reasons may be pretextual, the requirement of written reasons somewhat controls discriminatory decision-making when a rejected candidate has superior qualifications based on the factors that the decision-maker identifies as determinative.  To the best of Plaintiffs' knowledge, FDNY has not required decision-makers to reduce their

reasons for selecting a particular candidate to writing at any time between 2004 (and before) and the present.

99.    *Monitoring of decisions for discrimination.*  A properly functioning human resources department monitors both individual job selection decisions and the statistical pattern of decisions over a period of time, such as annually.  Because, to the best of Plaintiffs' knowledge, FDNY does not require decision-makers to reduce their reasons for each decision to writing, it would be very difficult for the agency to review job selection decisions for possible illegal discrimination.  As it is, FDNY makes no effort to review those decisions proactively, only after the fact if a passed-over employee chooses to complain internally or to initiate legal proceedings.

100.    FDNY also does not monitor the statistical pattern of job selection decisions on an annual or other basis.  In view of the judicial findings about the discrimination in which the FDNY engaged in hiring firefighters, the need for monitoring to prevent similar discrimination against African American and other minority employees in Civilian positions has been obvious. The failure to implement a rigorous monitoring program is, at best, reckless, and at worst evidence of tolerance of intentional discrimination at the highest ranks of FDNY.

101.    For many years, FDNY has not cared enough about discrimination to create an office responsible to and capable of engaging in necessary monitoring.  The Bureau of Human Resources in 2017 had approximately 70 employees, but half of them are engaged in investigations of outside applicants for employment and none of them engages in monitoring duties.  Instead, in addition to investigations, HR employees are engaged in activities such as managing applications for leave, personnel files, and the human resources information systems.

102.     The Settlement Agreement that ended the *United States v. City of New York* litigation in 2015 provided for a new executive FDNY position, the Chief Diversity and Inclusion Officer ("CDIO"), to report directly to the Fire Commissioner, the head of the FDNY. 308 F.R.D. 53, 66-67 (E.D.N.Y. 2015).  The Agreement provides that the CDIO will be responsible, among other duties, for "promoting diversity in the FDNY and expanding awareness of the value of full inclusion of firefighters from all racial and ethnic groups." *Id.*  The Agreement contemplates that the CDIO will, among other tasks, oversee the FDNY's internal EEO Office, including identifying EEO resource and enforcement problems in order to improve the EEO system.

103.     Judge Garaufis welcomed the creation of the CDIO position, explaining that enhanced minority recruitment is an appropriate remedy in this case; accordingly, efforts by a high-ranking FDNY official to encourage such enhanced recruitment would also be welcome. The court has previously discussed deficiencies of the FDNY's EEO Office, and required in the Modified Remedial Order that the City reassess the FDNY's EEO program in order to make substantial changes. Any help in that process by an FDNY executive tasked with promoting diversity would also be welcome.  *United States v. City of New York*, 308 F.R.D. 53, 67 (E.D.N.Y. June 5, 2015) (citations omitted).

104.     Fire Commissioner Nigro, under direction from the Mayor's office, has selected two persons, first Pamela Lassiter and then Cecilia Loving, to fill the position of CDIO.  Neither of them has the skills and/or experience to be effective in that position.  When Lassiter was terminated after less than a year on the job, she had done nothing to monitor or address statistical disparities in the rates at which whites and African Americans had been selected to fill Civilian

35

job positions, let alone racial disparities in compensation.  Loving similarly has not attempted to monitor, let alone address, any racial disparities in Civilian job selections or compensation.

105.    The FDNY's EEO office, which reports to the CDIO, is no more capable of monitoring.  In 2011, Judge Garaufis found that the FDNY's EEO Office was "woefully under-funded and fails to effectively carry out its responsibilities to ensure the FDNY's compliance with the EEO laws."  *United States v. City of New York*, 2011 U.S. Dist. LEXIS 115074, at *46 (E.D.N.Y. Oct. 5, 2011).

106.    After giving testimony in the *United States v. City of New York* litigation that put the FDNY in an unfavorable light, Lyndelle Phillips, who had served as the Assistant Commissioner of EEO for four years, was demoted in 2011 and terminated in 2012.  She never was allocated sufficient budget to monitor the job placement decisions throughout the FDNY. Phillips sued the City for racial discrimination and retaliation.  Phillips was replaced by Margo Ferrandino, who quietly transferred to a different agency in early 2015.  The position remained vacant until 2016, when Don Nguyen was appointed to the position.

107.    As the New York Daily News reported, "The FDNY's EEO office has always been a sore spot within the agency . . . .  Many firefighters and EMS personnel — of all races and genders — have been frustrated by slow investigations and ongoing probes that don't seem to yield clear conclusions . . . ."

108.    The EEO unit's budget has been increased under Nguyen, but its focus remains almost exclusively on investigating complaints rather than also monitoring to determine whether the statistical pattern of job placement and compensation decisions is adverse to African Americans or other protected minorities.  Most of its approximately 14 employees in 2017 were

lawyers engaged in investigations of individual discrimination allegations by employees and not on monitoring.

109.    As a result of the long-standing failures in the mission and capabilities of the FDNY's EEO office and of the failure of the CDIO to effect the types of changes contemplated by Judge Garaufis, FDNY has allowed the types of discrimination in job placement decisions discussed above to proceed unabated.

110.    The City has not stepped into the breach caused by the inadequacies of FDNY's Human Resources, CDIO, and EEO office to monitor FDNY personnel decisions for racial discrimination, even though it should know, not only from the *United States v. New York* litigation, but also from its own Workforce Profile reports, that racial employment numbers at FDNY are strikingly different than in the rest of its workforce.

### VI.   COMPENSATION DISPARITIES AND DISCRIMINATION

111.    Employee Class members, as well as their counterparts of other races, are subject to collective bargaining agreements between the City and one of several different unions.  These CBAs prescribe minimum salaries or wage rates for each job title covered by the CBA, and if the title has multiple levels, prescribe minimum salaries or wage rates for each level.  In addition, the CBAs prescribe mandatory compensation increases, if any, each year for all employees.

112.    As a result, wage or salary differentiation among employees with the same job title and level can occur at only two times:  when an employee acquires a new job title (either because the person is hired by FDNY or when an existing FDNY employee changes job titles or levels) and FDNY agrees to pay him or her more than the minimum for the position and level; and when FDNY decides to give an employee an increase in pay that exceeds the raise mandated by the applicable CBA for all employees within that position and level.

37

113.    The allegations below address racial discrimination in compensation decisions both when FDNY establishes an employee's pay when the employee is hired or changes job titles or levels and when FDNY makes discretionary pay increases over and above the minimum increases mandated by the applicable CBA.

114.    The allegations below, and the proposed subclass asserting pay discrimination claims, are limited to employees in the Professional and Management Specialist job categories. The Administrator/Manager category is excluded from the proposed Employee class.  The compensation subclass excludes employees in the Craft/Operator category and in the Fire Protection Inspector category because FDNY pays all or virtually all employees in the same title and level within those categories the same salary.  To the extent that any racial discrimination in compensation exists for employees in those categories it is in allocation of overtime opportunities.  Plaintiffs have not yet been able to analyze any such disparities and hence make no allegations about them at this time.  The compensation subclass also excludes employees in the lower-paid, largely minority job categories of Paraprofessionals, Clericals and Clerical Supervisors, and Laborer/Transportation job categories because, while there is somewhat greater salary differentiation than in the Craft/Operator and Fire Protection Inspector categories, the differentiation is small.

