Civil No. 17-CV-9447 (JPO)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ANNETTE RICHARDSON, *et.al.*

Plaintiffs,

-against-

CITY OF NEW YORK,

Defendant,

**DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

***JAMES E. JOHNSON***
*Corporation Counsel of the City of New York*
*Attorney for Defendant*
*100 Church Street*
*New York, N.Y.  10007*

*Of Counsel:  Yuval Rubinstein*
*Tel:  (212) 356-2467*
*Matter No. 2017-066659*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................... iv

PRELIMINARY STATEMENT .............................................................. 1

STATEMENT OF FACTS

    A.  Overview of the FDNY ..................................................3

    B.  The Selection Process For Hiring, Promotion, And Compensation Delegates Significant Discretion To Each Bureau .........................................3

    C.  The FDNY's Commitment To Diversity and Inclusion ..........................................................6

        1.  The FDNY'S EEO Policy and Office of Diversity and Inclusion .....................................6

        2.  The FDNY's Efforts To Address Underutilization ........................................6

        3.  Plaintiffs' Comparison of Civilian and Uniform Recruitment is Faulty .............................8

    D.  Plaintiffs' Statistical Analyses Do Not Establish Class-wide Discrimination ...............................9

    E.  Plaintiffs And The Putative Class Members Have Thrived In Their Careers .....................................12

ARGUMENT ..................................................................... 13

    POINT I

    PLAINTIFFS FAIL TO SATISFY RULE 23(a) .................................. 14

    A.  Plaintiffs Are Unable To Establish Commonality Under Rule 23(a)(2) ...............................14

        1.  Pattern or Practice Under 42 U.S.C. § 1983 And CHRL .................................14

**Page**

    i.  Statistical Evidence .......................................................14

    ii. Anecdotal Evidence         21

    iii. Failure to Address Known Disparities         23

   2. Disparate Impact Under The CHRL ....................................25

    i.  The Two New "Facially Neutral Practices" Plaintiffs Introduce Are "Policies Against Having Uniform Employment Practices"         25

    ii. The *Kassman* Factors Weigh In Defendant's Favor         27

 B. Plaintiffs Fail To Establish Typicality Under Rule 23(a)(3) Or Adequacy Under Rule 23(a)(4) ...........................................................................33

**Page**

POINT II

      PLAINTIFFS FAIL TO SATISFY RULE 23(b).................................. 37

    A.   Plaintiffs Fail To Satisfy The Requirements
       For A Rule 23(b)(3) Class............................................................37

    B.   Plaintiffs Fail To Satisfy The Requirements
       For A Rule 23(b)(2) Class............................................................39

CONCLUSION.................................................................................................. 40

# TABLE OF AUTHORITIES

<u>**Cases**</u> <u>**Pages**</u>

*Abrams v. Kelsey-Seybold Med. Group*,
    178 F.R.D. 116 (S.D. Tex. 1997) ............................................................................15

*Adkins v. Morgan Stanley*,
    307 F.R.D. 119 (S.D.N.Y. 2015) .....................................................................33, 38

*Aguilar v. ICE*, No. 07-8224 (KBF),
    2012 U.S. Dist. LEXIS 53367 (S.D.N.Y. Apr. 16, 2012) ......................................40

*Amchem Prods. v. Windsor*,
    521 U.S. 591 (1997) ...........................................................................................37, 39

*Anderson v. United States HUD*,
    554 F.3d 525 (5th Cir. 2008) .................................................................................26

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ...............................................................................................26

*Bodner v. Oreck Direct, LLC*,
    2007 U.S. Dist. LEXIS 30408 (N.D. Cal. Apr. 25, 2007) ....................................36

*Bolden v. Walsh Constr. Co.*,
    688 F.3d 893 (7th Cir. 2012) ..............................................................................2, 16

*Chen-Oster v. Goldman, Sachs & Co.*,
    325 F.R.D. 55 (S.D.N.Y. 2018) ...........................................1, 25, 28, 29, 30, 33, 38

*Clayborne v. Omaha Pub. Power Dist.*,
    211 F.R.D. 573 (D. Neb. 2002) .............................................................................15

*Cooper v. Southern Co.*,
    390 F.3d 695 (11th Cir. 2004) ...............................................................................33

*Coser v. Moore*,
    587 F. Supp. 572 (E.D.N.Y. 1983),
    *aff'd*, 739 F.2d 746 (2d Cir. 1984) .........................................................................17

*Croker v. Boeing Co. (Vertol Div.)*,
    437 F. Supp. 1138 (E.D.Pa. 1977),
    *aff'd*, 662 F.2d 975 (3d Cir. 1981) .........................................................................17

*Cuevas v. Citizens Fin. Group, Inc.*,
    526 Fed. Appx. 19 (2d Cir. 2013) .........................................................................37

**Cases**                                                                            **Pages**

*Davidson v. Citizens Gas & Coke Util.*,
    238 F.R.D. 225 (S.D. Ind. 2006) ................................................................36

*Dukes v. Wal-Mart Stores, Inc.*,
    964 F. Supp. 2d 1115 (N.D. Cal. 2013) ..............................................2, 16, 17, 27

*Ellis v. Costco Wholesale Corp.*,
    285 F.R.D. 492 (N.D. Cal. 2012) ............................................................2, 28, 29

*Gen. Tel. Co. of the Southwest v. Falcon*,
    457 U.S. 147 (1982) ........................................................13, 21, 22, 30, 35

*H.B. Rowe Co., Inc. v. Tippett*,
    615 F.3d 233 (4th Cir. 2010) ................................................................16

*Hannon v. Chater*,
    887 F. Supp. 1303 (N.D. Cal. 1995) ......................................................16

*Harris v. Initial Sec., Inc.*,
    No. 05-3873 (GBD), 2007 U.S. Dist. LEXIS 18397 (S.D.N.Y. Mar. 7, 2007) ......................35

*Honadle v. University of Vermont & State Agric. College*,
    56 F. Supp. 2d 419 (D.Vt. 1999) ............................................................16

*In re Initial Pub. Offering Sec. Litig.*,
    471 F.3d 24 (2d Cir. 2006) ................................................................20

*Jones v. Nat'l Council of Young Men's Christian Ass'ns of the United States*,
    34 F. Supp. 3d 896 (N.D. Il. 2014) ................................................16, 28, 29, 32

*Junod v. NWP Servs. Co.*,
    No. 8:14-cv-1734-JLS, 2016 U.S. Dist. LEXIS 195195
    (C.D. Cal. July 18, 2016) ................................................................26

*Kassman v. KMPG*,
    416 F.Supp.3d 252 (S.D.N.Y. 2018).................................... 1, 15, 20, 25, 27-32

*Ladik v. Wal-Mart Stores, Inc.*,
    291 F.R.D. 263 (W.D. Wisc. 2013) ..........................................................29

*Legal Aid Soc'y v. Brennan*,
    608 F.2d 1319 (9th Cir. 1979) ............................................................16

*Lo Re v. Chase Manhattan Corp.*,
    431 F. Supp. 189 (S.D.N.Y. 1977) ..........................................................34

**Cases**                                                                                      **Pages**

*Malave v. Potter*,
　320 F.3d 321 (2d Cir. 2003)......................................................................................18, 19

*Maldonado v. Ochsner Clinic Found.*,
　493 F.3d 521 (5th Cir. 2007) .........................................................................................40

*Messer v. Meno*,
　130 F.3d 130 (5th Cir. 1997) .........................................................................................16

*In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*,
　209 F.R.D. 323 (S.D.N.Y. 2002) ...................................................................................39

*Moore v. Publicis Grp. SA*,
　No. 11-1279 (ALC)(AJP), 2014 U.S. Dist. LEXIS 185384
　(S.D.N.Y. May 15, 2014)..........................................................................................23, 29

*Moussouris v. Microsoft Corp.*,
　2018 U.S. Dist. LEXIS 112792 (W.D. Wash. June 25, 2018)..................................21, 22

*In re Navy Chaplaincy*,
　306 F.R.D. 33 (D.D.C. 2014).........................................................................................27

*North Shore Concrete & Assoc. v. City of New York*,
　No. 94-4017 (ILG), 1998 U.S. Dist. LEXIS 6785 (E.D.N.Y. Apr. 12, 1998).........................16

*Oakley v. Verizon Communs., Inc.*,
　No. 09-9175 (CM), 2012 U.S. Dist. LEXIS 12975 (S.D.N.Y. Feb. 1, 2012)..............34, 38, 39

*Ottaviani v. State University of New York*,
　875 F.2d 365 (2d Cir. 1989)...........................................................................................21

*Randall v. Rolls-Royce Corp.*,
　2010 U.S. Dist. LEXIS 23421 (S.D. Ind. Mar. 12, 2010),
　*aff'd*, 637 F.3d 818 (7th Cir. 2011).................................................................................20

*Rapcinsky v. Skinnygirl Cocktails, L.L.C.*,
　No. 11-6546 (JPO), 2013 U.S. Dist. LEXIS 5635 (S.D.N.Y. Jan. 9, 2013)...........................34

*Romero v. H.B. Auto. Group, Inc.*,
　No. 11-386 (CM), 2012 U.S. Dist. LEXIS 61151 (S.D.N.Y. May 1, 2012) ..........................29

*Ronson Corp. v. Liquifin Aktiengesellschaft, Liquigas, S.p.A.*,
　375 F. Supp. 628 (2d Cir. 1974) .....................................................................................30

*Rothe Dev. Corp. v. DOD*,
　545 F.3d 1023 (Fed. Cir. 2008).......................................................................................16

**Cases**                                                                      **Pages**

*Ruiz v. Citibank, N.A.*,
    93 F. Supp. 3d 279 (S.D.N.Y. 2015)........................................................................21

*Sandata Techs., Inc. v. Infocrossing, Inc.*,
    No. 05-09546, 06-1896 (LMM) (THK), 2007 U.S. Dist. LEXIS 85176
    (S.D.N.Y. Nov. 16, 2007) ....................................................................................18

*Sheehan v. Purolator, Inc.*,
    839 F.2d 99 (2d Cir. 1988)............................................................................15, 34

*Shook v. Bd. of County Comm'rs*,
    543 F.3d 597 (10th Cir. 2008) ............................................................................39

*Slader v. Pearle Vision, Inc.*,
    No. 00-2797 (JSR), 2000 U.S. Dist. LEXIS 16453 (S.D.N.Y. Nov. 14, 2000).....................35

*Steelworkers v. Weber*,
    443 U.S. 193 (1979)...........................................................................................16

*Sykes v. Mel S. Harris & Assocs. LLC*,
    780 F.3d 70 (2d Cir. 2015).................................................................................37

*Taylor v. Zucker*,
    No. 14-5317 (CM), 2015 U.S. Dist. LEXIS 98877 (S.D.N.Y. July 27, 2015) ......................33

*Teamsters v. United States*,
    431 U.S. 324 (1977)......................................................................................14, 21

*Teasdale v. City of New York*,
    No. 08-1684 (KAM), 2013 U.S. Dist. LEXIS 133764
    (E.D.N.Y. Sept. 18, 2013),
    *aff'd*, 574 Fed. Appx. 50 (2d Cir. 2014) ..............................................................26

*Thomas v. City of New York*,
    953 F. Supp. 2d 444 (E.D.N.Y. 2013) ............................................................13, 22