115.    The allegations below also do not include statistical analyses for all job titles in the Professionals and Management Specialists job categories.  Plaintiffs have access to publicly available payroll data for the FDNY that shows, among other information, the names of employees, their civil service job positions, and their salaries each year from 2008 through 2016. The information does not, however, contain racial information for the employees.  For that reason, Plaintiffs cannot perform agency-wide compensation analyses for all job titles in a job

category comparable to the job selection analyses discussed above that show much lower rates of African American employment at FDNY than in other city agencies, especially in higher-paying job categories.

116.    In lieu of such information, Plaintiffs have been able to obtain racial information for the great majority of employees in the job titles in which they have worked plus several other job titles.  The compensation analyses show patterns of racial discrimination in compensation across the Professional and Management Specialist job categories.  A list of job titles that Plaintiffs have placed into each of those two categories appears as Appendix A, with the exception of titles with fewer than three employees in 2016 and job titles in which there was little or no differentiation in salary in 2016.  Plaintiffs have attempted to follow the DCAS classification scheme used in the Workforce Report but because the Report provides only generalized descriptions of each category and some examples of job titles within the category, there may be minor differences.

117.    While Plaintiffs have not analyzed all job titles in the two job categories and have not identified the race of all employees in the analyzed job titles, the analyses are more than sufficient to make plausible the allegations of racial discrimination in the pay of persons in the three job categories.  The number of employees in the job titles for which Plaintiffs have gathered racial information comprise at least half of the employees in both job categories.  And in each of the titles, Plaintiffs were able to identify the race of the great majority of employees in 2016, the last year for which Plaintiffs had payroll information.  As a result, the samples are sufficiently large for conclusions based on the analyses to at least rise to the level of plausibility.

118.    In addition, the information that Plaintiffs have been able to obtain – both anecdotal and pay data – reflects pay discrimination against each of the Plaintiffs individually,

including Brenda McKiver, the Plaintiff in the Clerical and Clerical Supervisor category, even though no allegations are presented about systemic pay discrimination in that job category.

A.    **FDNY Systematically Underpays Plaintiffs and Class Members Across Three Job Categories**

      1.    **FDNY Has Systematically Discriminated Against African American Management Specialists in Its Compensation Decisions**

119.    Sample Size.  According to the DCAS 2015 Workforce Report, FDNY employed 263 Management Specialists in 2015.  Plaintiffs identify 298 Management Specialists in 2016 on Exhibit A.  Plaintiffs believe that the differences in counts are the results of growth in the number of Management Specialists between 2015 and 2016 and possibly Plaintiffs' inclusion of several job titles in the Management Specialist job category that DCAS did not include in that category for purposes of the Workforce Report.

120.    Payroll data reflect that at the end of 2015, FDNY employed 76 Administrative Staff Analysts ("ASAs") and 61 Administrative Managers ("AMs") paid on a salary (as opposed to hourly) basis with salaries below $150,000.  If all ASAs and AMs are included, the totals climb to 85 and 61, respectively, which is over 2/3 of the total of Management Specialists shown in the DCAS Workforce Report.

121.    Administrative Staff Analysts.  In 2016, the number of ASAs with salaries below $150,000 had increased to 81.  Although the payroll data now available to Plaintiffs does not contain racial information, Plaintiffs were able to identify the race of all but seven.  Of the 74 ASAs of known race, 13 were African-American that year and 61 were not.  The mean salary of the 13 African-American ASAs that year was $89,811, while the median salary was $87,147.  In comparison, the mean salary of the 61 non-African American ASAs was $94,019, and the median salary was $89,755.  Thus, the mean salary of ASAs who were not African American was 4.7% higher than the mean salary of the African American ASAs.

122.     The average pay disparity was larger when comparing African American to white employees because the mean salary of the 43 white ASAs was $96,269, and the median was $93,657.  Consequently, the mean salary of white ASAs was 7.2% higher than the mean salary of the African American ASAs.

123.     Annette Richardson is the Plaintiff who is an ASA.  She became an ASA in 2010. Before then, she had worked for the City's Department of Investigation for over five years ending in June 2002, when she had taken a private job.  Her salary at that company working in the computer incident management field had climbed to $82,000 before her job was relocated overseas.  Upon losing that job, she successfully applied for a position as a management consultant with FDNY in 2006.  But instead of giving her a salary commensurate with her pay in private industry, the Department of Human Resources (then called the Personnel Department) would only approve a salary of about $65,000 for her, a more than 20% pay cut.  White employees accepting jobs with FDNY, regardless whether they were accepting employment or re-employment, were not asked to take such large pay cuts.

124.     After about three years as a management consultant, Richardson successfully applied in 2009 for the position of Director of Human Resource Information Systems that had been occupied by Jack Gridley, a white male.  Gridley's salary had been about $103,000 annually, and he had the civil service job title of Administrative Community Relations Specialist. (Plaintiffs do not know whether DCAS classifies Administrative Community Relations Specialists as Management Specialists or Para Professionals.)  In 2009, FDNY had seven Administrative Community Relations Specialists, with salaries ranging from about $83,000 to Ridley's $103,000.  Only one Administrative Community Relations Specialist was African American, and she had the second lowest salary among the seven employees, at about $87,000.

41

125.    Richardson asked for a salary comparable to Gridley's, but FDNY was unwilling to give her such a large increase, and instead told her that she would not receive more than an 8% increase over her then salary of about $65,000 as a management consultant.  FDNY also gave her a different civil service job title, Administrative Staff Analyst, than Ridley had held.  Richardson acquiesced and assumed the ASA position with the office title of Director, HRIS at the starting salary of $69,971 dollars annually, 33% less than Gridley had been paid.  Subsequently, Richardson learned that many persons who are promoted or hired to fill vacant positions receive salaries comparable to the people they replaced and are not limited to 8% salary increases.

126.    In 2010, Richardson's first full year as an ASA, FDNY had 60 ASAs with salaries below $150,000.  Richardson's salary of $69,971 was the fourth lowest among them.  It was about $26,500 below the median salary for ASA's of $96,514.

127.    Richardson's low salary relative to other ASAs also did not make sense given her responsibilities.  As the director of HRIS between 2010 and the present, she has consistently managed several employees as well as the processes by which records for the over 16,000 employees have been maintained.  According to FDNY's directory for 2017, Richardson managed four employees.  During her tenure, her staff, responsibilities, and job description have increased.  Her duties are those of a database application manager, as she has day to day responsibility for the supervision of data input and output, generates customized reports and processing, manages databases, and grants access to those databases.  These responsibilities make her position is comparable to computer software specialists in the Bureau of Technology and Development who manage databases, but she is not paid a comparable salary.  But in addition, within the past year Richardson's duties have expanded to also supervising the Absence

Control Unit, with a regular staff of three employees, light duty staff of three more people, and one temporary position.

128.    FDNY's unwillingness to give Richardson a higher salary in 2010 was typical for the agency in its treatment of African American ASAs.  Plaintiffs have been able to identify the race of 37 of the 63 salaried ASAs in 2010, all of whom were still employed by the agency in 2016.  The average salary for the seven African American ASAs was $86,549, while the average salary for the non-African American ASAs was $93,445, a difference of almost $7,000.

129.    By 2016, Richardson's salary had increased to $80,826, an increase of about 15.5% from 2010.  Even with that increase, it was still about $23,000 less than Gridley's had been seven years before.

130.    More important, African American ASAs on average received smaller pay increases between 2010 and 2016 than did non-African American ASAs.  Between 2010 and 2016, the seven African American ASAs' average salary increased by about 12.5% to $97,361.  Over the same period, the 30 non-African American ASAs received average increases of about 16.8% to $109,178.  Put another way, among persons who were ASAs between 2010 and 2016, the seven African-American ASAs' salaries were about 8.0% lower than the other ASAs in 2010 and about 12.1% lower in 2016.  The pay gap increased by about 50% over that period.