*United States v. City of New York*,
    637 F. Supp. 2d 77 (E.D.N.Y. 2009) .....................................................................8

*United States v. City of New York*,
    717 F.3d 72 (2d Cir. 2013)............................................................................19, 37

*Valentino v. United States Postal Serv.*,
    674 F.2d 56 (D.C. Cir. 1982) ..............................................................................14

**Cases**                                                                    **Pages**

*Waisome v. Port Auth. of N.Y. & N.J.*,
   948 F.2d 1370 (2d Cir. 1991) ........................................................................18

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011) ......................................................................... *passim*

*Webster v. Fulton County*,
   51 F. Supp. 2d 1354 (N.D. Ga. 1999) .........................................................16

## Statutes

41 C.F.R. § 60-1 *et seq.* ................................................................................15

42 U.S.C. § 1983 ...........................................................................................14

Fed. R. Civ. P. 8(a) ........................................................................................25

Fed. R. Civ. P. 23 ...............................................................................3, 13, 19

Fed. R. Civ. P. 23(a) ..........................................................13, 14, 32, 36

Fed. R. Civ. P. 23(a)(2) ......................................................14, 27, 32

Fed. R. Civ. P. 23(a)(3) ...............................................................................32

Fed. R. Civ. P. 23(a)(4) ...............................................................................32

Fed. R. Civ. P. 23(b) ....................................................................................36

Fed. R. Civ. P. 23(b)(2) ......................................................36, 38, 39

Fed. R. Civ. P. 23(b)(3) ......................................................36, 37, 38

Fed. R. Civ. P. 23(g) ....................................................................................36

Fed. R. Civ. P. 26(e) ....................................................................................17

Fed. R. Civ. P. 65(d) ....................................................................................38

N.Y.C. Admin. Code § 8-107(18) ...............................................................37

## PRELIMINARY STATEMENT

The New York City Fire Department ("FDNY") employs an exceptionally diverse civilian workforce that is 60% minority. African-American employees comprise nearly 25% of the FDNY's civilian workforce, and hold pivotal leadership positions in Human Resources, Legal Affairs, Recruitment, Candidate Investigation, and Diversity and Inclusion. Yet the seven class[1] plaintiffs, who represent a narrow and atypical sliver of the civilian workforce, claim the FDNY has engaged in systemic discrimination against African-American civilians.

The scope of the putative class, comprising **166** civil service titles, is simply breathtaking. Plaintiffs purport to represent a class that lumps together job titles such as Radio Repair Mechanic, Attorney, Clerical Associate, and Oiler. These titles are rife with dissimilarities based upon professional and educational qualifications, job duties, civil service status, and union representation. Even before *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011), such 1970s-vintage class actions were rarely even *filed*, much less certified.

In *Kassman v. KMPG*, 416 F.Supp.3d 252, 277 (S.D.N.Y. 2018), the Court denied certification where the proposed class "covers a myriad of job descriptions, ranging from accountants to scientists, engineers, attorneys and Ph.D. economists, at levels of seniority ranging from Associate to Managing Director." But *Kassman* pales in comparison to the sprawling class plaintiffs propose. The cases plaintiffs cite underscore that the putative class is an outlier post-*Dukes. See Chen-Oster v. Goldman, Sachs & Co.*, 325 F.R.D. 55, 63 (S.D.N.Y.

---

[1] Plaintiffs have now withdrawn plaintiff Jon Watson's class claims after "conclud[ing]" that FPI should be excluded from the class. Pl. Memorandum of Law ("Memo."), p. 1, n.1. Although this decision is unsurprising given the high percentage of African-Americans in the FPI ranks, defendant strongly objects to plaintiffs' gerrymandering of the class definition after completing the expensive and time-consuming class discovery process. Defendant also objects to the declarations from clerical employees alleging compensation discrimination, who are not even part of the Employee Compensation Subclass. The Amended Complaint excludes these lower-paying titles because "the [salary] differentiation is small," Dkt. 55, ¶114, and plaintiffs cannot now muddy the waters by proffering supposedly "powerful anecdotes" (Memo., p. 26, n. 13) from employees who are not even members of the putative subclass.

2018)(class narrowly limited to "Associates and Vice Presidents….in [three] revenue-generating divisions"); *Ellis v. Costco Wholesale Corp*., 285 F.R.D. 492, 509 (N.D. Cal. 2012)("the class covers only two closely-related, management-level positions").

Plaintiffs face a truly daunting task in identifying the "glue" needed to bind together 166 titles and "produce a common answer to the crucial question why was I disfavored." *Dukes*, 564 U.S. at 352. Plaintiffs do not come close. *Dukes* noted that "significant proof that an employer operated under a general policy of discrimination" could establish commonality. *Id.* at 339 (brackets and quotation marks omitted). But such "proof" is wholly lacking. The statistical analyses of plaintiffs' expert are improperly aggregated, and merely demonstrate "there is no evidence that the <u>entire class</u> was subject to the same allegedly discriminatory practice[.]" *Dukes v. Wal-Mart Stores, Inc*., 964 F. Supp. 2d 1115, 1121 (N.D. Cal. 2013)(emphasis in original). The smattering of anecdotes from a handful of class members is unconvincing, and plaintiffs completely ignore the FDNY's efforts to increase the racial diversity of its civilian workforce.

Nor have plaintiffs identified a "common mode of exercising discretion." *Dukes*, 564 U.S. at 356. Plaintiffs have minted two new "facially neutral practices" – failing to recruit civilians to the same extent as firefighters and "walling off" EEO and Human Resources – that are "polic[ies] against having uniform employment practices." *Dukes*, 564 U.S. at 355. Plaintiffs' unfounded assertion that Steve Rush, Donay Queenan and the Fire Commissioner have overseen a centralized decision-making process is merely a strained attempt to "repackage local variability as uniformity." *Bolden v. Walsh Constr. Co*., 688 F.3d 893, 898 (7th Cir. 2012).

In sum, plaintiffs and the putative class members "have little in common but their [race] and this lawsuit." *Dukes*, 564 U.S. at 360. Because Rule 23 demands far more to certify a class, the Court should deny plaintiffs' motion.

## STATEMENT OF FACTS

### A.     Overview of the FDNY

The FDNY employs 17, 300 permanent employees, consisting of 15,200 employees in Fire Suppression, Emergency Medical Service ("EMS") and Fire Protection Inspector ("FPI") titles, while the remaining 2,100 employees are in civilian titles. Ex. A, Singh Decl., ¶4. The FDNY is divided into numerous bureaus, and utilizes 166 civil service job titles, excluding uniform and EMS. *Id.* ¶5.  These civilian titles encompass a tremendously broad range of professional, clerical, administrative, and craft positions. The Notices of Examination for six titles – Clerical Associate, Rubber Tire Repairer, Investigator, Certified IT Developer, Auto Mechanic, and Research Assistant – illustrate the different job skills and educational and professional experience required. Exs B-G. The FDNY's list of examinations for Fiscal Year 2018 covers a breadth of titles as well. Ex. H.

African-American civilian employees have held pivotal leadership roles at the FDNY. Doug White, who was the FDNY's Deputy Commissioner of Administration between 2002 and 2018 and is himself African-American, noted that three Deputy Commissioners at FDNY were African-American. Ex. I, White Dep., 76:11-15, 212:3-9. Steve Rush likewise noted the FDNY's diversity at the Deputy and Assistant Commissioner levels. Ex. J, Rush Dep., 145:9-17. In addition, African-Americans hold key policymaking positions at the FDNY, including Human Resources ("HR"), Recruitment and Retention, Legal Affairs, Candidate Investigation ("CID"), Diversity and Inclusion, amongst many others. Ex A, ¶¶14-15.

### B.     The Selection Process For Hiring, Promotion, And Compensation Delegates Significant Discretion To Each Bureau

The FDNY's bureaus are granted significant discretion to make hiring, promotion, and selection decisions. For Competitive titles in which the New York City Department of

Citywide Administrative Services ("DCAS") administers an examination and certifies an eligible list, the bureau's hiring manager takes the lead in interviewing the candidates and selecting the candidate. HR's role focuses on ensuring the civil service rules are followed and the selected candidate is qualified for the title. Ex. A, ¶¶17-20. Steve Ertrachter, the FDNY's Director of Licensing, likewise emphasized that HR participated in the "list calls" to help "navigate through the civil service system." Ex. K, Ertrachter Dep., 62:10-17.

For "discretionary" civilian titles in which no eligible list exists, HR provides guidance to the bureau but does not participate in interviews or make the selection decision. Ex. A., ¶¶21-23. The bureau conducting the interview will prepare an "interview disposition" which "stat[es] what employees were interviewed and the reason for selecting the employee that they selected." Ex. L, Queenan Dep., 160:3-8. Once the candidate is selected, HR reviews the information submitted to ensure the candidate is qualified for the position. Ex. A, ¶23.

The FDNY's bureaus are also afforded considerable discretion in the compensation-setting process. For example, Cecilia Loving testified that she would set the salary "parameters" for a civil service title, and would turn to HR for "guidance." Ex. M, Loving Dep., 261:3-9; 264:14-265:10. The FDNY also maintained a program for discretionary pay increases for employees who had permanently assumed additional duties of a substantial nature, although this program was recently suspended. Ex. N, Rush Decl., ¶5. The bureaus would "poll the managers for nominations," with the bureau head making the final selection. Ex. K, 72:7-12. Plaintiffs themselves acknowledged that the selection decision was made at the bureau level. Ex. O, McKiver Dep., 98:17-25. Neither Rush nor the Fire Commissioner played a role in determining discretionary increases, and HR would "review and implement" the decision but did

not make the selection. Ex. P, Perez Dep., 164:22-165:20. Rush provided advice to the bureaus, but did not interfere with the selection decision. Ex. N, Rush Decl., ¶7.

Plaintiffs' motion paints a fictional storyline whereby the Queenan-Rush-Fire Commissioner "triumvirate" oversaw a centralized decision-making process for hiring and promotion. Memo., pp. 12-16. But plaintiffs' assertions grossly misrepresent the facts. For civil service titles utilizing an eligible list, HR would "coordinate" the interview process with the hiring managers, but it is the hiring managers who draft the interview questions and make the selection decision. Ex. P, pp. 14:2-16:9; Ex. A, ¶¶17-20.

Plaintiffs' bald assertion that the "process is largely the same" for civilian hires and promotions that do not utilize an eligible list (Memo., p. 13) is completely incorrect. Queenan testified that HR would only participate in interviews for "mid to high level managerial" positions. Ex. L, 65:13-16; Ex. A, ¶22 (HR does not currently participate in interviews for selections outside the civil service process). The attached vacancy notices make clear that interviews were often conducted solely by the bureaus. Exs. Q-T. The bureaus also ranked the candidates, and provided the justification for the selection. Ex U, Candidate Scoring Sheet. Perez emphasized that the *"[f]inal decision [is] by the hiring manager."* Ex. P, 43:13-17.