131.    Thus, Richardson's pay has been discriminatorily low every year from 2008 forward for two reasons.  It was initially set at rates lower than the rates of persons doing similar work or with the same job title, and her pay increases did not match those of her peers.

132.    Richardson's pay also is low compared to other employees in FDNY's Bureau of Human Resources.  In 2016, FDNY paid her a salary of $80,826 to head the Human Resources Information Center and the Absence Control Unit, two of the units of the Bureau of Human

43

Resources. Margaret Puppa, a white woman, is the second in command of a different HR unit, the Candidate Investigation Division, which investigates the background of candidates for positions. Puppa, who has the title of Administrative Investigator (which Plaintiffs also categorize as a Management Specialist), had a salary of $119,573 in 2016, almost 50% higher than Richardson's. While the unit in which Puppa is a supervisor has more employees than does the unit that Richardson manages, a 50% pay differential between them is unjustifiable.

133.    A second comparator for Richardson is Emily Rahimi, a white woman who also works in the Bureau of Human Resources. She was promoted in 2013 from the position of Associate Public Information Specialist in FDNY's Public Information Office to an Administrative Manager position in Human Resources and received a $20,000 raise from about $58,000 to $78,000 (see below for a discussion of Administrative Manager compensation). Although her responsibility was only to prepare a periodic employee bulletin, she had no staff to manage, and is an Administrative Manager rather than an Administrative Staff Analyst (Administrative Staff Analysts on average receive higher salaries than Administrative Managers), Rahimi's salary was about $8,000 more than Richardson's in 2013. In 2015 Rahimi was reclassified as an Administrative Staff Analyst, although her job duties did not change. That title promotion resulted in a 12% increase in pay for her to almost $88,000, almost $12,000 more than Richardson. While Rahimi was receiving these pay increases, Richardson repeatedly requested raises from her manager, Donay Queenan, without success. Notably, in 2016, Richardson was given additional duties formerly performed by the Bureau of Technology & Development within FDNY, but again, her request to Queenan for a pay increase was not honored and did not even receive a formal response. In 2017, Rahimi's pay was bumped again to over $92,000. Richardson finally received a raise on September 24, 2017, but that still leaves

her pay well short of Rahimi's.  Two other non-African American Administrative Staff Analysts with no greater job duties than Richardson's but considerably higher compensation are Aurora Gabriel-Perez, also in the Human Resources Department, and Mary McLaughlin in the Bureau of Health Services.

134.    The pay history of white employee Timothy Keppler provides a striking contrast to Richardson's.  Keppler initially joined the FDNY as an Administrative Staff Analyst Trainee on May 26, 2015.  His starting salary was $45,299.  After only about a year, on June 13, 2016, FDNY promoted Mr. Keppler to the position of Administrative Staff Analyst with an over 25% raise in salary to $57,590.  On June 25, 2017, Keppler was again promoted to the position of City Resident Scientist (a non-civil service title given to him by FDNY HR), and his salary skyrocketed from $57,950 to $90,425, although his civil service title and his essential job duties remained unchanged.  Between May 2015 and June 2017 his salary virtually doubled, to a salary of about $10,000 more than Richardson's salary.

135.    Most black employees at FDNY, even those who have labored for 25 years or more, make a mere fraction of Keppler's current $90,425 salary, regardless of work performance.  No Plaintiff, and to the best of Plaintiffs' knowledge no class member, has received close to a 100% increase over the course of two years, or even over the course of ten years.

136.    Administrative Managers.  In 2016, FDNY employed 59 Administrative Managers ("AMs") (all had salaries below $150,000).  Plaintiffs were able to identify the race of 55 of the 59 AMs that year.  Of the 55 AMs of known race, 21 were African American and 34 were not.  The mean salary of the 21 African American AMs that year was $69,883.  By comparison, the mean salary of the 34 non-African American AMs was $73,967.  The mean

salary of AMs who were not African American thus was 5.8% higher than the mean salary of the African American AMs.

137.     As with the ASAs, the average pay disparity was greater when limiting the comparison to white and black AMs.  The mean salary of the 19 white AMs was $74,557; consequently, the mean salary of white AMs was 6.7% higher than the mean salary of the African American AMs.

138.     Because averages for all persons with a given job title can be affected by new hires starting at lower salaries, it is more meaningful to compare persons with similar years of experience in the job.  This type of comparison reveals that the starting salaries of Plaintiffs and other African-American AMs tend to be lower than their non-African American peers and that Plaintiffs and other African American AMs have received lower percentage increases than those accorded to the non-African American with the same AM job title.

139.     To qualify as an AM, an employee or outside applicant must first pass a test administered by DCAS.  Before 2010 FDNY had provisionally given several employees the title of AM.  In 2010, two long-time FDNY employees who had passed the test became the first official AMs at FDNY.  In 2011, 11 other employees who had passed the test became AMs, bringing the total number of AMs to 13.  Plaintiff Debra Poe was one of the 11 added in 2011.

140.     Of the 12 AMs in 2011, three were African American.  Their mean salary as AMs in 2011 was $64,372, while the nine non-African Americans had a mean salary of $70,270.  The average African American salary was almost $6,000 less than the average non-African American salary.  Poe had the second lowest salary of the 12 AMs.

141.     This disparity cannot be explained solely as a function of prior salary.  Of the 13, seven employees received an increase upon their promotions of above 5% over their salary in the

prior year; only one was African American.  The other six received increases upon their promotions of less than 5% or no increase at all.  Two of the six employees who received these small raises were African American, including Poe.

142.    The next year, 2012, FDNY added 15 more AMs, including Plaintiff Deborah Bowman.  That year the salary increases attendant on the promotions to the AM positions were far more standardized, almost all (including Bowman's) between 6% and 10%.  As discussed below, standardized percentage increases are not discriminatory as long as the prior rates were not discriminatory.  If they were, then similar percentage increases can exacerbate the disparities.  That happened here.  African American AMs in 2012 were earning considerably less, on average, than non-African American AMs.  And, as discussed below, the disparities have only grown worse.

143.    Five of the 28 persons who became AMs in 2012 or before left FDNY's employ before the end of 2016.  Of the other 23, 14 received the base increases negotiated between their union and the City over the years, which cumulatively came to about 7.2%.  Eight of those 14 persons were African American.  The other nine received discretionary increases that brought their percentage increases into double figures.  Four of those nine were African American.

144.    While the difference between 8/14 (57%) and 4/9 (44%) is not large, the overall impact of the discretionary increases was substantial because three of the nine AMs received discretionary increases of 25% or more, and none of the three was African American.

145.    These 25% or larger raises cannot be attributed to superior qualifications or job duties.  White male Robert Rampino, for example, received the largest overall increase, from $87,588 in 2012 to $123,268 in 2016, a 41% jump over the four-year period.  He has only a high school or GED diploma, without other academic credentials.  Indeed, upon information and

belief, Rampino became an AM because he was deemed unqualified for his prior job at FDNY.
The 2017 directory does not reflect that any employees report to him, unlike Poe, who earns
$55,000 less and has supervised one or two employees throughout her time as an Administrative
Manager.

146.    Plaintiff Bowman was one of the AMs who did not receive a discretionary
increase between 2012 and 2016.  As a result, her salary in 2016 was well below that of non-
African American comparators, such as Aurea Otero, a Hispanic AM.  In 2016 Otero's salary
was $86,190, while Bowman's was $66,075, a difference of over $20,000.  During the five years
between 2012 and 2016, Otero's salaries cumulatively exceeded Bowman's by about $95,000.