Plaintiffs' discussion of the salary process (Memo., p. 14-16) completely glosses over the significant discretion granted to the bureaus described above. Rush himself emphasizes that the bureaus took the lead role in selecting individuals for discretionary increases, and that he did not interfere with the decision. Ex. N, ¶7. Rush does provide guidance to bureaus on raises, but the bureaus have sometimes disregarded his guidance, as in the case of Carline Germain. *Id.* ¶10. Plaintiffs' bald assertion that the bureaus consulted with Rush about pay decisions in the "knowledge that he ultimately could reject their recommendation" (Memo., p. 15) finds no

support in the record. Plaintiffs also acknowledge that the current Fire Commissioner, Daniel Nigro, has "delegated" initial salary decisions to the First Deputy Commissioner. Memo., p. 15. But plaintiffs neglect to mention that the Deputy Commissioner that Rush referenced who "would handle…a lot of leg work upfront" was Robert Turner, who is himself African-American. Ex. 21, 88:18-12.

## C.   The FDNY's Commitment To Diversity and Inclusion

### 1.   The FDNY'S EEO Policy and Office of Diversity and Inclusion

The FDNY maintains an EEO policy that reflects a commitment to "ensur[ing] that the Fire Department draws from all segments of our City and that every employee has an equal opportunity to contribute diverse perspectives and talents[.]" Ex. V. The EEO policy details the range of its protections, and also outlines the procedure for the filing, investigation, and resolution of EEO complaints. *Id.* The FDNY has also created an Office of Diversity and Inclusion, which is currently headed by Cecilia Loving. The Chief Diversity and Inclusion Officer ("CDIO") has developed a strategic plan after meeting with over 1,600 employees, which includes numerous initiatives to foster a diverse working environment at the FDNY. Ex. W, 2019-2020 Strategic Plan.

### 2.   The FDNY's Efforts To Address Underutilization

Plaintiffs claim that the FDNY has "largely ignored" underutilization in African-American civilian titles as shown in the quarterly CEEDS reports provided by DCAS. Memo., pp. 9-11. But plaintiffs focus almost entirely on the 2006-2014 timeframe, *before* the class period even begins.  Plaintiffs did not even depose the two individuals most knowledgeable about the FDNY's efforts to address underutilization, Marie Giraud and Don Nguyen. The factual record that plaintiffs either omit or never bothered to discover eviscerates plaintiffs' assertions.

The FDNY hired Giraud in 2016 to serve as its Director of Workforce Utilization. Ex. X, Giraud Decl., ¶3. The agency also developed a Workforce Utilization Directive shortly after Giraud's hiring. Ex. Y. The Directive stated that the FDNY would analyze the CEEDS reports on a quarterly basis for job groups and titles exhibiting underutilization. These titles would be "targeted for remedial measures" working with community partner organizations. *Id.* For example, the FDNY would coordinate with these partner organizations to "distribute and advertise opportunities for employment" in order to reach "diverse and qualified applicant pools." *Id.*

Giraud soon put these words into action. Giraud regularly conferred with HR and the EEO Office concerning underutilization of particular civilian titles. Giraud also met with HR to discuss recruitment and targeted advertising. Ex X, ¶¶5-7. In January 2019, the FDNY promoted Giraud to Assistant Commissioner of Candidate Investigation, taking over for Margaret Quinn-Puppa. *Id.* ¶11.

The EEO Office, led by Assistant Commissioner Nguyen, has further institutionalized the process for addressing underutilization. Nguyen receives civilian postings from Rona Dodson at HR, and matches the quarterly CEEDS reports to the posted vacancies. Ex. Z, Nguyen Decl., ¶8. If the posting is an underutilized title, Nguyen provides this information to Diversity Coordinator Tameka Lowe, who works with Director of Community Affairs Fabricio Caro to advertise for these vacancies with the FDNY's community partner organizations. *Id.*

The suggestion that HR is somehow "walled off" from the EEO Office (Memo., pp. 16-18) has no grounding in fact, as the foregoing summary demonstrates. Both Giraud and Nguyen have collaborated with HR to address and remediate underutilization. The EEO Office

has also worked with HR on structured interviewing techniques to ensure uniformity in the interviewing process. Ex Z, ¶10.

### 3. Plaintiffs' Comparison of Civilian and Uniform Recruitment is Faulty

When the Department of Justice filed suit against the FDNY in 2007, African-Americans constituted 3.4% of firefighters. *United States v. City of New York*, 637 F. Supp. 2d 77, 80 (E.D.N.Y. 2009). In sharp contrast, plaintiffs' December 1, 2017 complaint acknowledged that nearly 25% of the FDNY's civilian employees were African-American (Dkt. 4, ¶20), and plaintiffs also concede the FDNY's civilian workforce is majority-minority. Memo., p. 3.

Despite this obvious dissimilarity, plaintiffs' motion second-guesses the FDNY for focusing its recruitment efforts on uniform titles. Memo., pp. 18-20. But White cogently explained that the FDNY's recruitment campaigns focused on firefighters because that title was the "biggest problem that the [FDNY] had," while "civilians were a much better situation" that was "more easily correctible." Ex. I, pp. 102:14-17, 104:24-105:2. The FDNY's recruitment office, headed by Nafeesah Noonan, does recruit for Fire Alarm Dispatcher ("FAD") and FPI titles that are unique to the FDNY. Ex. L, 88:7-11.

The FDNY also faces unique challenges in its ongoing efforts to increase the diversity of its civilian titles. Giraud and Nguyen emphasize that many of the FDNY's civilian openings involve civil service titles in which DCAS administers an examination. Ex. X, ¶¶8-9; Ex Z, ¶9. The pool of eligible candidates is determined by DCAS, and FDNY appoints candidates off a rank-order list using the "one-in-three rule." *Id.* Queenan and Rush similarly mentioned this challenge in recruiting for civilian titles. Ex. L, 192:20-24; Ex. J, 148:17-22. As a result, the FDNY's recruitment efforts outside the FAD and FPI titles focus on titles in which no eligible list exists. Ex. Z, ¶9.

**D.      Plaintiffs' Statistical Analyses Do Not Establish Class-wide Discrimination**

Plaintiffs retained Dr. Charles Scherbaum to examine whether African-Americans at the FDNY are "systematically: (1) underutilized; (2) subject to disparate selection rates in hiring; (3) subject to disparate selection rates in promotion; and (4) disparately compensated." Ex. 1, p. 11. Dr. Scherbaum has produced three reports – a February 2, 2020 expert report, April 16, 2020 rebuttal report, and a May 23, 2020 "supplemental" report served just three days before plaintiffs filed their motion. Exs. 1, 3, 4.

Dr. Scherbaum's report purports to show that African-Americans are underutilized in five broad job groups – Management Specialist, Health Professional, Clerical Supervisor, Clerical and Craft – although no underutilization was shown in the Science Professional group. Ex. 1, p. 40. Each job group is comprised of several job titles, as shown in Appendix B of the report. *Id.*, p. 158. Dr. Scherbaum compared African-American representation in these six groups with the availability percentages derived by DCAS. *Id.*, p. 38. The availability percentages are calculated based upon internal pools comprised of civil service list data and external pools comprised of Census data. *Id.*

Defendant's expert, Dr. Chris Erath, concluded that Dr. Scherbaum's underutilization analysis "can provide evidence neither for nor against the classwide allegations in this case" due to the "fallacy of composition." Ex. 2, p. 2. Specifically, there is no reason to expect the availability to be the same for the disparate job titles in each group, as shown by American Community Survey (ACS) data. *Id.*, pp. 4-6. For example, the Health Professional group shows 36% African-American availability, yet the ACS data shows 5.8% availability for doctors, 22% for nurses, and 48% for licensed practical nurses (LPNs). *Id.*, p. 5. The 36% availability percentage for the overall Health Professional group is "far off" from these more specific percentages based upon job title. *Id.*

Dr. Scherbaum's rebuttal report backtracked significantly, acknowledging ***"Dr. Erath is correct that utilization analyses do not automatically imply adverse impact or discrimination[.]"*** Ex. 4, p. 8. Dr. Scherbaum stated that an underutilization analysis is merely the "starting point" for analysis, *Id.*, p. 7.

Dr. Scherbaum also conducted several "hiring" analyses that actually combine hiring and promotion data. Ex. 1, pp. 70-103. As Dr. Erath points out, the results of Dr. Scherbaum's hiring analyses are distinctly underwhelming. Ex. 2, pp. 10-14. For example, Dr. Scherbaum conducted an applicant-flow analysis comprised of only 30 job titles. But even amongst this hand-picked subset, Dr. Scherbaum found adverse impact in *less than half* of these titles. Ex. 1, p. 100. Dr. Scherbaum's analysis comparing new African-American hires at the FDNY in the five job groups with all other City agencies found statistical significance in only "4 of the 20 comparisons." *Id.*, p. 95. Plaintiffs' discussion of this analysis (Memo., pp. 6-8) once again ignores this key finding.

The report elsewhere masks the underwhelming results. For example, the hiring analysis in Table 30 shows African-Americans in a "statistically significant disadvantage" in 26 category-years between 2005 and 2018. Ex. 1, p. 73. But Dr. Scherbaum neglects to mention that the *total* category-years is 56 as shown in Table 31, which includes 4 job categories over 14 years. *Id.*, p. 74. Although the "disadvantage" appears in less than half of the category-years, this critical detail is unmentioned in the report.

Dr. Scherbaum's May 23 "supplemental" report, which is clearly untimely, is similarly deficient. During class discovery, plaintiffs requested some applicant data, but not DCAS's applicant data for civil service examinations. Dr. Erath analyzed this data from 2005-2018 and grouped the various selection outcomes into "good," "bad" and "other" categories. Ex.

10

2, pp. 9-10. Dr. Erath found that 29.53% of African-American applicants were selected compared to 29.46% of white applicants. *Id.*. Although Dr. Scherbaum was provided this data on March 23, he did not express any criticisms of Dr. Erath's methodology at his April 30 deposition. Ex. AA, Scherbaum Dep., 233:2-234:12. In fact, Dr. Scherbaum testified "there is nothing else beyond what is in my report." *Id.* 234:23-235:4. Yet on May 23, plaintiffs produced a 17-page "supplemental" report that critiqued Dr. Erath's methodology. Ex. 4. Dr. Scherbaum reshuffled the "good," "bad" and "other" hiring outcomes and conducted a shortfall analysis. The result shows a "shortfall" of 15 African-Americans between 2005 and 2018, or approximately one per year. *Id.*, p. 10, Table 3.

Dr. Scherbaum conducted a purported "promotion" analyses that, rather astonishingly, used DCAS's availability percentages as the benchmark. Ex. 1, p. 105. The results of Dr. Scherbaum's flawed "promotion" analysis are underwhelming in any case, as with the hiring analyses. For example, Table 47 shows a disparity for African-Americans in 20 of the 56 category-years. Ex. 1, p. 106.

As Dr. Erath pointed out, Dr. Scherbaum's use of availability percentages is not a "valid analysis" because it is "not limited to and differs from the actual FDNY workforce." Ex. 2, p. 14. Dr. Scherbaum claimed in his rebuttal report that applicant data for promotions does not exist (Ex. 3, p. 37), but that is simply incorrect. The applicant data defendant produced in August 2019 *did* include applicant pools for promotions. For example, the Executive Assistant position was a promotion in title that was posted only internally. Ex. AB, Database Extract. Defendant also produced the applicant pool data for civil service promotional examinations administered by DCAS, even though plaintiffs never requested this data set in discovery.

With respect to salary, Dr. Scherbaum conducted a regression analysis to determine whether there are statistically significant disparities in the Management Specialist and Science Professional job groups, although Dr. Scherbaum's regression inexplicably failed to analyze Health Professionals. Ex. 1, pp. 124-129. In addition, Dr. Scherbaum's analysis controlled only for tenure and *not* job title. This analysis thus grouped together disparate job titles whose salaries obviously differed. Ex. 2, p. 16.