147.    Bowman and Otero both work in the Bureau of Fiscal Services performing
similar, related work.  Bowman audits and assists in replenishing funds through the agency
budgets by accruing and clearing expenditures through auditing procedures outlined in the NYC
Comptroller's instructions.  She communicates with account payables representatives requesting
pertinent documents to release these funds and restore budget money to the current fiscal year.  If
the funds are released, the money can be spent in the form of purchase orders.  Otero prepares
purchase orders for budgeted expenditures, requests increases and decreases in the amounts of
the purchase orders, and communicates with other units about their purchase orders.

148.    Plaintiff Poe did receive a small discretionary increase in 2016, but it brought
her salary up to only $68,951.  It was bestowed on her only because she agreed to take on
additional responsibilities after another employee retired and nobody had been hired to take on
his former duties.

149.    Poe supervises the Civilian Leave unit of the Bureau of Human Resources.  In
2016 she had one report, but at other times two employees have reported to her.  The unit

evaluates and processes under City guidelines requests for leave from Civilians.  Non-African

American AM Ireneo Almazan similarly supervises a small unit, with three employees, dealing

with overtime inquiries of uniformed employees.  His salary in 2016 was $75,398.  Richard

Kemp, also a non-African American AM, assists in running a larger unit (about ten employees),

and was paid a salary of $72,824 in 2016.  Other non-African American AMs have higher

salaries even though they do not have any supervisory duties, including Otero ($86,190),

Kathleen Clements ($84,834), Clarinda Matela ($83,948), and Iris Ramos ($79,198).  In short, as

a result of FDNY's failure to pay Poe a non-discriminatory salary, her salary was less than other

AMs performing similar duties.

150.    The bottom line is that of the 23 employees in 2016 who had been AMs for at

least four years, the average salary of the 12 African-American employees was $66,444 while the

average salary of the 11 non-African American employees was $80,822.  The non-African

American long-term AMs were paid on average a whopping 22% more than their African

American peers.

151.    The pay of African Americans who have been AMs since 2012 or before lags not

only behind their non-African American peers, but also behind the pay of white employees who

became AMs after they did.  For example, Poe and Rahimi (discussed above) were both

Administrative Managers in Human Resources in 2014.  Poe had been an AM for three years

longer than Rahimi and supervised an employee, which Rahimi did not.  Yet Rahimi's salary in

2014 was $78,000, while Poe's was $59,560, a difference of over $18,000.

152.    ASAs and AMs, as well as other Management Specialists, work in most of

FDNY's bureaus and offices and perform a variety of duties.  Poe, for example, is the Civilian

Leave Supervisor within the Bureau of Human Resources, under Donay Queenan, while

Bowman is an Accounts Representative within the Accounts Payable unit of the Bureau of Fiscal Services.  Nonetheless, the compensation disparities between African American and other Management Specialists is systemic, as the information above indicates.

> **2.      FDNY Has Systematically Discriminated Against African American Professionals in its Compensation Decisions**

153.      Sample Size.  According to the DCAS 2015 Workforce Report, FDNY employed 183 persons in professional positions in 2015.  The report identifies Computer Specialists as an example of a professional position.

154.      Following DCAS guidance to the extent possible, Plaintiffs have included 12 job titles with 169 employees in 2016 with salaries below $150,000 in the Professional category.  This includes 60 Computer Specialists and 32 Computer Associates.  Employees in those two titles, therefore, constitute about 50% of the employees classified by DCAS as Professionals and more than 50% of the employees in the job titles that Plaintiffs have categorized as Professional.

155.      Computer Specialists.  Plaintiffs were able to identify the race of 51 of the 60 Computer Specialists in 2016, of whom six were African American and 45 were not.  The mean salary of these six employees was $85,106 and the median was either $82,000 or $85,390, depending whether the third or fourth highest figure is used.  The mean salary of the other 45 Computer Specialists was $93,272, over $8,000 more, and the median salary was $92,289.

156.      This salary disparity in 2016 is largely a product of disparities in discretionary increases over time.  Twenty-one of the 59 Computer Specialists had been employed in that job title since 2008, the earliest year for which Plaintiffs have payroll data.  Plaintiffs were able to identify the race of 19 of the 21.  Of the 19, seven received the minimum increases negotiated by their union totaling 11.6% (an average of about 1.4% per year), two received increases ranging between 15 and 19%, four received increases between 20 and 24%, three received increases

between 25 and 29%, two received increases between 30 and 34%, and one received increases totaling over 35%.

157.   Two Plaintiffs, Stephanie Thomas and Dino Riojas, were the only African Americans who served as salaried Computer Specialists throughout that nine-year period.  They both received only the minimum 11.6% increase, while all but 5 of their 17 non-African American peers received much larger increases.

158.   In fact, Riojas has not received a discretionary increase in his 35 years as a Computer Specialist at FDNY, while Thomas has not received a discretionary increase in her 30 years as a Computer Specialist.

159.   FDNY's unwillingness to award Riojas and Thomas discretionary raises is not for lack of accomplishments.  Riojas for many years has managed the only complex mainframe computer system remaining in FDNY which, among other things, is integral to the building inspection process and generates $55 million in revenue annually for FDNY.  His duties require him regularly to write new computer programs for the system, something no other FDNY employee is qualified to do.  He also makes major contributions in other ways.  During the FDNY migration from a Windows XP environment to the current Windows 7 environment in 2013, for example, Bureau of Technology and Development Systems Chief Information Officer (CIO) Joel Golub asked Riojas to ensure that data in over 2,800 Microsoft Access databases throughout FDNY were not lost or corrupted in the migration.  Riojas became certified in Microsoft Access, performed this task without assistance, and successfully completed it on time. Both CIO Golub and Deputy Director of Programming Jason Cheng thanked him for a job well done.  But FDNY did not reward Riojas monetarily.

160.    The impact of the lack of discretionary increases despite Riojas's uniquely valuable skill set and accomplishments is seen by comparing him to other Computer Specialist, level 4 employees such as himself.  There were five other level 4 Computer Specialists in 2016 who also were Computer Specialists in 2008, the first year for which Plaintiffs have payroll data. In 2008, Riojas received the fourth highest salary of the six.  But over the years, three of the five non-African Americans received discretionary increases, including the two lowest paid in 2008, who over the eight-year period through 2016 saw their salaries increase by 36.6% and 34.6%, respectively, compared to Riojas's 11.6% increase.  As a result, Riojas is now the lowest paid Computer Specialist level 4.  Linda Shang, one of those five other Computer Specialist level 4s who used to work under Riojas and whom Riojas trained, had a salary of $120,975 in 2016, which was 17.2% higher than Riojas's 2016 salary of $103,209.

161.    As alleged above in paragraph 59, Thomas has won awards for her work as a Computer Specialist, but not any discretionary increases.  Because FDNY has not awarded her any promotions, even to a Computer Specialist 2 level, or discretionary increases, Thomas's annual compensation is stuck at the same level as new Computer Specialists.  In 2016, she was the lowest paid Computer Specialist among the 21 Computer Specialists who had that title also in 2008, and only one person within that peer group (none of whom was African American except for Riojas) was less than $3,000 above her salary level.