Dr. Erath's regression analysis did control for job title, and the results show virtually no statistically significant disparities in salary over 14 years. Ex. 2, pp. 18-19. Dr. Scherbaum's rebuttal report attempted to control for job title solely in the Science Professional group. Ex. 3, pp. 32-36. But Dr. Scherbaum made a fundamental error by dividing the titles into ten groups, which "artificially forces the pay difference between each of those groups to be the same." Ex. AC, Erath Dep., 179:13-181:3. In any event, Dr. Scherbaum's revised regression did not even look at Health Professionals or Management Specialists.

**E.      Plaintiffs And The Putative Class Members Have Thrived In Their Careers**

Plaintiffs' motion purports to describe their "frustrations" in seeking to advance their careers. Memo., pp. 23-25. But plaintiffs' own deposition testimony demonstrates the opposite. Deborah Bowman has supervised the FDNY's cashier's office and was promoted to Administrative Manager (Ex. AD, Bowman Dep., 38:19-39:24); Dino Riojas has risen to Computer Specialist Level 4, and is also a supervisor (Ex. AE, Riojas Dep., 40:6-41:19); Brenda McKiver was promoted to Administrative Manager in 2017 (Ex. O, 34:16-35:14); Debra Poe was promoted to Administrative Manager and oversaw the Leave Unit prior to retiring, and declared "I love the job that I do." (Ex. AF, Poe Dep., 26:10-27:20, 46:17-24); Annette Richardson was promoted to Administrative Staff Analyst in 2009 and was Director of the FDNY's HRIS system (Ex. AG, Richardson Dep., 30:1-24, 38:4-9). The declarants have also

excelled in their careers: for example, Carline Germain was promoted in 2019 to Director of Administration in the Bureau of Fire Prevention and received, in her own words, a "huge jump in pay." Ex. 28, ¶20.

Plaintiffs and some of the putative class members also complain that they were paid less than their colleagues. Memo., pp. 26-27. For example, Annette Richardson complains that she earned less than her white predecessor. Memo., p. 26. But Rush points out that the FDNY does not always offer a new employee the same salary as the incumbent. Ex. N, ¶4. The "comparators" that plaintiffs and putative class members identify are not remotely similar. For example, Carline Germain claims she should be earning the same salary as Steve Ertrachter, even though Ertrachter has worked in City government since the 1970s and has far more experience than Germain and supervises many more subordinates. Ex. N, ¶11. [2]

## **ARGUMENT**

"The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Dukes*, 564 U.S. at 349 (internal quotation omitted). As a result, "a class representative must be part of the class and possess the same interest and suffer the same injury as the class members." *Gen. Tel. Co. of the Southwest v. Falcon*, 457 U.S. 147, 156 (1982)(internal quotation omitted). "Rule 23 does not set forth a mere pleading standard" but instead demands a "rigorous analysis" that may "entail some overlap with the merits of the plaintiff's underlying claim." *Dukes*, 564 U.S. at 351. With this demanding standard in mind, plaintiffs do not come close to establishing "that the prerequisites of Rule 23(a) [and (b)] have been satisfied." *Dukes* 564 U.S. at 351 (quoting *Falcon*, 457 U.S. at 161).

---

[2] Plaintiffs claim that Stephanie Thomas has been "stuck" in her position for over 30 years (Memo., p. 24), but fail to mention that a court has already determined that is not the case. *See Thomas v. City of New York*, 953 F. Supp. 2d 444, 449 (E.D.N.Y. 2013)(granting summary judgment because Thomas's "personal belief that she has been the subject of discrimination and retaliation is not enough").

## POINT I

## PLAINTIFFS FAIL TO SATISFY RULE 23(A)

**A.    Plaintiffs Are Unable To Establish Commonality Under Rule 23(a)(2)**

Rule 23(a)(2) requires plaintiffs to establish "there are questions of law or fact common to the class." But merely "[r]eciting these questions is not sufficient to obtain class certification." *Dukes*, 564 U.S. at 349. Plaintiffs must provide a "common contention" establishing "the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Id.* at 350 (emphasis in original)(internal quotation omitted). In other words, plaintiffs must provide "some glue holding the alleged *reasons* for all those decisions together." *Id.* at 352 (emphasis in original). Plaintiffs fall well short of providing this "glue."

### 1.  Pattern or Practice Under 42 U.S.C. § 1983 And CHRL

*Dukes* emphasized that "proof of commonality necessarily overlaps with [plaintiffs'] merits contention that Wal-Mart engages in a pattern or practice of discrimination." 564 U.S. at 353.  The framework set forth in *Teamsters v. United States*, 431 U.S. 324 (1977) guides the commonality analysis. *Id.* at 358. But plaintiffs' "statistical and anecdotal evidence…falls well short" of establishing commonality. *Id.* at 356.

#### i.    Statistical Evidence

Dr. Scherbaum has produced three reports totaling 222 pages. But such prolixity cannot mask the fact that his underutilization, hiring, and promotion analyses failed to examine *any* non-discriminatory variables despite the "highly specialized education and training necessary for the diverse occupational categories this case involves[.]"  *Valentino v. United States Postal Serv*., 674 F.2d 56, 70 (D.C. Cir. 1982)(Ginsburg, J.). Dr. Scherbaum testified that he did not have the information needed to examine the cause of these disparities (Ex. AA, 109:6-

14

18; 166:17-167:3; 172:19-23), which is hardly persuasive given the extensive class discovery conducted.[3] For this reason alone, Dr. Scherbaum's analyses fail to support a finding of commonality. *See Sheehan v. Purolator, Inc.*, 839 F.2d 99, 103 (2d Cir. 1988)(affirming denial of class certification where statistics "did not take into account various relevant non-discriminatory factors"); *Fuller v. Instinet, Inc.*, 120 Fed. Appx. 845, 846 (2d Cir. 2004)(Rule 23(a) not met where plaintiff "fail[ed] to include any relevant non-discriminatory factors in her statistical study"); *Ross v. Nikko Sec. Co. Int'l, Inc.*, 133 F.R.D. 96, 97 (S.D.N.Y. 1990)(same).

Dr. Scherbaum's statistical analyses are also beset by over-aggregation. Plaintiffs acknowledge, as they must, that "[p]ost-*Dukes*, the statistical study must 'conform[] to the level of decision for the challenged practices." Memo., p. 35 (quoting *Kassman*, 416 F.Supp.3d at 282). Plaintiffs claim that Dr. Scherbaum's aggregated statistical analyses pass muster "[b]ecause the decision-making at FDNY is so centralized[.]" Memo., p. 36. But as noted above, plaintiffs' argument has no basis in fact. *See supra,* pp. 3-6.

Indeed, Dr. Scherbaum's analyses illustrate why many courts have been highly skeptical of aggregated statistical studies post-*Dukes*.   Plaintiffs' motion focuses heavily upon Dr. Scherbaum's analysis purporting to show that African-Americans are underutilized in five of six broad "job groups." Memo., pp. 3-8. Given that many large employers perform such underutilization analyses pursuant to Department of Labor guidelines, *see* 41 C.F.R. § 60-1 *et seq.*, it is striking that underutilization analyses are rarely even discussed in class certification decisions – the proverbial "dog that didn't bark." The few class certification decisions that factor underutilization into the commonality analysis have expressed disapproval. *See Clayborne v. Omaha Pub. Power Dist.,* 211 F.R.D. 573, 592 (D. Neb. 2002); *Abrams v. Kelsey-Seybold Med.*

---

[3] Although Dr. Scherbaum explained why he did not control for education or evaluation ratings in his salary regression (Ex. 1, p. 121), there were other factors his non-salary analyses could have included, as he testified.

*Group*, 178 F.R.D. 116, 123-24 (S.D. Tex. 1997). In fact, underutilization analyses are usually invoked by *defendants* in reverse discrimination cases involving employment and contracting.[4]

Nor is the absence of such case law surprising, as underutilization analyses are particularly ill-suited to the commonality analysis. Statistical evidence can support a finding of commonality by demonstrating "that the <u>entire class</u> was subject to the same allegedly discriminatory practice[.]" *Dukes II*, 964 F.Supp.2d at 1121 (emphasis in original)(internal quotation omitted); *Jones v. Nat'l Council of Young Men's Christian Ass'ns of the United States*, 34 F. Supp. 3d 896, 910 (N.D. Il. 2014)(statistical analysis must show "there is a *common* explanation—that the same explanation applies to the entire class")(emphasis in original).

Underutilization analyses aggregate various job titles into large "groups" that make it impossible to determine whether the "entire class" is subject to the same practice. As Dr. Erath pointed out, the availability percentages for particular job titles differ from the aggregate availability percentage in each of the six job groups. Ex. 2, pp. 4-5 (discussing different availability percentages for doctors and nurses grouped together in "Health Professional" category). As a result, Dr. Scherbaum's underutilization analysis "leaves no way to know if the disparity is widespread, localized, or a statistical artifact." *Id.*, p. 2. The post-*Dukes* case law firmly supports Dr. Erath's critique. *Bolden*, 688 F.3d at 896 (if only 5 of 25 superintendents engaged in discrimination, aggregate data would not support implication that all 25 superintendents behaved similarly to establish commonality).

---

[4] *See Steelworkers v. Weber*, 443 U.S. 193, 223 n.2 & 246 (1979)(Rehnquist, J., dissenting); *H.B. Rowe Co., Inc. v. Tippett*, 615 F.3d 233, 244-45 (4th Cir. 2010); *Rothe Dev. Corp. v. DOD*, 545 F.3d 1023, 1047 (Fed. Cir. 2008); *Messer v. Meno*, 130 F.3d 130, 138-39 (5th Cir. 1997); *Legal Aid Soc'y v. Brennan*, 608 F.2d 1319, 1340-43 (9th Cir. 1979); *Honadle v. University of Vermont & State Agric. College*, 56 F. Supp. 2d 419 (D.Vt. 1999); *Webster v. Fulton County*, 51 F. Supp. 2d 1354, 1369 (N.D. Ga. 1999); *North Shore Concrete & Assoc. v. City of New York*, No. 94-4017 (ILG), 1998 U.S. Dist. LEXIS 6785, at *11 (E.D.N.Y. Apr. 12, 1998); *Hannon v. Chater*, 887 F. Supp. 1303, 1317 & n.59 (N.D. Cal. 1995).

Dr. Scherbaum's rebuttal report backtracked significantly in response to Dr. Erath's critique. Dr. Scherbaum acknowledged "Dr. Erath is correct that utilization analyses do not automatically imply adverse impact or discrimination" and claimed such analyses merely provide a "starting point." Ex. 4, p. 8. But this caveat, combined with the weakness of plaintiffs' hiring statistics described below, further undermines plaintiffs' assertion that a common question exists. *See also Coser v. Moore*, 587 F. Supp. 572, 592 (E.D.N.Y. 1983), *aff'd*, 739 F.2d 746 (2d Cir. 1984)("In spite of the AAP's evidence of underutilization of women, the court does not find that Stony Brook has a pattern and practice of discrimination against  women in the libraries."); *Croker v. Boeing Co. (Vertol Div.)*, 437 F. Supp. 1138, 1184 (E.D.Pa. 1977), *aff'd*, 662 F.2d 975 (3d Cir. 1981)("underutilization does not necessarily imply hiring discrimination" because "[a]ctual hiring figures must be examined")

Dr. Scherbaum's hiring analyses also suffer from the same "fallacy of composition" as his underutilization analysis. But the results of these analyses still fail to show class-wide discrimination. *See supra*, p. 10. In fact, plaintiffs *themselves* concede that Dr. Scherbaum's aggregated hiring analyses showed statistically significant disparities in only "half the combinations of year and job group[.]" Memo., p. 21. This lackluster result is insufficient to show the "entire class" was subjected to the same discriminatory hiring policies during the relevant period. *Dukes II*, 964 F.Supp.2d at 1121 (no commonality where plaintiffs "have not identified statistically significant disparities in even a majority of the relevant decision units").