162.    And as discussed above in paragraph 60, Thomas many years ago developed an expertise in project management.  FDNY has only one other employee experienced in project management who comes from a computer background, Dean Eliades, although he lacks Thomas's technical computer experience.  FDNY hired Eliades in late 2015, but despite Thomas's much greater tenure, experience, and technical qualifications, his salary of about

$103,000 in 2016 exceeded hers by about $18,000.  Two other FDNY project managers, both

titled as Administrative Staff Analysts, may have some significant computer software or

hardware knowledge.  Darlene Hasselbring's salary in 2016 was almost $124,000, while

Katarina Synak's (also newly hired by FDNY) is about $115,000.  The disparities between their

salaries and the salary of a 30-year highly credentialed employee such as Thomas are staggering.

163.    The result of FDNY's racial discrimination in compensation also can be seen in

the average salaries in 2016 of African American and non-African American Computer

Specialists who had been employed by FDNY since 2008, if not before.  In addition to Riojas

and Thomas, a third African American, Laura Pirtle-Morand, had worked as a Computer

Specialist throughout this nine-year period but was not mentioned above because, for most of the

time, she had worked on an hourly rather than salaried basis before becoming salaried in 2015.

The average salary of these three Computer Specialists in 2016 was $92,433.  The average salary

of the 17 non-African Americans was $100,921.

164.    Computer Associates.  In 2016, the number of Computer Associates increased to

32, of whom 30 were paid on a salaried basis.  Plaintiffs have been able to identify the race of 26

of these Computer Associates.  Ten of these 26 Computer Specialists were African American.

The mean salary of these ten employees was $68,235.  The average salary of the other 16

Computer Associates of known race was $69,125, only about a thousand dollars more.

165.    But what appears to be a relatively small racial disparity in salaries was almost

completely a function of the large number of recent hires of Asian-Americans as computer

associates.  As beginning employees – and possibly because of racial discrimination against

Asian-Americans – these new employees received low salaries, driving down the average salary

for non-African American computer associates.

166.     Thus, looking only at employees who worked as computer associates during the entire 2008-16 period, the mean salary in 2016 of the six African Americans was $68,076, while the mean salary of the six non-African Americans was $77,081, a difference of about $9,000.

167.     And if the one non-white employee among the six long-term non-African American computer associates is excluded, the mean salary in 2016 of the white computer associates was $78,590, about $10,000 more than the average salary of the long-term African American computer associates.

168.     The racial disparity in the average salaries of persons who were Computer Associates throughout the 2008-16 period is primarily a function of FDNY paying African American Computer Associates much lower salaries than other Computer Associates in 2008. And of course, because African Americans start from lower base salaries than their comparators and because most employees receive the same percentage increase each year, African Americans receive lower dollar increases than their comparators and the dollar gap between them grows year after year.

**4.     FDNY Has Discriminated Against Brenda McKiver in its Compensation Decisions**

169.     According to the DCAS 2015 Workforce Report, FDNY employed 437 persons in clerical and clerical supervisory positions in 2015.  The report also identifies Principal Administrative Associates ("PAAs") as a clerical supervisory position.  The payroll data indicates that these were 129 PAAs (including ten hourly) in 2015.

170.     Racial disparities in pay are not as pronounced among PAAs as they are in job titles in higher paid job categories.  Nonetheless, a racial disparity in compensation exists. Plaintiffs have been able to identify the race of 103 salaried PAAs in 2016: 47 African

Americans and 56 non-African Americans.  The average salary of African-American PAAs that year was $2,600 less than the average salary of the other PAAs:  $57,540 to $60,140.

171.     Plaintiff Brenda McKiver has suffered more pronounced pay discrimination than have African-American PAAs generally.  McKiver is a 29-year FDNY employee who has worked as a PAA in the Bureau of Fire Prevention for about 23 years.  During that time, she has never received a discretionary increase.  As of 2016, she had the fifth lowest salary out of over 100 employees with the PAA job title.  Of the four lower-paid PAAs, two were only hired into FDNY in 2016, and the other two became PAAs much more recently than McKiver.  She was the lowest paid PAA with more than twenty years of tenure in the position in the entire FDNY.

172.     The Bureau of Fire Prevention ("BFP") is by far the largest bureau or office for Civilian Employees in FDNY.  Recommendations about pay increases for most or all BFP employees – not including persons whose management level places them outside the class definition – are made by a white director, Steven Ertrachter.

173.     Employee Class member Jo Blackwell is a 38-year FDNY employee who has worked as a clerical associate in the FDNY's Bureau of Fire Prevention since 2000.  Blackwell, like McKiver, has not received a discretionary increase during those 17 years.  In response to Blackwell's request for a raise, Ertrachter dismissively responded, "You don't need money.  What do you need money for?"  McKiver, who heard this story from Blackwell, believes that this accurately reflects Ertrachter's attitude toward African American employees seeking raises.

174.     For many years, McKiver worked in Ertrachter's unit of the Bureau of Fire Prevention, reviewing the paperwork, certifying, and maintaining the records for installers and servicers of fire extinguishers and smoke detectors and for companies providing exhaust head cleaning.  In or about 201_, white employee Maryana Chouchereba and two assistants to

Chouchereba took over those duties along with other duties not previously performed by McKiver. Chouchereba left FDNY in 2017, and the department gave McKiver's former job duties to Jennifer McHugh, a white woman. While McHugh had some other duties, McKiver's former job was her primary duty. McHugh's job title was Community Coordinator, and her salary in 2016 was $56,229, about $7,000 more than McKiver's $49,508.

175.     Not long after Chouchereba and her assistants assumed McKiver's job duties, McKiver started working in a different unit of the Bureau of Fire Prevention, although Ertrachter remained responsible for her in the salary setting process. In her new unit, McKiver and two other employees perform the identical duties. One of McKiver's co-workers is African American while the other is white. The white employee, Tamara Casadona, is a PAA like McKiver, but in 2016 was paid $53,286, almost $4,000 more than McKiver. The disparity cannot be justified based on tenure with FDNY or time-in-position: McKiver started with FDNY in 1988 and became a PAA in 2000, while Casadona first became employed by FDNY – as a PAA – in 2011.

176.     McKiver is not the only Plaintiff to suffer pay discrimination while a PAA. In 2007, Assistant Commissioner James Basile informed Plaintiff Deborah Bowman, who was then working as a PAA at the FDNY's Fleet Services unit located in Long Island City, that he had requested a 4% discretionary salary increase for her and her co-workers. Bowman's white co-workers subsequently received their discretionary salary increases, but she did not. Basile informed Bowman that he did not know why her salary increase was not approved by FDNY Headquarters, but later told her that her name had been included on the increase list by mistake. She then sent an email to Assistant Commissioner Rush asking for an explanation, but he never responded to her email. Bowman, unlike many PAAs and AMs, has a Bachelor's degree. She

also had worked for FDNY for about twenty years in 2007.  Nonetheless, she was denied the raise that her peers received.

> **5.      The Racial Discrimination in Compensation Began Long Before the Limitations Period**

177.     The limitations period goes back to December 2015.  The data available to Plaintiffs goes back to 2008.  As alleged above, the data reflect that African Americans with job titles within the challenged job categories were systematically paid less than non-African American employees in those job categories back to at least 2008.

178.     Upon information and belief, racial discrimination in pay did not begin in January 2008.  Plaintiffs have observed discrimination in pay that has affected them as well as other African American employees back to 2004, if not before.  All the factors discussed in this Complaint that contribute to the pay discrimination, including FDNY's culture, policies, and practices, have been in place since at least 2004.

**B.      A Small Group of Decision-Makers Makes or Approves Discretionary Pay Decisions at FDNY**

179.     The widespread pay discrimination against African Americans at FDNY in the Professional and Management Specialist categories is attributable to several factors.  First, FDNY, through Assistant Commissioner for Budget & Finance Stephen Rush, has an announced policy of limiting salary increases upon hire or promotion to 8% over an employee's prior salary. Even if this policy were applied evenhandedly, it would lock in preexisting racial pay disparities. However, Plaintiffs allege that this policy is enforced only against African-American employees, and they have provided examples above in which white employees received raises in excess of 8%.  These exceptions exacerbate the discrimination caused by the 8% policy.