Even when Dr. Scherbaum focuses on job title, the results are underwhelming. Dr. Scherbaum conducted an applicant flow analysis based on a subset of 30 job titles. Ex. 1, p. 100. But even this analysis showed adverse impact in *less than half* of the job titles. *Id.* These

results render absurd plaintiffs' core argument that the FDNY's "triumvirate" oversaw a centralized decision-making process that discriminates against African-American civilians.

Nor does the shortfall analysis Dr. Scherbaum produced on May 23 change the result. Ex. 4. The Court should strike this untimely report, which is not a legitimate supplement under Rule 26(e), and prejudices defendant while giving plaintiffs an unfair and undeserved advantage.[5] *See Sandata Techs., Inc. v. Infocrossing, Inc.*, No. 05-09546, 06-1896 (LMM) (THK), 2007 U.S. Dist. LEXIS 85176, at \*20 (S.D.N.Y. Nov. 16, 2007)(precluding party from relying upon supplemental expert report submitted beyond deadline for expert discovery).

Even if the May 23 report was admissible, it still fails to raise a common question tying the class together. Dr. Scherbaum quibbled with Dr. Erath's assignment of "good," "bad," and "other" outcomes, and ran a purported statistical analysis based on his preferred assignment of outcomes. Ex. 4, p. 10. The resulting "shortfall" amounts to just 15 African-American hires *and* promotions spanning 2005-2018, or approximately one per year. *Id.* Even if this result is taken at face value for purposes of this motion, it *still* does not raise a common question as to whether the FDNY engaged in hiring discrimination across 166 job titles. *See Waisome v. Port Auth. of N.Y. & N.J.*, 948 F.2d 1370, 1376 (2d Cir. 1991)(even where a "disparity [is] found to be statistically significant" it may still be "of limited magnitude").

Dr. Scherbaum's "promotion" analysis, meanwhile, is nothing of the sort. "In the context of promotions…the appropriate comparison is customarily between the composition of candidates seeking to be promoted and the composition of those actually promoted." *Malave v.*

---

[5] Plaintiffs never requested in class discovery applicant data from DCAS civil service examinations, and as a result this data was produced along with Dr. Erath's report on March 23. Dr. Scherbaum was deposed five weeks later, on April 30, but made no reference to the critiques of Dr. Erath raised three weeks later in his May 23 "supplemental" report. Ex. AA, pp. 233:2-235:4. Defendant was therefore deprived of the opportunity to question Dr. Scherbaum about these critiques and the methodology used in his May 23 "shortfall" analysis.

*Potter*, 320 F.3d 321, 326 (2d Cir. 2003). Dr. Scherbaum made the truly baffling decision to use DCAS's outside availability percentages. Ex. 1, p. 105. In other words, the applicant "pool" Dr. Scherbaum relied upon was not even comprised of *actual FDNY employees applying for promotion*. The results of Dr. Scherbaum's "promotion" analysis fail to establish class-wide discrimination during the applicable time period anyway. Ex. 1, p. 106.

Dr. Scherbaum justified this "proxy" estimate by claiming that applicant data does not exist for all promotions. Ex. 4, p. 37. That is not so. Even before defendant produced applicant data for civil service promotional exams, plaintiffs were provided with applicant data in August 2019 that included hiring *and* internal promotions. *See supra*, p. 10. It is evident Dr. Scherbaum did not understand the data he was analyzing. Because his analysis fails to use the "appropriate comparison," *Malave*, 320 F.3d at 326, the results are "meaningless." Ex. 2, p. 16. [6]

Dr. Scherbaum's compensation analysis is plainly insufficient as well. Dr. Scherbaum conducted a regression analysis that failed to control for job title. Ex. 2, pp. 16-18. This analysis grouped together job titles whose salaries are clearly dissimilar. Dr. Erath did control for job title, and found virtually no statistically significant disparities across the job groups. *Id.*, pp. 18-19. Dr. Scherbaum's rebuttal report belatedly controlled for job title in the Science Professional group but *not* for Health Professionals or Management Specialists. Memo., p. 28. [7] Both parties' experts agree there is no "common contention" uniting the Professional and Management Specialist job groups after controlling for job title.

---

[6] Plaintiffs' critique of Dr. Erath for not conducting a promotion analysis (Memo., p. 25) is absurd. The Second Circuit squarely held in *United States v. City of New York*, 717 F.3d 72, 85-85 (2d Cir. 2013) that an employer is not required to conduct its own statistical analysis to rebut the plaintiffs' case. Dr. Erath ably explained why Dr. Scherbaum's "promotion" analysis based on availability percentages was not a "valid analysis" and was "meaningless." Ex. 2, p. 16. That is sufficient to rebut Dr. Scherbaum's flawed analysis.

[7] Dr. Scherbaum's decision to control for job title in the Clerical and Craft job groups but not the Management Specialist or Health Professional groups (Ex. 3, pp. 31-36) is completely mystifying, as the putative subclass excludes the Clerical and Craft job groups.

The experts' primary disagreement turns on whether job title is a "tainted variable." Plaintiffs claim this "technical" dispute should not be decided because it does not "go to class certification issues." Memo., pp. 28, 36. But this transparent attempt to shield Dr. Scherbaum from scrutiny - while repeatedly criticizing Dr. Erath's report - is meritless. *Dukes* makes clear that Rule 23's "'rigorous analysis' will entail some overlap with the merits of the plaintiff's underlying claim," which "cannot be helped." 564 U.S. at 351. The Second Circuit has disavowed any "suggest[ion] that a district judge may not weigh conflicting evidence" at this stage. *In re Initial Pub. Offering Sec. Litig.*, 471 F.3d 24, 42 (2d Cir. 2006). Because this "factual dispute" is pivotal to whether the Employee Compensation Subclass has raised a common contention, it should be "resolve[d]." *Id.* at 41.

Dr. Scherbaum asserts that job title should not be factored into the regression analysis because whites are more concentrated in higher-paying titles. Memo., pp. 27-28. But *Kassman* rejected a strikingly similar argument. The Court faulted the plaintiffs' expert for "aggregat[ing] data across function, thereby equating job and job title, [which] obfuscated the principal explanatory variable," while acknowledging the "higher concentration of men in the best compensated Service Lines and Cost Centers within a single function." 416 F.Supp.3d at 283. [8] *See also Randall v. Rolls-Royce Corp.*, 2010 U.S. Dist. LEXIS 23421, at *29-30, n.6 (S.D. Ind. Mar. 12, 2010), *aff'd*, 637 F.3d 818 (7th Cir. 2011)(rejecting argument that job title is "tainted variable" because men occupied jobs with higher salaries).

Dr. Scherbaum's argument fails even on its own terms. As noted above, plaintiffs fail to establish class-wide hiring discrimination throughout the applicable period. *See supra*, p.

---

[8] *Kassman* determined that Dr. Vekker's analysis failed to raise a common question while denying KPMG's motion to strike under *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). 416 F.Supp.3d at 271-72. Although defendant in no way concedes that Dr. Scherbaum's analyses pass muster under *Daubert*, his analyses likewise fail to support a finding of commonality irrespective of their admissibility at trial.

10. Even assuming that African-Americans are disproportionately hired into lower-paying job titles, as Dr. Scherbaum suggests, he still fails to establish these initial hiring decisions are tainted by *race discrimination*. *See Ottaviani v. State University of New York*, 875 F.2d 365, 375 (2d Cir. 1989)(rejecting argument that rank should be omitted from salary regression as tainted variable absent evidence of discrimination in "placement into initial rank").

### ii.   Anecdotal Evidence

In pattern or practice cases, anecdotal evidence serves to "bring the cold numbers convincingly to life." *Teamsters*, 431 U.S. 339. But in *Dukes*, the plaintiffs' supporting affidavits constituted only 1 out of every 12, 500 class members, and covered only 235 of Wal-mart's 3400 stores. 564 U.S. at 358. These scattered and unrepresentative affidavits thus failed to "demonstrate that the entire company 'operate[s] under a general policy of discrimination'….to certify a companywide class." *Id.* (quoting *Falcon*, 457 U.S. at 159, n.15).

The thirteen declarations supporting plaintiffs' motion are similarly deficient both quantitatively and qualitatively. The most glaring deficiency is the absence of even *one* declaration from a member of the Rejected Applicant Class. When combined with the anemic hiring statistics described above and Erica Richardson's weakness as a class representative described below, it is evident the "Rejected Applicant Class" is a mere fiction. The twelve civilian FDNY employees represent only 3% of the 385 employees who comprise the Employee Class (Memo., p. 30), while only five of the declarants – Asare, Germain, Jules-Baptiste, Reid, and Saylor – are members of the Compensation Subclass, at most 5% of the class. *See Ruiz v. Citibank, N.A.,* 93 F. Supp. 3d 279, 291 (S.D.N.Y. 2015)("scattershot" anecdotal evidence fails to satisfy *Dukes*); *Moussouris v. Microsoft Corp.*, 2018 U.S. Dist. LEXIS 112792, at *73 (W.D.

Wash. June 25, 2018)(affidavits comprising "1 for every 959 class members" were "too weak" to establish commonality).

More importantly, the declarants do not cover a representative cross-section of the FDNY's civilian workforce. It is particularly striking that none of the declarants represent craft or professional titles. The declarants are concentrated in just a handful of titles, such as Principal Administrative Associate, Investigator, Administrative Manager, Clerical Associate, and Community Coordinator. Exs. 24-36. This small and unrepresentative sample is insufficient to raise a common question as to whether the FDNY's *entire* civilian workforce was subjected to a pattern or practice of discrimination. *Moussouris*, 2018 U.S. Dist. LEXIS 112792 at *74 ("it is difficult to imagine that these nine declarants represent sufficiently the multitude of positions throughout the company").

The substance of the declarants' testimony hardly supports a finding of commonality either. As noted above, many of the plaintiffs and declarants have thrived in their FDNY careers, receiving promotions and pay increases. *See supra*, p. 12. Although they complain that certain promotions and pay increases were either denied or unsatisfactory, these scattered complaints do not come close to bridging the "wide gap" between the declarants' individual claims and "the existence of a class of persons who have suffered the same injury as that individual." *Falcon*, 457 U.S. at 158. The declarants' frustration that they have "simply have not gone as far as they would like" in their careers, *Thomas*, 953 F.Supp.2d at 449, is not enough.