180.     Second, the great majority of employees receive the same percentage increase each year.  Such a system will not cause discrimination if the pay rates from the prior year are

non-discriminatory, but if the rates in the prior year are discriminatory, such a system not only perpetuates the discrimination but also exacerbates it by magnifying differences in absolute terms. For example, if one employee has a salary of $90,000 in year 1 and another employee has a salary of $80,000 in that same year for doing the same work and they both receive a 3% increase, in year 2 the first employee will have a salary of $92,700 while the second employee will have a salary of $82,400. The pay gap will have grown by $300.

181.    Third, FDNY does not have any persons or process to monitor discretionary increases for racial disparities. This permits non-African American employees to receive the great bulk of the discretionary increases, allowing the racial salary disparities to increase by more than would occur if all employees received only the minimum increases mandated by the applicable CBA.

182.    Fourth, FDNY also does not monitor the salaries of employees in the same or similar positions to identify employees whose compensation appears to be higher or lower than their peers, regardless of how the disparities may have occurred in the past. Because FDNY does not centrally review salaries for disparities, it has no centralized process for increasing the salaries of poorly compensated employees.

183.    FDNY's failure to monitor compensation increases and levels puts it at odds with many, presumably most, large employers, which regularly audit compensation. An audit requires employers to compile and analyze personnel data on pay for employees doing the same work. As part of such audits, employers typically look back as far as necessary to determine whether any employees' compensation is affected by past decisions or other practices that may affect current compensation. When problems are identified, these employers also typically adjust employee compensation so that past decisions are no longer a factor in current pay.

58

184.     FDNY also does not encourage managers, let alone have a policy requiring managers, to consider employees' pay relative to their peers in making recommendations for discretionary increases.  As a result, managers may recommend repeated discretionary increases for favored employees while never recommending increases for disfavored employees, as reflected in various of the paragraphs above.

185.     Managerial discretion in recommending pay increases also is not constrained by performance reviews.  As discussed above, FDNY does not insist on annual performance reviews or objective performance reviews for those employees whose performance is reviewed. It also does not formulaically tie performance ratings to pay increases – a practice that can limit managerial discretion.

186.     The policies and practices identified above, including the lack of monitoring, allow FDNY to set both initial salaries and discretionary increases discriminatorily.  As discussed above in the context of job selection decisions, FDNY has a decades-long history of in-group favoritism toward Irish, Italian, and other persons of European descent and hostility toward African Americans.

187.     These biases do not have to affect a large number of current managers to have a major effect on compensation.  A small group of almost exclusively white managers – high ranking officials in each bureau and office – have input into discretionary compensation decisions by recommending a wage rate or salary for a newly hired or promoted employee. However, ultimate decision-making power is concentrated in one person, Assistant Commissioner for Budget & Finance Stephen Rush. He typically decides whether to approve a salary or wage rate in excess of the minimum only after consulting with Queenan.  As a result,

Rush has pay-setting power, and Queenan has pay-setting influence, for all newly hired or promoted members of the proposed Classes.

188.    Rush has a stated practice of not permitting increases in prior pay of over 8%, including when an employee is first hired by FDNY, receives a promotion, or receives a discretionary increase.  However, this is not a stated policy or even a regular practice of FDNY itself/as a whole.  Rather, Rush and Queenan wield the 8% limit like a cudgel against African Americans to hold down their increases, but frequently do not apply this supposed limit for white employees.

189.    Similar concentration of decision-making occurs as to discretionary increases.  These increases can be made twice a year.  Rush establishes a discretionary increase budget for each bureau or office.  The Department Leaders next make recommendations concerning increases for favored employees.  The recommendations are then considered by an approximately four or five-person committee that includes Rush and Queenan.  The FDNY bestows increases only on employees and in amounts approved by the committee.

190.    Even if Rush, Queenan, members of the compensation committee, and bureau and office leaders are not now affected by biases in favor of white employees and/or against African-American employees, the percentage raise system combined with the lack of monitoring of salaries still produce discriminatory results.

## VII.  CONTINUING VIOLATION AND DAMAGES

191.    The culture, policies, and practices that have caused FDNY to underhire and underemploy African Americans for Civilian positions, confine them largely to lower paying Civilian jobs, and set their salaries or wage rates below the compensation of white Civilian employees have all been in place since 2004, if not before, and have existed on a continuous

basis at all times since then.  The culture, policy, and practices have resulted in systemic and continuing racial discrimination in hiring, advancement, and pay decisions against African American Civilian employees in every year since 2004.

192.    FDNY's underhiring and underemployment of African Americans, confining African Americans largely to lower paying Civilian jobs, and setting their salaries or wage rates below the compensation of white employees all have caused members of the two proposed Classes to receive far less in salaries and wages than they would have between 2004 (or earlier) and the present absent racial discrimination.

193.    African Americans' discriminatorily low salaries and wages also produce large damages in the form of lost overtime pay.  Employees at FDNY earn prodigious amounts of overtime pay, often more than the amount of regular pay that they receive.  Any salary or wage differential between two employees is increased, generally by 50%, at their overtime rates.

194.    African Americans' discriminatorily low salaries and wages also produce large damages in the form of diminished employee benefits.  For example, the pension benefits to which a retiree is or may become eligible are, with certain limitations and variations, calculated by multiplying the number of years of credited service by the employee's average salary in his or her final three years or highest three years of compensation.  As a result, the higher an employee's salary or wage rate during those three years, the greater the benefits that the employee may receive.

## VIII.   <u>CLASS ALLEGATIONS</u>

195.    Plaintiffs bring this litigation on behalf of themselves and two classes:

- All African Americans who have been employed in a Civilian full-time position in FDNY at any time between three years prior to the filing of this Complaint and the date a class

is certified, unless throughout this period they (a) were in a job title classified by the City as an administrator or manager, or (b) had a salary of at least $150,000 per year during at least one year during the period (the "Employee Class"); and

- All African Americans who passed any applicable DCAS tests, possessed all other posted requirements for any posted FDNY Civilian vacancy, and applied and were rejected by FDNY for any such position at any time between three years prior to the filing of this Complaint and the date a class is certified unless they applied for a position (a) in a job title classified by the City as an administrator or manager ("Rejected Applicant Class").

196.    In addition, Plaintiffs bring this action on behalf of the following subclass of the Employee Class:  All Employee Class members who have been employed in a Civilian full-time position classified as Professional or Management Specialist at any time between three years prior to the filing of this Complaint and the date a class is certified.

### A.    The Employee Class

197.    The Employee Class is sufficiently numerous that joinder of all of its members in this lawsuit would be impractical.  As alleged above, about 300 Civilian Employees in 2015 were African American.  With turnover, there are probably more than 350 current and former FDNY employees in the Employee Class.

198.    The Class's claims raise numerous common questions of fact or law, including but not limited to:

- Did FDNY promote Class members less frequently than similarly situated white peers?

- Were the promotion decisions adverse to Class members at least in part because of in-group favoritism toward persons of Irish, Italian, or other European descent?

- Were the promotion decisions adverse to Class members made by a small number of overwhelmingly white decision-makers, and if so, has that facilitated the discrimination?

- Has FDNY failed to adopt and/or systematically implement generally recognized HR practices, and if so, has that failure facilitated discrimination against Class Members in promotion decisions?