Perhaps recognizing the weakness of their anecdotal evidence, plaintiffs claim there is "evidence that *one* of the three decision-makers, HR head Queenan, was biased against them." Memo., p. 38 (emphasis added). Yet this "evidence" is meager at best. Although Queenan is herself biracial, Carline Germain claims that Queenan is "ashamed or otherwise wants to hide

22

her African American lineage." Ex. 25, ¶29. Annette Richardson similarly claims Queenan "considers herself white." Ex. 10, 145:19-25. Such speculative mind-reading is the precise opposite of "significant proof." Germain's observation that Queenan was "laughing" after Lyndelle Phillips was informed of her termination is just as threadbare. Ex. 25, ¶33. Germain also "assume[s]" that African-American employees told Queenan about Margaret Quinn Puppa's alleged conduct. *Id.* ¶32 (emphasis added). But plaintiffs do not provide any details showing that Puppa subjected African-American employees to disparate treatment or demonstrate that Queenan somehow "refused to investigate or take seriously allegations of racial discrimination." Memo., p. 16.

The Court's class certification decision in *Moore v. Publicis Grp. SA*, No. 11-1279 (ALC)(AJP), 2014 U.S. Dist. LEXIS 185384 (S.D.N.Y. May 15, 2014) further demonstrates the paltriness of plaintiffs' "anecdotal evidence" against Queenan. The plaintiffs and putative class members submitted harrowing and highly credible testimony detailing how a member of the employer's alleged "cabal" engaged in appalling harassment and sexual assault. No. 11-1279, Dkt. 425, pp. 13-20. The Court determined that this "shameful behavior" still failed to establish a common question as to whether the "cabal" engaged in discrimination against the class. 2014 U.S. Dist. LEXIS 185384 at *20-21. The allegations against Queenan are not remotely comparable to *Moore*, and plaintiffs likewise fail to show that the "three decision-makers" comprising the FDNY's "triumvirate" engaged in systemic race discrimination against civilians.

### iii.   Failure to Address Known Disparities

The Amended Complaint alleged that a common question existed as to whether hiring, promotion, and compensation decisions were adverse to the class because of a culture of "in-group favoritism toward persons of Irish, Italian, or other European descent." Dkt. 55, ¶¶198,

204, 210. Plaintiffs claimed the FDNY's treatment of African-American employees in favor of white employees was "consistent with FDNY's long history of discriminating against African Americans as firefighters." *Id.* ¶69. But these allegations, which copy-and-paste from the Vulcan Society's lawsuit involving firefighters, made little sense given that whites constitute only "the plurality of the civilian workforce." Memo., p. 3. Plaintiffs evidently agree, as their motion completely ignores these allegations. As described further below, defendant vehemently objects to plaintiffs' trial-and-error approach to pleading.

Plaintiffs have shifted gears completely, and now praise the FDNY's "successful" recruitment efforts for firefighters. Memo., p. 19.  Plaintiffs argue instead that the FDNY has been aware of underutilization in civilian titles as shown by the quarterly CEEDS reports provided by DCAS, but has failed to redress this underutilization. Memo., p. 37. But plaintiffs' argument focuses almost entirely on the 2006-2014 time period,[9] and plaintiffs did not even depose the two individuals most actively involved in addressing underutilization: Marie Giraud and Don Nguyen.

The FDNY hired Giraud in 2016 as the Director of Workforce Utilization, where she monitored the CEEDS report for underutilization and was involved in advertising for underutilized titles. Ex. X. Nguyen, who has served as Assistant Commissioner of EEO since 2016, has further institutionalized the FDNY's process for addressing underutilization working with Rona Dodson at HR, Diversity Coordinator Tameka Lowe, and Director of Community Affairs Fabricio Caro. Ex. Z. Plaintiffs' decision to dwell on the distant past and ignore the present is both baffling and wholly insufficient to raise a common question.

---

[9] It is striking – and highly troubling – that plaintiffs use the present tense while citing testimony from EEO officers who left the FDNY in 2011 (Phillips) and 2014 (Ferrandino). Memo., pp. 17-18.

In *Kassman*, the Court determined that KPMG "was sensitive to gender disparities in pay and promotion and made efforts to remedy the issue" and that plaintiffs had shown, at most, "that the firm's efforts have not completely eradicated the gap." 416 F.Supp.3d at 283-84. *Kassman* applies with even greater force here, as the FDNY faces greater constraints than private-sector employers like KPMG. Giraud and Nguyen note that much of the FDNY's civilian hiring is in civil service titles. DCAS provides the pool of eligible candidates for these titles, and the FDNY is required by law to appoint these candidates in rank-order under the "one-in-three rule." Ex. X, ¶¶8-9; Ex. Z, ¶9. It is impractical for the FDNY to advertise and recruit for these civil service titles, particularly if many other City agencies utilize them as well. Nor does *Chen-Oster* support plaintiffs' cause; the Court determined that "Goldman Sachs did not adequately apply corrective measures" despite being knowledgeable about gender disparities. 325 F.R.D. at 77. But in this case, defendants have indeed implemented corrective measures. The EEPC acknowledged in 2017 that the FDNY had satisfied all corrective measures in its most recent audit. Ex. AH.

## 2. Disparate Impact Under The CHRL

### i. The Two New "Facially Neutral Practices" Plaintiffs Introduce Are "Policies Against Having Uniform Employment Practices"

Defendant's May 26, 2020 motion to strike expressed puzzlement as to why plaintiffs made the FDNY's alleged failure to adopt "widely accepted human resource practices" the centerpiece of their disparate impact claim, as *Dukes* made clear this "policy against having uniform employment practices" was insufficient to establish commonality. Dkt. 76, pp. 12-17. Plaintiffs' motion provides clarification of sorts: they simply ignore these allegations. The Court's September 28, 2018 decision noted that plaintiffs' disparate impact claim challenges the FDNY's allegedly "ad hoc and subjective" decision-making process (Dkt. 26, p. 28), yet

plaintiffs' motion does not develop these allegations. Plaintiffs have instead substituted two *new* purportedly "facially neutral practices": (1) the FDNY's alleged failure to adopt programs for civilian employees that it has adopted to diversify its firefighter ranks, and (2) the failure to cooperate between the FDNY's EEO and HR offices. Memo., p. 2.

Plaintiffs' decision to jettison the Amended Complaint's disparate impact allegations and substitute two new "facially neutral practices" contravenes the "fair notice" required by Rule 8(a) and is an end-run around *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). The Court must not permit plaintiffs to use their pleading as a working draft that can be reshaped at the class certification stage. *See Anderson v. United States HUD*, 554 F.3d 525, 529 (5th Cir. 2008)(vacating certification of class "based on claims not pleaded in the complaint"); *Junod v. NWP Servs. Co*., No. 8:14-cv-1734-JLS, 2016 U.S. Dist. LEXIS 195195, at *12-13 (C.D. Cal. July 18, 2016)("Class certification is not a time for asserting new legal theories that were not pleaded in the complaint…where proposed classes seek recovery on the basis of a theory not found in the operative complaint, courts generally decline to certify the class.")(internal quotation marks and brackets omitted).

Even if plaintiffs are able to rely upon these two new "facially neutral practices," they still cannot establish commonality. The essence of any disparate impact claim is that a facially neutral selection method - such as an examination, performance evaluation system, or reduction-in-force - disproportionately harms a protected class. The CHRL is no different. *See Teasdale v. City of New York*, No. 08-1684 (KAM), 2013 U.S. Dist. LEXIS 133764, at *37 (E.D.N.Y. Sept. 18, 2013), *aff'd*, 574 Fed. Appx. 50 (2d Cir. 2014)(claiming vehicular test had disparate impact under CHRL). But the FDNY's alleged inattention to civilian recruitment compared to firefighters and "walling off" the HR and EEO offices are not even "facially

neutral" and are not *selection* procedures. It is evident that these two "practices" merely rehash plaintiffs' pattern or practice disparate treatment claim.

In addition, these two practices are precisely the type of "polic[ies] *against having uniform employment practices*" that are "just the opposite of a uniform employment practice that would provide the commonality needed for a class action." *Dukes*, 564 U.S. at 355 (emphasis in original). In other words, plaintiffs do not argue that these two practices, when "faithfully applied, led to a disparate impact." *Dukes II*, 964 F.Supp.2d at 1127. Plaintiffs instead claim that the FDNY's alleged *failure* to institute certain practices and procedures harms African-American civilians. But *Dukes* forecloses this very argument. *In re Navy Chaplaincy*, 306 F.R.D. 33, 52 (D.D.C. 2014)(plaintiffs' theory "that the Chaplain Corps lacks effective protections against discriminatory decision-making by individual chaplains" is "precisely the one rejected by *Walmart* and its progeny").

### ii. The *Kassman* Factors Weigh In Defendant's Favor

*Dukes* held that the delegation of discretion to lower-ranking supervisors is insufficient to establish commonality under Rule 23(a)(2); plaintiffs must instead identify a "common mode of exercising discretion that pervades the entire company." 564 U.S. at 356. *Kassman* analyzed four factors to establish whether a "common mode" exists, 416 F. Supp. 3d at 276-281, and plaintiffs urge the Court to apply these factors. Memo., pp. 31-35. But as noted above, plaintiffs' statistics fail to establish a class-wide common question, and the two "facially neutral practices" plaintiffs have introduced run counter to *Dukes*. In addition, the Amended Complaint faulted the FDNY for *failing to implement* a "common mode of exercising discretion," (Dkt. 55, ¶91), and plaintiffs cannot now "unring the bell." But even assuming the *Kassman* factors apply, plaintiffs fall well short of establishing commonality.

**Managerial Non-Involvement**

The Court in *Kassman* looked at "the involvement of top management in the discretionary decision-making," although "mere approval or limited oversight by higher-level executives, without more, falls short of showing a sufficient common denominator." 416 F.Supp.3d at 280. Plaintiffs' motion largely focuses upon this factor. Memo., pp. 12-16, 32-33. But as described above, plaintiffs' bald assertion that Queenan, Rush, and the Fire Commissioner "made all the challenged decisions" (Memo., p. 33) is contradicted by the record as well as plaintiffs' own statistical evidence. *See supra,* pp. 3-6.

The record instead makes clear that the selection decisions for hiring and promotion were ultimately made by the bureau, *not* by the "triumvirate." The bureaus also selected the employees who would receive discretionary salary increases, as even plaintiffs acknowledged in their depositions. Nor is there any evidence that Rush or Queenan "changed pay or promotion recommendations submitted to them for approval with any frequency, much less that they did so with…regularity[.]" *Jones*, 34 F. Supp. 3d at 908.

The cases plaintiffs cite serve to bolster defendant's position. In *Ellis*, for example, "top management actually made the promotion decisions." *Kassman*, 416 F. Supp. 3d at 280 (citing *Ellis*, 285 F.R.D. at 511-12). Similarly, in *Chen-Oster*, "Goldman Sachs' management committee [ultimately] decides who is promoted." 325 F.R.D. at 66. But the record simply does not support a similar determination in this case, no matter how often plaintiffs use the word "centralized" in their brief.

Defendant acknowledges, of course, that the FDNY's upper management exercised an oversight role in the hiring, promotion, and compensation process, such as ensuring that selected candidates were qualified for the position. But the unremarkable fact that Queenan and Rush ensured that personnel decisions complied with civil service rules and the FDNY's

budget process does not thereby "constitute a common practice." *Kassman*, 416 F.Supp.3d at 280. The FDNY's upper management played, at most, a "limited oversight" role. *Id.* (quoting *Jones*, 34 F. Supp. 3d at 908).