- Have FDNY executives and officials been aware that Class members receive fewer promotions than similarly situated whites and done nothing to rectify the disparities?

- Have the Mayor and other City executives and officials failed to exercise control over FDNY's human resources and diversity practices despite myriad forms of notice of the racial discrimination at FDNY?

- Has FDNY had a continuing policy of discrimination against Class Members that entitles them to relief under NYCHRL for discriminatory promotion decisions back to 2004?

199.    Plaintiffs Annette Richardson, Bowman, McKiver, Poe, Riojas, Thomas, and Watson are typical of other Class Members in that they have been Civilian employees of FDNY and have claims of promotion discrimination that they suffered as a result of the same factors that led to discrimination against Class Members.  Their claims, like the claims of other Class Members, also give rise to NYCHRL liability under the continuing violations doctrine.

200.    Plaintiffs Annette Richardson, Bowman, McKiver, Poe, Riojas, Thomas, and Watson are adequate representatives of the Employee Class.  Their claims are typical of the claims of other Class Members; they have no conflicts with the Class Members; and they have retained experienced counsel capable of representing the Class.

201.    Class certification is appropriate under Federal Rule of Civil Procedure 23(b)(2) because FDNY has acted or refused to act on grounds that apply generally to the Employee Class

such as by allowing a small group of almost exclusively white managers to make discriminatory promotion decisions and failing to adopt and/or systematically implement recognized means of controlling managerial bias. These actions and failures make appropriate Class-wide injunctive relief, including but not limited to the measures identified in the Prayer for Relief below.

202.    Class certification also is appropriate under Federal Rule of Civil Procedure 23(b)(3). The common issues identified above will predominate over any purely individual issues. Moreover, a class action is superior to other means for fairly and efficiently adjudicating the controversy. After all these years, agency-wide injunctive relief is needed to address the discrimination. That type of relief would be difficult if not impossible to obtain in a non-class suit brought by one or a small number of plaintiffs.

### B.    The Employee Compensation Subclass

203.    The Employee Compensation Subclass is sufficiently numerous that joinder of all its members in this lawsuit would be impractical. As alleged above, the Subclass contained over 80 members in 2015. With turnover, there are probably more than 100 current and former FDNY employees in the Employee Compensation Subclass.

204.    The Subclass's claims raise numerous common questions of fact or law, including but not limited to:

- Did FDNY pay Subclass members less than similarly situated white peers, including giving them fewer and smaller discretionary pay increases?

- Were the compensation decisions adverse to Subclass members at least in part because of in-group favoritism toward persons of Irish, Italian, or other European descent?

- Were the compensation decisions adverse to Subclass members made by a small number of overwhelmingly white decision-makers, and if so, has that facilitated the discrimination?

- Has FDNY failed to adopt and/or systematically implement generally recognized HR practices, and if so, has that failure facilitated discrimination against Subclass Members in compensation decisions?

- Have FDNY executives and officials been aware that Subclass members been paid less than similarly situated whites and done nothing to rectify the disparities?

- Have the Mayor and other City executives and officials failed to exercise control over FDNY's human resources and diversity practices despite myriad forms of notice of the racial discrimination at FDNY?

- Has FDNY had a continuing policy of discrimination against Subclass Members that entitles them to relief under NYCHRL for discriminatory compensation decisions back to 2004?

205.   Plaintiffs Annette Richardson, Bowman, Poe, Riojas, and Thomas are typical of other Subclass Members in that they have been Civilian employees of FDNY and have claims of pay discrimination that they suffered as a result of the same factors that led to discrimination against other Subclass Members.  Their claims, like the claims of other Subclass Members, also give rise to liability under the continuing violations doctrine of the NYCHRL.

206.   Plaintiffs Annette Richardson, Bowman, Poe, Riojas, and Thomas are adequate representatives of the Employee Compensation Subclass.  Their claims are typical of the claims of other Subclass Members; they have no conflicts with the Subclass Members; and they have retained experienced counsel capable of representing the Subclass.

207.    Class certification is appropriate under Federal Rule of Civil Procedure 23(b)(2) because FDNY has acted or refused to act on grounds that apply generally to the Employee Compensation Subclass such as by allowing a small group of almost exclusively white managers to make discriminatory compensation decisions and failing to adopt and/or systematically implement recognized means of controlling managerial bias.  These actions and failures make appropriate Subclass-wide injunctive relief, including but not limited to the measures identified in the Prayer for Relief below.

208.    Class certification also is appropriate under Federal Rule of Civil Procedure 23(b)(3).  The common issues identified above will predominate over any purely individual issues.  Moreover, a class action is superior to other means for fairly and efficiently adjudicating the controversy.  After all these years, agency-wide injunctive relief is needed to address the discrimination.  That type of relief would be difficult if not impossible to obtain in a non-class suit brought by one or a small number of plaintiffs.

### C.    The Rejected Applicant Class

209.    The Rejected Applicant Class is sufficiently numerous that joinder of all of its members in this lawsuit would be impractical.  According to the 2015 Workforce Report, FDNY hired about 90 Civilian employees in 2015.  If 2015 was typical, the agency hired about 270 Civilian employees over the past three years.  Plaintiffs cannot know the number of rejected outside applicants who were African American until discovery commences, but almost certainly hundreds if not thousands of African Americans were among the rejected applicants who are members of the Rejected Applicant Class.

210.    The claims of the Class raise numerous common questions of fact or law, including but not limited to:

- Did FDNY hire Class members less frequently than similarly situated white peers, and less frequently than other City agencies hired employees into similar positions?

- Were the hiring decisions adverse to Class members at least in part because of in-group favoritism toward persons of Irish, Italian, or other European descent?

- Were the hiring decisions adverse to Class members made by a small number of overwhelmingly white decision-makers, and if so, has that facilitated the discrimination?

- Has FDNY failed to adopt and/or systematically implement generally recognized HR practices, and if so, has that failure facilitated discrimination against Class Members in hiring decisions?

- Have FDNY executives and officials been aware that Class members are hired less frequently than similarly situated whites and done nothing to rectify the disparities?

- Have the Mayor and other City executives and officials failed to exercise control over FDNY's human resources and diversity practices despite myriad forms of notice of the racial discrimination at FDNY?

211.    Plaintiff Erica Richardson is typical of other Class Members in that she applied and was rejected for one or more Civilian positions at FDNY for which she was qualified as a result of the same factors that led to discrimination against other Class Members.

212.    Plaintiff Erica Richardson is an adequate representative of the Rejected Applicant Class.  Her claims are typical of the claims of other Class Members; she has no conflicts with the Class Members; and she has retained experienced counsel capable of representing the Class.

213.    Class certification is appropriate under Federal Rule of Civil Procedure 23(b)(2) because FDNY has acted or refused to act on grounds that apply generally to the Rejected Applicant Class, such as by allowing a small group of almost exclusively white managers to

make discriminatory hiring decisions and failing to adopt and/or systematically implement recognized means of controlling managerial bias. These actions and failures make appropriate Class-wide injunctive relief, including but not limited to the measures identified in the Prayer for Relief below.

214.    Class certification also is appropriate under Federal Rule of Civil Procedure 23(b)(3). The common issues identified above will predominate over any purely individual issues. Moreover, a class action is superior to other means for fairly and efficiently adjudicating the controversy. After all these years, agency-wide injunctive relief is needed to address the discrimination. That type of relief would be difficult if not impossible to obtain in a non-class suit brought by one or a small number of plaintiffs.