**Class Size**

   *Kassman* also examined the "nature of the purported class." 416 F.Supp.3d at 276-277. Plaintiffs estimate that the total class size is approximately 1500. Memo., p. 33. Although the putative class is smaller than the class in *Dukes*, "the Court did not suggest that certification should be denied because the class was too numerous." *Ladik v. Wal-Mart Stores, Inc.*, 291 F.R.D. 263, 270 (W.D. Wisc. 2013). Plaintiffs must "identify 'a common contention . . . that is capable of classwide resolution'" regardless of the class size. *Id.* (quoting *Dukes*, 564 U.S. at 350. For example, the Court denied class certification in *Moore* even though the putative class contained only 200 members. Dkt. 425, p. 3.

   The Court in *Kassman* was particularly troubled that "[p]laintiffs' proposed class covers a myriad of job descriptions, ranging from accountants to scientists, engineers, attorneys and Ph.D. economists, at levels of seniority ranging from Associate to Managing Director." 416 F.Supp.3d at 277. *See also Romero v. H.B. Auto. Group, Inc.*, No. 11-386 (CM), 2012 U.S. Dist. LEXIS 61151, at *53 (S.D.N.Y. May 1, 2012)(no commonality where "the proposed class would contain salespersons, porters, office staff, an Inventory Manager, and 'unidentified non-managerial title'"). *Kassman* contrasted this broad class with *Chen-Oster* and *Ellis*, which were limited to only a few professional titles. 416 F.Supp.3d at 277.

   The sheer breadth of the putative class far exceeds *Kassman*, let alone *Chen-Oster* and *Ellis*. The class jumbles together an assortment of professional, administrative, craft, and clerical titles that have nothing in common. The dissimilarities are glaring: titles such as Attorney and Electrician require degrees and certificates while other titles such as Principal

Administrative Associate do not; many titles are competitive titles hired off an eligible list while other titles such as Physician are exempt from the civil service hiring process; the putative class members belong to different unions, while other titles lack union representation.  This type of loosely related top-to-bottom class was a rarity even before *Dukes*, and hearkens back to the freewheeling era before *Falcon*. 457 U.S. at 156-157.

Plaintiffs' motion ignores this key distinction, and merely notes that the class members work "in a single geographic location." Memo., p. 33. But it matters little that a vast array of dissimilar job titles are housed under one roof. The dissimilarities amongst these titles render it difficult if not impossible to raise a common question "capable of classwide resolution" that can be resolved "in one stroke." *Dukes*, 564 U.S. at 350.

## Framework For Discretion

*Kassman* also looks to "what procedures govern the discretion and then analyze the rigidity of the process through which discretion is exercised." 416 F.Supp.3d at 277. Although the Amended Complaint faulted the FDNY for failing to implement "widely accepted human resources practices" that constrain managers' discretion (Dkt. 55, ¶90-98), plaintiffs now change tack and claim "the City constrains the decision-making processes in multiple ways." Memo., p. 34.[10] Plaintiffs use DCAS's rules on civil service vacancies and provisional hiring as examples, yet the Amended Complaint alleged that the FDNY "*circumvent[s]* these standardized process[es]" that DCAS establishes. Dkt. 55, ¶34 (emphasis added). Once again, plaintiffs should not be "permitted to 'blow hot and cold' in a lawsuit." *Ronson Corp. v. Liquifin Aktiengesellschaft, Liquigas, S.p.A.*, 375 F. Supp. 628, 630 (2d Cir. 1974).

---

[10] It is particularly odd for plaintiffs to cite *Chen-Oster* in support, as the Amended Complaint bemoaned the FDNY's *absence* of company-wide selection procedures akin to 360 reviews, quartiling, and cross-ruffing.

As described above, the FDNY vests significant discretion in each bureau when making hiring, promotion, and compensation decisions. For civil service titles using eligible lists, which comprise "1/3 of FDNY's hires" (Memo., p. 12), the selection decisions are made by each bureau. HR's role is limited to providing guidance that the civil service process is followed, but HR itself does not make selection decisions. *See supra*, pp. 3-4.

Plaintiffs move the goalposts by asserting "*the City* constrains the decision-making process" by "mandat[ing] the processes for filling civil service vacancies" and "plac[ing] limitations on provisional hiring." Memo., p. 34 (emphasis added). But the civil service process overseen by DCAS has absolutely nothing to do with the two "facially neutral practices" plaintiffs are asserting *or* with plaintiffs' contention that the FDNY's "triumvirate" oversees a centralized decision-making process. In fact, plaintiffs' focus on DCAS seriously undermines their core argument that *FDNY's* upper management engages in a discriminatory "common mode of exercising discretion."

For the remaining two-third of job selections in which no civil service eligible list exists, the discretion afforded to each bureau is greater still. The hiring managers develop the interview questions, interview and rank the candidates, and make the ultimate selection decision using their own criteria. *See supra*, pp. 3-5. The record makes clear that the "individual decision makers or groups at the practice area level exercised discretion" in making these selections, and plaintiffs cannot establish that these decision-makers' discretion is rigidly "constrain[ed]." *Kassman*, 416 F.Supp.3d at 278.

The FDNY's bureaus are also given significant discretion to select the salary for candidates and to select employees for discretionary pay increases while the program was in existence. *See supra*, p. 6. Plaintiffs try to sidestep this discretion by claiming that the FDNY

"imposes a process for the *amounts* of discretionary increases" and "generally limited raises upon promotions to 8%." Memo., p. 34 (emphasis added). Plaintiffs are yet again backtracking from the Amended Complaint, which alleged the 8% limit applied to African-Americans but not white employees. Dkt. 55, ¶188. But plaintiffs' argument is irrelevant to the commonality analysis anyway, as even "Wal-Mart imposed limits on the size of raises that could be awarded[.]" *Jones*, 34 F. Supp. 3d at 905 (citing *Dukes*, 564 U.S. at 343). Because the FDNY has "granted broad discretion to managers to increase wages and to select employees for promotion," the mere fact that the "discretion had limits and was subject to…oversight" does not suffice. *Id.*

Plaintiffs' argument that the "divorce of EEO considerations from HR decisions" constitutes a "common mode of exercising discretion" is completely baffling. Memo., p. 34. As noted above, plaintiffs' focus on what the FDNY has allegedly *failed* to do is "just the opposite of a uniform employment practice that would provide the commonality needed for a class action." *Dukes*. 564 U.S. at 355.

**Criteria Governing Discretions**

Finally, *Kassman* examines "the criteria that govern the discretionary decisions" 416 F.Supp.3d at 279. "Subjective criteria, prone to different interpretations, generally do not provide common direction." *Id.* This factor weighs decisively against plaintiffs as well. Each FDNY's bureau's decision-making process for hiring and promotion rests upon inherently subjective criteria. Ex. U. Discretionary pay increases, which are based upon the selected employee's additional duties and responsibilities over the past year, are similarly subjective in nature. Perhaps unsurprisingly, "[p]laintiffs do not present evidence that any of these challenged criteria constrained discretion." *Id.*

**B.      Plaintiffs Fail To Establish Typicality Under Rule 23(a)(3) Or Adequacy Under Rule 23(a)(4)**

Plaintiffs' motion discusses commonality and typicality only "briefly" based upon the understanding that defendant will only challenge the commonality requirement under Rule 23(a)(2). Memo., p. 30. Plaintiffs are mistaken. The "rigorous" analysis required under Rule 23(a) is not limited to commonality. *See Dig. Music Antitrust Litig*., 321 F.R.D. 64, 87 (S.D.N.Y. 2017)(typicality showing "requires something more than general conclusory allegations")(internal quotation omitted). In any event, plaintiffs' conclusory assertion that they were "subject to the same centralized decision-making and review process" (Memo., p. 30) contradicts what plaintiffs alleged in the Amended Complaint, and is devoid of factual support anyway. Defendant discusses its remaining typicality and adequacy arguments "in tandem." *Chen-Oster*, 385 F.R.D. at 78.

**Plaintiffs Represent A Small And Atypical Sample Of The Class**

Plaintiffs' most fundamental shortcoming is that they do "not have claims that would have been typical of the *entire class*." *Cooper v. Southern Co*., 390 F.3d 695, 715 (11th Cir. 2004)(emphasis in original). The putative class is astonishing in its breadth, covering more than 100 professional, clerical, administrative, and craft titles. Yet plaintiffs represent only a small handful of these titles – Administrative Manager (McKiver, Poe, Bowman); Computer Specialist (Riojas, Thomas); and Administrative Staff Analyst (Annette Richardson). *See Taylor v. Zucker*, No. 14-5317 (CM), 2015 U.S. Dist. LEXIS 98877, at *24 (S.D.N.Y. July 27, 2015)(plaintiffs who "represent only three of 68" organizations in putative class are "not a representative sample"); *Adkins v. Morgan Stanley*, 307 F.R.D. 119, 139 (S.D.N.Y. 2015)(plaintiffs "do not represent a broad enough swath" to be typical of entire class).

The antiquated, top-to-bottom nature of the class further illustrates plaintiffs' lack of typicality. Bowman, Poe and McKiver, who have held clerical titles, are not typical of the professional titles that require specialized education or experience. Conversely, Thomas and Riojas hold information technology positions that are atypical of the numerous craft and clerical titles in the putative class. Even when such class actions were more common in the 1970s and 1980s, courts still expressed concern that plaintiffs' claims were atypical. *See Sheehan v. Purolator, Inc*., 103 F.R.D. 641, 652 (E.D.N.Y. 1984), *aff'd*, 839 F.2d 99 (2d Cir. 1988)(plaintiff not typical of class "ranging from secretaries and customer service representatives to officers and professionals like [plaintiff] herself"); *Lo Re v. Chase Manhattan Corp.*, 431 F. Supp. 189, 197-98 (S.D.N.Y. 1977)(plaintiffs were not typical of "a class [that] would include bank tellers, clericals, maintenance personnel and a multitude of other positions").

Erica Richardson, the sole representative of the Rejected Applicant Class, further illustrates plaintiffs' weakness as class representatives. Richardson applied for four unique titles – Substance Abuse Counselor, Community Coordinator, Training Administrator, and Family Liaison. Dkt. 55, ¶15. These four positions are far from typical of the array of positions comprising the class.

Richardson never even took a civil service examination for an FDNY title, and lacks class standing to represent the Rejected Applicant Class. Dkt. 76, pp. 7-9.   Even if Richardson did have standing, Richardson's claim is atypical of the class members who *did* pass a DCAS examination. *Oakley v. Verizon Communs., Inc*., No. 09-9175 (CM), 2012 U.S. Dist. LEXIS 12975, at *40 (S.D.N.Y. Feb. 1, 2012)(claim of employee who failed to satisfy employer's FMLA policy was not typical of class members who did).   It is black-letter law that "a class representative must be part of the class and possess the same interest and suffer the same

34

injury as the class members." *Falcon*, 457 U.S. at 155. Because Richardson cannot satisfy this standard, approving Richardson as a class representative "would do a disservice to the putative class[.]" *Rapcinsky v. Skinnygirl Cocktails, L.L.C.*, No. 11-6546 (JPO), 2013 U.S. Dist. LEXIS 5635, at *21 (S.D.N.Y. Jan. 9, 2013).