## IX.   COUNTS

### A.    Count One:  42 U.S.C. §§ 1981, 1983

215.    Plaintiffs reallege each of the paragraphs above as if they were expressly set out in this paragraph.

216.    The City, through its agency the FDNY, has impaired under color of state and municipal law the right of Plaintiffs and members of the proposed Classes and Subclass to make and enforce contracts of employment, which under 42 U.S.C. § 1981 shall be the same as the right of white persons, in that the FDNY has (a) discriminatorily failed to select African-American outside and internal candidates to fill vacant positions while instead selecting white candidates with lesser qualifications, and (b) paid African-American employees less than, and given African-American employees smaller pay increases than, similarly situated white employees.

217.     In making its job selection (hiring and promotion) and compensation decisions, FDNY and its officials and managers have acted under color of the statutes, ordinances, regulations, customs, and usages, of the laws of the State of New York which, among other things, delegate authority over these decisions to the City of New York.

218.     The City, through its agency the FDNY, has subjected the Plaintiffs and the members of the proposed Classes and Subclass to the deprivation of the rights, privileges, or immunities secured by 42 U.S.C. § 1981, as set forth above.

219.     The discrimination in job selection and compensation decisions against Plaintiffs and members of the proposed Classes and Subclass have been performed pursuant to a policy or custom within FDNY entitling Plaintiffs and the proposed Class and Subclass members to relief under 42 U.S.C. § 1983.  The discrimination has been so persistent or widespread to constitute a custom or usage with the force of law.  It also has been so manifest as to imply the constructive acquiescence of senior policy-making officials within FDNY and the City Government.  The City's failure to train and supervise its employees adequately has displayed a deliberate indifference to the constitutional rights of African-American job applicants and employees at FDNY.

220.     Plaintiffs and members of the proposed Classes and Subclass have been damaged by the discrimination in job selection and compensation decisions since 2004 (if not before) or such later date as they were first rejected for employment by FDNY or first became employed by FDNY.  This damage takes the form of lost pay and lost employee benefits for members of the Rejected Applicant Class, and of lost pay and diminishment of those employee benefits tied to pay levels for members of the Employee Class and Employee Compensation Subclass.  Class and Subclass Members also have suffered damage in the form of mental pain and suffering as

they have experienced stagnation in job position and compensation while watching equally or lesser qualified white employees rocket past them in position, compensation, or both.  Members of both Classes and the Subclass will be damaged in the future by the discrimination unless injunctive relief is entered.

> **B.**     **Count Two:  New York City Human Rights Law**

221.     Plaintiffs reallege each of the paragraphs above as if they were expressly set out in this paragraph.

222.     The City, through its Agency FDNY, has discriminated against the Plaintiffs and Class and Subclass Members in its job selection and compensation decisions because of their race in violation of NYC Administrative Code § 8-107.1(a)(3).

223.     Through (a) FDNY's failure to adopt or implement systematically widely accepted human resources practices that reduce the opportunity for discrimination, (b) FDNY's culture of in-group favoritism, (c) FDNY's assignment of job selection and compensation decisions to a very small group of almost exclusively white decision-makers who share in the culture of in-group favoritism, (d) use of percentage increases in compensation without any effort to audit and adjust salary rates to eliminate the effects of past discrimination in compensation decisions, and (e) the City's failure to exercise control over FDNY's human resources and diversity practices and failure to monitor and correct for current discrimination and the present effects of past discrimination, the City has engaged in a pattern or practice of discrimination in hiring, promotion, and compensation decisions against Plaintiffs and the Class and Subclass Members.

224.     FDNY's failure to adopt or implement systematically widely accepted human resources practices that reduce the opportunity for discrimination and its assignment of job

selection and compensation decisions to a very small group of almost exclusively white decision-makers, and the City's failure to exercise control over FDNY's human resources and diversity practices have had a disparate impact against Plaintiffs and the Class and Subclass Members.

225.   The policy or custom of racial discrimination within FDNY in job selection and compensation decisions has been continuing since 2004.

226.   Plaintiffs and the Class and Subclass Members have been damaged by the discrimination in job selection and compensation decisions since 2004 or such later date as they were first rejected for employment by FDNY or first became employed by FDNY.  This damage takes the form of lost pay and lost employee benefits for members of the Rejected Applicant Class, and lost pay and diminishment of those employee benefits tied to pay levels for members of the Employee Class and Subclass.  Class and Subclass Members also have suffered damage in the form of mental pain and suffering as they have experienced stagnation in job position and compensation while watching equally or lesser qualified white employees rocket past them in position, compensation, or both.  Class and Subclass Members will be damaged in the future by the discrimination unless injunctive relief is entered.

## X.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court enter a judgment against Defendant and in favor of Plaintiffs and the Class and Subclass Members and award the following relief:

A.   An order: certifying this action as a class action on behalf of the proposed Classes and Subclass pursuant to Federal Rule of Civil Procedure 23; declaring Plaintiffs Annette Richardson, Bowman, McKiver, Poe, Riojas, Thomas, and Watson as representatives of the Employee Class, Plaintiffs Richardson, Bowman, Poe, Riojas, and Thomas as representatives of

the Employee Compensation Subclass, and Plaintiff Erica Richardson as the representative of the Rejected Class; and declaring Plaintiffs' counsel as counsel for each Class and Subclass;

B.      An order granting Plaintiffs and members of the Classes and Subclass actual damages for violations of 42 U.S.C. § 1981 and 1983 and of the NYCHRL, including but not limited to back pay, front pay, and other forms of lost compensation such as the value of lost employee benefits;

C.      An order granting Plaintiffs and the members of the Classes and Subclass costs of suit, reasonable attorney's fees and expenses;

D.      An order granting Plaintiffs and the Classes and Subclass appropriate injunctive and declaratory relief for a period of time to be determined by the Court but not less than seven years, including but not limited to:

- Appointing an outside monitor going forward for five years or more to review individual and overall job selection and compensation decisions to detect individual instances and patterns of racial discrimination and to train appropriate employees of the FDNY on how to perform such monitoring after the term of the outside monitor ends;

- Requiring FDNY to create plans to increase the representation of African Americans in Civilian positions in which African Americans are underrepresented, which plans shall be reviewed and approved by the outside monitor and ultimately the Court, and giving the outside monitor access to all necessary information to monitor FDNY's actions to insure that FDNY complies with the plans;

- Appointing either the outside monitor or another expert to conduct an audit of compensation of Civilian employees and adjust the compensation of any African American employees determined to be underpaid; and

- Requiring FDNY to review its Human Resources practices identified in this Complaint and modify them as the outside monitor and ultimately the Court deem appropriate.

**E.**     An order granting Plaintiffs and the Class and Subclass members such other, further and different relief as the nature of the case may require or as may be determined to be just, equitable and proper by this Court.

## XI.  DEMAND FOR A JURY TRIAL

Plaintiffs demand a jury trial on all issues triable as of right by a jury.

Respectfully submitted,

    /s Michael Lieder    

**VALLI KANE & VAGNINI, PLLC**

Rob J. Valli, Jr.
Sara Wyn Kane
Valli Kane & Vagnini LLP
600 Old Country Road, Suite 519
Garden City, New York 11530
Telephone: (516) 203-7180
Facsimile: (516)706-0248
rvalli@vkvlawyers.com
skane@vkvlawyers.com

**MEHRI & SKALET PLLC**

Cyrus Mehri
U.W. Clemon (*pro hac vice pending*)
Michael D. Lieder
Mehri & Skalet, PLLC
1250 Connecticut Ave., NW, Suite 300
Washington, DC 20036
Telephone: (202) 822-5100
Facsimile: (202) 822-4997
cmehri@findjustice.com
jclemon@findjustice.com
mlieder@findjustice.com