Plaintiffs attempt to get around this glaring shortcoming by noting they are grouped into six of DCAS's job groups. Memo., p. 3. But these job groups comprise an assortment of different job titles that cover a range of dissimilar job duties. Defendant is also unaware of any class certification decision that has assessed typicality and adequacy using the broad EEO-4 categories mandated by federal law.

### Annette Richardson, Thomas, and Poe Are Inadequate Class Representatives

Annette Richardson retired from the FDNY on October 1, 2019, while Stephanie Thomas and Debra Poe retired earlier this year. As a result, their claims for prospective relief are now moot. Dkt. 76, pp. 3-5. But irrespective of the mootness issue, the three retired plaintiffs' interests are "quite likely in conflict with the interests of current employees, for a former employee's primary interest necessarily centers on recovering back pay, while a current employee may well be far more interested in obtaining injunctive relief." *Slader v. Pearle Vision, Inc.*, No. 00-2797 (JSR), 2000 U.S. Dist. LEXIS 16453, at *2 (S.D.N.Y. Nov. 14, 2000); *see also Harris v. Initial Sec., Inc.,* No. 05-3873 (GBD), 2007 U.S. Dist. LEXIS 18397, at *21 (S.D.N.Y. Mar. 7, 2007)(same).

### John Coombs's Declaration Demonstrates Plaintiffs' Inadequacy As Class Representatives

Plaintiffs testified that they were approached by John Coombs, a firefighter and former president of the Vulcan Society, about an EEOC complaint that was to be filed alleging discrimination against African-American civilians. Ex. O, 122:13-25; Ex. AE, 148:14-149:22; Ex. AD, 167:18-168:1; Ex. AG, 163:16-165:15; Ex. AI, Thomas Dep., 189:18-190:15. On

October 12, 2016, an organization calling itself "Concerned Civilians Against Discrimination" issued a press release in which Coombs was quoted and listed as a press contact, and called for the "removal" of Loving and Nguyen and the "ouster" of Commissioner Nigro. Ex. AJ. Plaintiffs have never even heard of this organization. Ex. AF, 124:12-14; Ex. AG, 169:25-170:5.

Plaintiffs have now submitted a lengthy declaration from Coombs. Ex. 26. The ostensible purpose is to document Coombs's efforts to raise the issue of discrimination against civilians with FDNY leadership and the City. But a careful reading of the declaration reveals something much different. Coombs notes that: (a) his "favored candidate" for Fire Commissioner, Phillip Parr, was not selected in 2014 (¶14); (b) he urged Commissioner Nigro to remove Queenan and Jose Maldonado from their positions (¶20); (c) Nigro selected Pamela Lassiter as CDIO rather than Coombs's preferred candidate, Patrick Damas (¶¶21-23); (d) Coombs repeatedly expressed his dissatisfaction with Lassiter's job performance, and claims Lassiter "falsely accused" Coombs of putting his hands around her (¶¶26-33).

The October 2016 press release and Coombs's own declaration show Coombs's ongoing efforts to appoint his "favored candidates" and seek the "ouster" of high-ranking FDNY officials he dislikes, even when they are African-American. That is precisely why Coombs's undeniable role in "construct[ing] this lawsuit before it had a plaintiff" is so troubling. *Bodner v. Oreck Direct, LLC*, 2007 U.S. Dist. LEXIS 30408, at *6 (N.D. Cal. Apr. 25, 2007). Although courts have acknowledged that class counsel are often the "driving force" of a lawsuit, *Davidson v. Citizens Gas & Coke Util.*, 238 F.R.D. 225, 229 (S.D. Ind. 2006),[11] it is altogether different when an employee who owes no fiduciary obligation to the class exerts such influence. In short,

---

[11] Defendant, to be clear, is not alleging that class counsel have engaged in any impropriety, and does not dispute counsel's adequacy under Rule 23(g).

Coombs's role in this lawsuit casts serious doubt as to whether plaintiffs can adequately prosecute this case on behalf of the class.

## POINT II

### PLAINTIFFS FAIL TO SATISFY RULE 23(B)

Plaintiffs' motion asks the Court to certify an opt-out class under Rule 23(b)(3), or "alternatively" an injunctive-only class under Rule 23(b)(2). Memo., pp. 38-40. But plaintiffs' perfunctory discussion of Rule 23(b) is surprising, for "[a]s with Rule 23(a), the district court must conduct a rigorous analysis in determining whether Rule 23(b)'s requirements have been met." *Cuevas v. Citizens Fin. Group, Inc.*, 526 Fed. Appx. 19, 21-22 (2d Cir. 2013)(internal quotation omitted). Plaintiffs fail to satisfy Rule 23(b) in any case.

### A.     Plaintiffs Fail To Satisfy The Requirements For A Rule 23(b)(3) Class

Plaintiffs assert, in conclusory fashion, that they have satisfied the predominance and superiority requirements of Rule 23(b)(3). Memo., pp. 38-40. The predominance inquiry is "far more demanding" than the commonality inquiry, and "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods. v. Windsor*, 521 U.S. 591, 623-24 (1997). The haphazard class that plaintiffs have lumped together is anything but "cohesive" when considering how plaintiffs' claims will proceed at trial. *See Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 86 (2d Cir. 2015)(predominance inquiry may require consideration of how trial would be conducted).

Even if plaintiffs establish a *prima facie* pattern or practice case, defendant is still afforded "a broad opportunity to present in rebuttal *any relevant evidence* that shows that it lacked such an intent. *City of New York*, 717 F.3d at 87 (emphasis added). The CHRL likewise permits defendant to "prove as an affirmative defense that each such policy or practice bears a significant relationship to a significant business objective of the covered entity or does not

contribute to the disparate impact." N.Y.C. Admin. Code § 8-107(18). Under both frameworks, a morass of individual questions will predominate over any common question. For example:

- the defenses presented at trial will differ depending on whether the class member took a DCAS examination or applied directly to the FDNY;

- because selections are made at the bureau level, each bureau's criteria and decision-making process for hiring and promotion will need to be analyzed separately;

- defendant's rebuttal concerning discretionary pay raises will focus on whether the class member had performed additional duties to be eligible for the raise.

These thorny individual questions, which are the unavoidable result of plaintiffs' unwieldy class, will subsume any common questions at trial. Rule 23(b)(3) certification is wholly unwarranted in these circumstances. *Adkins*, 307 F.R.D. at 144 (no predominance where defendant's "'policies and practices' affected the putative class in different ways"); *Moore*, 2014 U.S. Dist. LEXIS 185384 at *26-27 (no predominance because single trial "would require individualized inquiries into the actions of each managerial employee who influenced a class member's pay"); *Oakley*, 2012 U.S. Dist. LEXIS 12975 at *43-45 (no predominance because "individual questions of causation in each case are extensive").[12]

Plaintiffs also fail to establish that a class action is superior to individual actions. Plaintiffs rely heavily upon the Court's observation in *Chen-Oster* that it is "nonsensical" to disaggregate claims into individual proceedings. Memo., p. 39. But unlike in *Chen-Oster*, plaintiffs have not identified common procedures akin to 360 reviews, cross-ruffing, and quartiling that make a single trial superior to individual proceedings. As noted above, the

---

[12] Plaintiffs' citation to *United States v. City of New York*, 276 F.R.D. 22, 48 (E.D.N.Y. 2011) is misleading, as the court was discussing "individual questions" in the context of *relief,* not liability. In that case, only one title – firefighter – was at issue, and each class member took the two challenged exams, making a class-wide trial on liability sensible. But in this case, the multiplicity of job titles and challenged decisions on the FDNY's civilian side swamp any common question that can be decided at trial.

Amended Complaint challenges the absence of such agency-wide evaluation methods, although plaintiffs have conveniently abandoned this argument.

In addition, Rule 23(b)(3) was intended to vindicate the rights of groups "who individually would be without effective strength to bring their opponents into court at all." *Amchem*, 521 U.S. at 617 (internal quotation omitted). Unlike other class actions, plaintiffs can hardly maintain that they would be unable to redress their claims on an individual basis. Stephanie Thomas already filed an individual lawsuit, and both plaintiffs and the putative class members can follow suit. *Cf. Oakley*, 2012 U.S. Dist. LEXIS 12975, at *50 (FMLA leave cases "are not cases where it makes no economic sense for an individual to pursue his own claim").

**B.      Plaintiffs Fail To Satisfy The Requirements For A Rule 23(b)(2) Class**

Plaintiffs argue "alternatively" that Rule 23(b)(2) certification for injunctive relief is appropriate because of the FDNY's "centralized and common" procedures. Memo., p. 40. But plaintiffs are distorting the FDNY's decision-making process as detailed above. In addition, the vague list of "changes" that plaintiffs propose is wholly insufficient to satisfy Rule 65(d). *See In re Methyl Tertiary Butyl Ether Prods. Liab. Litig*., 209 F.R.D. 323, 345 (S.D.N.Y. 2002). Plaintiffs cannot simply postpone the specifics pending the appointment of an "independent industrial/organizational psychologist." *See Shook v. Bd. of County Comm'rs*, 543 F.3d 597, 605-06 (10th Cir. 2008).

Plaintiffs' litany of vague "changes" also underscores the putative class's lack of cohesiveness described above. *Shook*, 543 F.3d at 604; *Maldonado v. Ochsner Clinic Found.*, 493 F.3d 521, 524 (5th Cir. 2007); *In re Methyl*, 209 F.R.D. at 343. For example, an injunction that revamps the FDNY's internal system for posting vacancies would not benefit applicants who take DCAS's civil service examinations. Because injunctive relief would not benefit the class "as a whole," Rule 23(b)(2) certification is unjustified. *See Breitman v. Xerox Educ. Servs., LLC*, No.

12-6583 (PAC), 2014 U.S. Dist. LEXIS 150369, at *13 (S.D.N.Y. Oct. 22, 2014)(Rule 23(b)(2) class not justified where injunctive relief would not benefit entire class).

Plaintiffs also fail to demonstrate that a Rule 23(b)(2) class is necessary to obtain *prospective* relief. For example, plaintiffs' motion focuses heavily upon the interactions between Lyndelle Phillips and Donay Queenan even though Phillips left the FDNY in 2011 and Queenan retired in January 2019. Queenan's successor is herself African-American, while the FDNY's leadership is dominated by African-Americans as well. Plaintiffs have also completely ignored the FDNY's efforts over the past several years to address underutilization and promote diversity in the civilian workforce. Although plaintiffs have failed to establish a "general policy of discrimination" in the first place, *Dukes*, 564 U.S. at 358, plaintiffs also fail to demonstrate why an injunction is needed *going forward* to redress actions from the past. *See Aguilar v. ICE*, No. 07-8224 (KBF), 2012 U.S. Dist. LEXIS 53367, at *28 (S.D.N.Y. Apr. 16, 2012)("single sweeping injunction" is unjustified where alleged events occurred in 2007).

## CONCLUSION

For the foregoing reasons, defendant respectfully requests that the Court deny plaintiffs' motion, and grant defendant costs and disbursements, together with such further other and further relief as the Court deems just and proper.

Dated:     New York, New York
              June 25, 2020

**JAMES E. JOHNSON**
Corporation Counsel of the
  City of New York
Attorney for Defendant
100 Church Street, Room 2-115
New York, New York 10007-2601
(212) 356-2467

By:      /s/
         Yuval Rubinstein
         Assistant Corporation Counsel