**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

ANNETTE RICHARDSON, ET AL.,

                       Plaintiffs,

           v.

CITY OF NEW YORK

                   Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Civil Action No.: 17-cv-09447 (JPO)

**PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF MOTION FOR CLASS CERTIFICATION**

**VALLI KANE & VAGNINI LLP**

Robert J. Valli, Jr.
Sara Wyn Kane
Matthew Berman
600 Old Country Road, Suite 519
Garden City, New York 11530
Telephone: (516) 203-7180
Facsimile: (516)706-0248
rvalli@vkvlawyers.com
skane@vkvlawyers.com
mberman@vkvlawyers.com

**MEHRI & SKALET PLLC**

Cyrus Mehri
Michael D. Lieder
Aisha Rich
1250 Connecticut Ave., NW, Suite 300
Washington, DC 20036
Telephone: (202) 822-5100
Facsimile: (202) 822-4997
cmehri@findjustice.com
mlieder@findjustice.com
arich@findjustice.com

# TABLE OF CONTENTS

I.      ARGUMENT ..................................................................................................................... 1

    A.  The Claims of the Proposed Classes and Subclass Raise Common Issues. .................... 1

        1.  FDNY Has Made Its Hiring, Promotion, and Salary Decisions in a Centralized

            Manner. ....................................................................................................................... 1

        2.  Plaintiffs' Statistical and Anecdotal Evidence Provide Sufficient Evidence of a

            Pattern of Discrimination .......................................................................................... 4

    B.  The Plaintiffs' Claims Are Typical of the Class Claims and, With the Limitations

        Below, They Are Adequate Representatives. .................................................................. 11

    C.  Plaintiffs Satisfy the Requirements of Rules 23(b)(2) and 23(b)(3). ............................ 13

II.     CONCLUSION ............................................................................................................... 15

## **TABLE OF AUTHORITIES**

*Page(s)*

*Cases*

*Benzinger v. NYSARC, Inc.,*
  385 F. Supp. 3d 224 (S.D.N.Y. 2019).........................................................................7

*Bodner v. Oreck Direct, LLC,*
  No. C 06-4756 MHP, 2007 U.S. Dist. LEXIS 30408 (N.D. Cal. Apr. 25, 2007)...................12

*Chen-Oster v. Goldman, Sachs & Co.,*
  114 F. Supp. 3d 110 (S.D.N.Y. 2015)......................................................................5, 8

*Chen-Oster v. Goldman, Sachs & Co.,*
  325 F.R.D. 55 (S.D.N.Y. 2018) ....................................................................1, 4, 13, 14

*Chen-Oster v. Goldman, Sachs & Co.,*
  No. 10 Civ. 6950 (AT), 2015 U.S. Dist. LEXIS 117865 (S.D.N.Y. Mar. 10,
  2015) ......................................................................................................................14

*Coser v. Moore,*
  587 F. Supp. 572 (E.D.N.Y. 1983), aff'd, 739 F.2d 746 (2d Cir. 1984)....................................7

*Ellis v. Costco Wholesale Corp.,*
  285 F.R.D. 492 (N.D. Cal. 2012).............................................................................1, 4

*Fuller v. Instinet, Inc.,*
  120 F. App. 845, 846 (2d Cir. 2004)............................................................................5

*Houser v. Pritzker,*
  28 F. Supp. 3d 222 (S.D.N.Y. 2014)......................................................................6, 15

*In re Johnson,*
  760 F.3d 66 (D.C. Cir. 2014) ...................................................................................1, 4

*Jones v. Nat'l Council of Young Men's Christian Ass'ns,*
  34 F. Supp. 3d 896 (N.D. Ill. 2014) .........................................................................2, 3

*Kassman v. KPMG LLP,*
  416 F. Supp. 3d 252 (S.D.N.Y. 2018)....................................................................1, 2, 3

*McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,*
  672 F.3d 482 (7th Cir. 2012) ...................................................................................14

*Moore v. Publicis Group SA*,
 No. 1:11-cv-1279, 2014 U.S. Dist. LEXIS 185384 (S.D.N.Y. May 15, 2014),
 2014 U.S. Dist. 185384 ..................................................................................................2, 3

*Palmer v. Schultz*,
 815 F.2d 84 (D.C. Cir. 1987) ..............................................................................................5

*Ross v. Nikko Sec. Co. Int'l, Inc.*,
 No. 88 Civ. 7692 (RPP), 1990 U.S. Dist. LEXIS 10476 (S.D.N.Y. Aug. 10,
 1990) ....................................................................................................................................5

*Sheehan v. Purolator, Inc.*,
 839 F.2d 99 (2d Cir. 1988)...................................................................................................5

*Shipes v. Trinity Indus.*,
 No. TY-80-462-CA, 1985 U.S. Dist. LEXIS 24079 (E.D. Tex. Oct. 10, 1985).......................6

*Strouchler v. Shah (Strouchler I)*,
 891 F. Supp. 2d 504 (S.D.NY. 2012) ................................................................................11

*Strouchler v. Shah (Strouchler II)*
 286 F.R.D. 244 (S.D.N.Y. 2012) ..................................................................................11, 12

*Taylor v. Zucker*,
 No. 14-5317 (CM), 2015 U.S. Dist. LEXIS 98877 (S.D.N.Y. July 27, 2015) .................11, 12

*Thomas v. City of New York*,
 953 F. Supp. 2d 444 (E.D.N.Y. 2013) ................................................................................15

*Tyson Foods, Inc. v. Bouaphakeo*,
 136 S. Ct. 1036 (2016)................................................................................................13, 14

*United States v. City of New York*,
 717 F.3d 72 (2d Cir. 2013)..................................................................................................14

*Velez v. Novartis Pharms. Corp.*,
 244 F.R.D. 243 (S.D.N.Y. 2007) ..........................................................................................9

*Wal-Mart Stores, Inc. v. Dukes*,
 564 U.S. 338 (2011)..........................................................................................4, 10, 11

**Other Authorities**

Fed. R. Civ. P. 23(a)(1) ..................................................................................................................1

Fed. R. Civ. P. 23(b)(2).........................................................................................................13, 15

Fed. R. Civ. P. 23(b)(3)................................................................................................................13

Fed. R. Evid. 602 ...................................................................................................................4

New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-101
    *et seq* ...................................................................................................................7

# I.  ARGUMENT

**A.    The Claims of the Proposed Classes and Subclass Raise Common Issues.**[1]

### 1.    FDNY Has Made Its Hiring, Promotion, and Salary Decisions in a Centralized Manner.

The City argues that Plaintiffs have failed to establish commonality despite the evidence that three members of FDNY top management—Donay Queenan in Human Resources ("HR"), Steven Rush in Finance and Budget, and the Fire Commissioner (or his proxy)—have overseen a centralized decision-making process in the agency. The City admits that these three officials "exercised an oversight role in the hiring, promotion, and compensation process," Opp. at 28, but asserts that this role was "limited," *id.* at 29. The City's assertion, however, rests on readily distinguishable case law and disregards the factual record. Substantial evidence establishes that Queenan, Rush, and the Commissioner had continued, regular, and class-wide involvement in the recruitment, job selection, and pay decisions for civilian positions at FDNY.

In contesting commonality, the City relies heavily on *Kassman v. KPMG LLP*, 416 F. Supp. 3d 252 (S.D.N.Y. 2018). But *Kassman* affirms that "[t]he involvement of top management in the discretionary decision-making is a key consideration in assessing commonality. If, for instance, 'a single decisionmaker[] or a small, cohesive group' vetted all of the pay and promotion decisions, then the involvement of that one individual, or small group of individuals, could constitute a common practice." *Id.* at 280 (citations omitted); *see, e.g., In re Johnson,* 760 F.3d 66, 73 (D.C. Cir. 2014); *Chen-Oster v. Goldman, Sachs & Co.,* 325 F.R.D. 55, 66 (S.D.N.Y. 2018); *Ellis v. Costco Wholesale Corp.,* 285 F.R.D. 492, 511-12 (N.D. Cal. 2012). Conversely, courts, such as in the cases cited by the City, have rejected commonality when top

---

[1]        The City does not challenge Plaintiffs' showing that the proposed classes and subclass satisfy the numerosity requirement of Rule 23(a)(1).

officials did not exercise more than limited oversight over the allegedly discriminatory personnel decisions. *See Kassman*, 416 F. Supp. 3d at 280 ("Plaintiffs have not shown sufficient involvement by top management.... [M]embers of senior management 'do not review or second-guess individual employee performance, pay or promotion decisions ....' Rather, upper management 'simply confirm[s] that ... assessment meetings were held and the compensation process completed' and 'look[s] at aggregated pay and promotion decisions against budgets.'"); *Moore v. Publicis Group SA*, No. 1:11-cv-1279, 2014 U.S. Dist. LEXIS 185384, at *7-8 (S.D.N.Y. May 15, 2014), 2014 U.S. Dist. 185384, at *7-8 (evidence did not show "unfettered authority" was vested in a "cabal" of corporate officers and hence did not support the allegations of centralized decision-making); *Jones v. Nat'l Council of Young Men's Christian Ass'ns*, 34 F. Supp. 3d 896, 908 (N.D. Ill. 2014) ("the evidence establishes that the [pay and promotion] recommendations of lower level direct supervisors and managers were almost always accepted [by senior management]; the plaintiffs point to no evidence showing that any member of senior management changed pay or promotion recommendations submitted to them for approval with any frequency, much less that they did so with a regularity that would establish them as a common denominator among the many such decisions.").

Here, by contrast, Plaintiffs have elicited testimony from upper-level FDNY officials—including Rush and Queenan themselves—indicating that Rush, Queenan, and the Commissioner were heavily involved with recruitment, job selection, and salary decisions. *See, e.g.,* Ex 71 at 22:9-23:13, 26:11-26:23, 79:25-80:19 (Rush) (testifying to Queenan/HR and Rush involvement with promotion and promotional pay decisions); *id.* at 34:13-35:11 (Rush) (testifying to Queenan, Rush, and Commissioner involvement with and sign off on discretionary raises); *id.* at 54:3-54:5, 64:17-65:12, 84:17-84:24, 85:9-85:19, 95:4-95:15, 98:10-98:14, 114:6-114:11,

135:24-136:3 (Rush) (testifying to active "back and forth" and engagement and oversight with units at FDNY over selections or salaries that raise budgetary issues); *id.* at 86:24-87:16, 88:2-88:14, 88:23-89:10 (Rush) (testifying to active oversight by Commissioner or Deputy First Commissioner); Ex. 70 at 65:9-67:8 (Queenan) (testimony regarding HR involvement in hiring); *id*. at 222:22-225:5 (Queenan) (testimony to Rush, Queenan, and Commissioner involvement with approval of a salary for a job candidate); Ex. 72 at 116:14-119:23, 122:10-123:18, 129:8-129:16, 157:16-157:21, 241:3-243:22 (White) (testimony by Queenan's supervisor regarding Queenan's control over civilian hiring and pay); *id.* at 138:4-139:6, 185:15-189:25, 269:25-270:9, 282:6-283:7 (White) (testimony by Queenan's supervisor regarding Rush's control over civilian salaries, temporary workers, and discretionary actions); Ex. 67 at 106:10-106:13, 117:13-121:14, 125:18-128:18, 129:12-132:3 (Ferrandino) (testimony regarding Queenan's role in hiring process); Ex.68 at 264:6-267:22 (Loving) (testimony regarding HR's relationship to compensation decisions); Ex. 73 at 59:20-60:2, 79:25-80:4, 124:2-126:10, 131:9-132:20 (Perez) (testimony regarding Rush and Queenan's involvement in personnel actions); Ex. 69 at 33:15-36:20, 37:5-37:12, 62:24-63:8, 66:10-68:6, 97:11-99:12 (Phillips) (testimony regarding Rush and Queenan's involvement in personnel actions). Plaintiffs also have testified about the roles of these top officials. *See, e.g.*, Ex. 63 at 130:9-131:3 (Bowman); Ex. 64 at 56:22-61:2, 66:3-67:12, 174:2-175:21 (Poe); Ex. 66 at 81:13-85:21, 135:25-137:12, 215:10-216:17, 236:20-237:14, 238:21-239:2 (A. Richardson).

 This testimony establishes that Queenan, Rush, and the Commissioner or his delegate were themselves the "ultimate" decisionmakers. They were not merely engaged in perfunctory review of decisions made by others. *Kassman*, *Moore*, and *Jones* reference no similar evidence

or testimony.  The involvement of Queenan, Rush, and the Commissioner in these decisions was "consistent, ... pervasive, [and] classwide." *Ellis,* 285 F.R.D. at 511.

This centralized decision-making negates the City's refrain that the scope of the proposed classes is "simply breathtaking" and resembles "1970s-vintage class actions." Opp. at 1. Regardless of whether the proposed classes would have been overly broad if, as in *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011), local managers had "broad discretion" to make the challenged decisions "with only limited corporate oversight," *id.* at 343, they are not overly broad in this case, as the holdings in *Chen-Oster*, *In re Johnson,* and *Ellis* reflect.

Whereas Plaintiffs rely heavily upon the factual record to substantiate their arguments, the City cites Rush's deposition only twice, neither time with respect to the question of centralized decision-making, and Queenan's deposition four times but only twice pertaining to top-management oversight.[2] Instead, the City supports its "limited oversight" argument primarily with a declaration from Tricia Singh, the current Assistant Commissioner of Human Resources, and a recent declaration from Steve Rush.  Singh, however, has worked for the FDNY only since January 2020, *see* Singh Decl. (ECF No. 86-1), ¶ 3, and thus lacks the personal knowledge necessary to testify about the personnel practices at FDNY before 2020. *See* Fed. R. Evid. 602. It is telling that the City relies upon the declaration of a witness who lacks personal knowledge and a recent declaration from Steve Rush that tap-dances around the centralization issues rather than on the hundreds of pages of deposition testimony from Rush and Queenan.

    **2.**    **Plaintiffs' Statistical and Anecdotal Evidence Provide Sufficient Evidence of a Pattern of Discrimination.**

---

[2]    One of the two cites is to support the statement, "Queenan testified that HR would only participate in interviews for 'mid to high level managerial' positions." Opp. at 5. But Queenan's testimony was that HR sat in on "[a]ll civil service and higher – mid to high level managerial" panels. Ex.70 at 65:13-65:16 (Queenan).  Later asked to clarify ("But again, not all civil service, right?"), Queenan unambiguously stated "[a]ll civil service."  *Id.* at 67:5-67:6 (Queenan).

*General issues.*  The City advances two flawed general criticisms of the statistical analyses performed by Plaintiffs' expert Dr. Charles Scherbaum. First, it asserts that he "failed to examine *any* non-discriminatory variables." Opp. at 14 (emphasis in original). That is false; depending on the analysis he controls for the variables job group, job title, certification of applicant, tenure, and year. He, like the City's expert Dr. Christopher Erath, could not control for variables such as education or performance appraisal ratings because data did not exist. Ex. 1 at 121 (Scherbaum Init Rep.). *See Palmer v. Schultz*, 815 F.2d 84, 100 (D.C. Cir. 1987) ("'plaintiffs cannot be legitimately faulted for gaps in their statistical analysis when the information necessary to close those gaps was possessed only by defendant[]'") (quoting *Trout v. Lehman*, 702 F.2d 1094, 1102 (D.C. Cir. 1983)).[3]

Second, the City wrongly criticizes Dr. Scherbaum's use of "broad job groups … comprised of several job titles." Opp. at 9, 15-16. The City ignores that its own Department of Citywide Administrative Services ("DCAS") created these job groups. *See Chen-Oster v. Goldman, Sachs & Co.*, 114 F. Supp. 3d 110, 120 (S.D.N.Y. 2015) ("Since Goldman Sachs was required to classify its employees into AAP job groups precisely on the basis of both similarity of duties and responsibilities and opportunities for compensation and promotion, the defendants cannot now reject that classification system as an input in creating a model for calculating expected pay and advancement."). And, except with respect to salary analyses, the City has not attempted to show that analyses using 135 job titles instead of DCAS' 6 job groups – even if they could be performed – would yield different results than Dr. Scherbaum obtained. *See, e.g.,*

---

[3]     The three decisions on which the City relies are not to the contrary. In *Sheehan v. Purolator, Inc.*, 839 F.2d 99, 103 (2d Cir. 1988), plaintiffs' expert omitted relevant non-discriminatory factors that defendant's expert showed made a difference in the outcome; in *Fuller v. Instinet, Inc.*, 120 F. App. 845, 846 (2d Cir. 2004), the Court did not make clear whether the missing data was available; and in *Ross v. Nikko Sec. Co. Int'l, Inc.*, No. 88 Civ. 7692 (RPP), 1990 U.S. Dist. LEXIS 10476, at * (S.D.N.Y. Aug. 10, 1990), the plaintiffs did not submit "any systematic statistical evidence that defendant is discriminating against women on a class-wide basis."

*Shipes v. Trinity Indus.,* No. TY-80-462-CA, 1985 U.S. Dist. LEXIS 24079, at *80-81 (E.D. Tex. Oct. 10, 1985) ("defendant did no more than speculate that plaintiffs' regressions <u>might</u> have been destabilized by terms that were probably collinear") (emphasis in original).[4]

In considering all the exchanges about the sufficiency of the evidence, it is important to remember that the issue now is not whether Plaintiffs ultimately will prevail on the merits based on the present evidence supplemented after merits discovery. Rather, the issue now is whether an important merits "question[] can be resolved on a classwide basis." *Houser v. Pritzker*, 28 F. Supp. 3d 222, 243 (S.D.N.Y. 2014).

*Underutilization.* The City does not dispute that its own contemporaneous documents repeatedly showed that FDNY underutilized African Americans. It also does not contest the accuracy of Dr. Scherbaum's calculations that FDNY underutilized African Americans in five of the six principal civilian job groups, regardless whether he measured availability by the DCAS availability percentages or the averages for other City agencies. Pls. Mem. at 2-8. Rather than try to prove that it did not under-employ African Americans in civilian positions, the City points to Dr. Scherbaum's statement that utilization analyses merely provide a "starting point" for analysis of "adverse impact or discrimination."[5] It also argues that legal decisions have accorded underutilization analyses little importance in discrimination cases. Opp. at 15-17.

The City misreads the decisions it cites about the significance of utilization analyses. The courts ruled against plaintiffs in those cases, not because utilization analyses were unreliable, but

---

[4]     The City refers to three job titles within the Health Professional Group for which census data indicates different availability percentages than the overall DCAS percentage: two were less than one was more. Opp. at 9. But that does not indicate that the overall availability percentage was incorrect or that any differences between the percentages for those titles and the overall percentage systematically caused the DCAS job group availability percentages to exceed the FDNY actual employment percentages for those job groups.

[5]     The "starting point" comment was not, as the City suggests, a hard-wrung concession from Dr. Scherbaum. Opp. at 10, 17. He proffered the observation readily.

because the data in those analyses did not support the claims. For example, the court denied class certification in *Coser v. Moore*, 587 F. Supp. 572 (E.D.N.Y. 1983), *aff'd*, 739 F.2d 746 (2d Cir. 1984), largely because the affirmative action plans of the employer (SUNY Stony Brook) showed net ***overutilization*** of three female faculty and underutilization of only two female librarians. *Id.* at 585**,** 591-92. By contrast, in this case, according to DCAS' own data, FDNY employed over ***200*** fewer African Americans than expected during the liability period. Ex. 1 at 50 (Scherbaum Init. Rep.). In *Coser* the librarian shortfall was about 8% (shortfall of 2 divided by female employment of 25), whereas at FDNY it is about ***75%*** (shortfall of about 209 divided by Black employment of about 273 in the six largest job groups). Ex. 1 at 32-34. Moreover, utilization analyses are especially significant in this case because of the City's own policies. The City required its agencies, including FDNY, to "review the … workforce composition, utilization, and new hires and promotions reports [the quarterly reports provided by DCAS] … identify any workplace barriers (e.g. underutilization in any job groups) … [and] remove any workforce barriers and address any underutilization of women and minorities in its workforce." Pls. Mem. at 8-9. FDNY's failure to comply with its mandated duties to review and address the underutilization violates the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-101 *et seq. See Benzinger v. NYSARC, Inc*., 385 F. Supp. 3d 224, 239-40 (S.D.N.Y. 2019) (because "an employer's failure to take remedial action for the discriminatory conduct of employees can create liability under the NYCHRL … [p]laintiff has adequately alleged facts that demonstrate aiding and abetting liability [under NYCHRL] on the part of [a defendant] for failing to investigate and remediate [p]laintiff's allegations of discriminatory conduct").

*Hiring and promotions.*  In his initial report, Dr. Scherbaum reported the results of four hiring analyses. Ex. 1 at 70-102. The City characterizes the results as "underwhelming" because,

in his most comprehensive analysis, the disparities between the expected and actual number of

Black hires were statistically significant only in about half the combinations of year and job

group. Opp. at 10, 17. The City is trying to take advantage of low statistical power when

decisions are divided into numerous small cells – an old defendant's trick. *See Chen-Oster*, 114

F. Supp. 3d at 120 ("disaggregation tends to mask common mechanisms because the sample size

in each unit is so small"). The aggregated shortfalls ("Sho") between the expected ("Exp")

number of Black hires based on DCAS availability percentages and the actual ("Act") number of

Black hires are what is telling, as shown below for the years within the liability period for which

data is available:[6]

| Years | Mgt Spec | | | Sci Prof | | | Clerical | | | Craft | | | Totals | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Exp | Act | Sho | Exp | Act | Sho | Exp | Act | Sho | Exp | Act | Sho | Exp | Act | Sho |
| 2015 | 5.6 | 2.0 | 3.6 | 1.9 | 1.0 | 0.9 | 11.8 | 2.0 | 9.8 | 8.0 | 2.0 | 6.0 | 27.3 | 7.0 | 20.3 |
| 2016 | 4.1 | 2.0 | 2.1 | 3.7 | 5.0 | +1.3 | 15.5 | 5.0 | 10.5 | 10.3 | 3.0 | 7.3 | 33.6 | 15.0 | 18.6 |
| 2017 | 5.0 | 1.0 | 4.0 | 3.3 | 1.0 | 2.3 | 2.1 | 2.0 | 0.1 | 8.7 | 2.0 | 6.7 | 19.1 | 6.0 | 13.1 |
| 2018 | 2.4 | 2.0 | 0.4 | 5.1 | 1.0 | 4.0 | 10.7 | 7.0 | 3.7 | 8.7 | 1.0 | 7.7 | 26.9 | 11.0 | 15.8 |
| Totals | 17.1 | 7.0 | 10.1 | 14.0 | 8.0 | 5.9 | 40.1 | 16.0 | 24.1 | 35.7 | 8.0 | 27.7 | 106.9 | 39.0 | 67.8 |

Each year, FDNY hired fewer than half the expected number of African Americans.  In three of

the four job groups it hired fewer than half the expected number of African Americans; in the

fourth (Science Professionals), the percentage hired was just over 50% of the expected number.

These types of disparities are ***overwhelming***, not underwhelming.[7]

The City trumpets Dr. Erath's job selection analysis that supposedly shows no differences

in the selection rates of White and Black candidates. Opp. at 10-11. But it does not dispute that

---

[6]     The "expected" and "actual" figures are calculated by multiplying the number of hires each year into each job group as shown in Tables 28 and 29 of Dr. Scherbaum's initial report by the percentages of African Americans hired and available as shown in Tables 31 and 32. Ex. 1 at 72, 75-76 (Scherbaum Init. Rep.).

[7]     The City criticizes Plaintiffs for "focus[ing] almost entirely on the 2006-2014 time period," which it calls "the distant past," and not deposing "the two individuals most actively involved in addressing underutilization: Marie Giraud and Don Nguyen." Opp. at 24. But Plaintiffs did not focus just on 2006-14: Queenan served until January 2019 and Rush is still at FDNY. And despite the City's suggestions to the contrary, the available data, such as in the table above, does not indicate that Giraud and Nguyen made a difference, at least in their first two years of 2017 and 2018.

Dr. Erath misleadingly lumped together hiring and promotion decisions, his analysis covered

only about 20% of hiring decisions, and he erroneously designated outcomes as "good," "bad,"

or "other" for candidates. Pl. Mem. at 22-23. Dr. Scherbaum recreated Dr. Erath's analysis after

correcting the misdesignated outcomes and found a shortfall of either 15 or 22 African

Americans selected in this roughly 20% sample. Ex. 4 at 8-10 (Scherbaum Supp. Rep.).[8]

The City also does not dispute that Dr. Erath did not even attempt to perform an analysis

focused only on promotions, as did Dr. Scherbaum. Pl. Mem. at 24-25. Dr. Scherbaum's

conclusion that the City underpromoted Black employees is buttressed by the anecdotal

evidence. *See Velez v. Novartis Pharms. Corp.*, 244 F.R.D. 243, 263, 266 (S.D.N.Y. 2007)

(finding commonality partly because the statistical findings of plaintiffs' expert "are supported

by anecdotal evidence that gives 'texture' to the statistics"; by contrast, when no statistical

evidence is offered, "'anecdotal testimony must by itself support an inference of sex-based

[employment] decisions'") (citations omitted). Plaintiffs have offered testimony from 11 class

members concerning denied promotions (Plaintiffs Bowman, McKiver, A. Richardson, and

Thomas and declarants Asare, Bunn, English, Horsley, Jules-Baptiste, Robinson, and Saylor),

which constitutes about 3% of the roughly 385 member Employee Class. Three percent is similar

to or greater than the percentage of class members testifying about pregnancy discrimination that

was sufficient in *Velez*, even in the absence in that case of statistical proof as is offered here. *See*

*Velez*, 244 F.R.D. at 257, 266 (testimony from 31 plaintiffs and declarants out of a class of

"thousands"). And, despite the City's statement that the anecdotes come from persons in similar

jobs, *see* Opp. at 22, they come from persons in titles that DCAS assigns to four of the six

---

[8]     The City complains that it did not have the chance to depose Dr. Scherbaum about his supplemental report.
Opp. at 10-11, 18. He testified at his deposition that he might conduct an additional analysis based on the newly
produced data. Ex. 62 at 235:13-25 (Scherbaum Tr.). The City did not ask to re-depose him on his supplemental
report; he would be available if requested.

principal job groups – Management Specialist (Bowman, A. Richardson, Asare, Jules-Baptiste, Saylor), Science Professional (Thomas), Clerical Supervisor (McKiver, Asare, Bunn, English, Robinson), and Clerical (Horsley) – a far more comprehensive group than in *Dukes.* 564 U.S. at 358 (declarations from only 1 out of every 15 stores).

*Salaries.*  In arguing that Plaintiffs had not shown a pattern of racial discrimination in salaries for Science Professionals and Management Specialists,[9] the City inexplicably ignores Dr. Scherbaum's analysis of salary disparities in his supplemental report. That report directly responds to Dr. Erath's critique of the salary analysis in his original report, a critique that the City largely repeats in its Opposition. Both experts performed multiple regression analyses of salary. The City argues that the analyses must control for job title. Opp. at 20 (citing *Kassman*, 416 F. Supp. 3d at 283). But that is not required and would be inappropriate in this case. FDNY's large number of job titles for a relatively small number of employees means that, frequently, the regression cannot compare White and Black employees with the same job title. For example, the Science Professional job group has 30 job titles, and in 2016, half the job titles had employees of only one race and only one job title had at least five White and five Black employees. Ex. 4 at 14-16 (Scherbaum Supp. Rep.). As a result, Dr. Erath's regression confounds race and job title. *Id.* at 14-15. To avoid confounding, Dr. Scherbaum grouped the 30 job titles into eight job analysis groups. *Id.* at 15-16. And when he performed the regression, instead of yielding no statistically significant disparities as Dr. Erath reports, Ex. 2 at 18, Dr. Scherbaum finds statistically significant disparities in nine years (including each year between 2013 and 2018), Ex. 4 at 16-17.

---

[9]     Plaintiffs accidentally omitted the word "Science" in front of "Professionals" in defining the Compensation Subclass in their initial memorandum.  Pl. Mem. at 29. Health Professionals are not included in the Compensation Subclass, and Dr. Scherbaum does not submit analyses about their salaries in his supplemental report.

Dr. Scherbaum did not complete a similar analysis for Management Specialists, for which there are even more job titles than for Science Professionals. Plaintiffs, however, have offered testimony from 2 Science Professionals (Riojas and Thomas) and 7 Management Specialists (Bowman, Poe, A. Richardson, Asare, Germain, Jules-Baptiste, Saylor). The Compensation Subclass has about 100 members, Pl. Mem. at 30, meaning that anecdotal evidence comes from about 11% of the members of the subclass, about the same percentage that the Supreme Court cites with approval in *Dukes.* 564 U.S. at 358.

### B. The Plaintiffs' Claims Are Typical of the Class Claims and, With the Limitations Below, They Are Adequate Representatives.

Just as centralized personnel decision-making causes the claims of racial discrimination in hiring, promotion, and salary decisions to give rise to common issues, so too centralized decision-making makes the claims of the Plaintiffs typical of the claims of other Class members. One of the decisions cited by the City, *Taylor v. Zucker*, No. 14-5317 (CM), 2015 U.S. Dist. LEXIS 98877 (S.D.N.Y. July 27, 2015), highlights the importance of centralized decision-making for both commonality and typicality.

In that case, plaintiffs sued New York State health officials on behalf of Medicaid recipients alleging that the State's practices had led to improper reductions and terminations of home services. Judge McMahon found against commonality and typicality because 68 companies delivered those services, plaintiffs were served by only three, and the companies, not the State, made the decisions to reduce or terminate care for individual patients. *Id.* at *29. She distinguished a similar case against the City of New York in which Judge Scheindlin had found commonality. *Strouchler v. Shah (Strouchler I)*, 891 F. Supp. 2d 504 (S.D.NY. 2012); *Strouchler v. Shah (Strouchler II)* 286 F.R.D. 244 (S.D.N.Y. 2012). Judge Scheindlin reached the opposite result from Judge McMahon because the New York City program was "highly centralized": all

patients' eligibility for the care "is determined by a set of doctors working in one department; that department is run by one individual, Dr. Anita Aisner, who is personally supervising the review of 'all split-shift cases.'" *Strouchler II*, 286 F.R.D. at 246, *discussed in Taylor*, 2015 U.S. Dist. LEXIS 98877, at \*24-26. Differences between the process by which Plaintiff Erica Richardson came to FDNY's attention and the process by which some other members of the Rejected Candidate Class came to FDNY's attention are of no consequence for the typicality analysis because of the roles of Queenan, Rush and the Commissioner.[10] Differences between the job duties of the other Plaintiffs and other members of the Employee Class and the Compensation Subclass are similarly inconsequential because of centralized decision-making.

The City questions the Plaintiffs' adequacy because John Coombs, the former president of the Vulcan Society, contacted them about filing charges of discrimination with the EEOC. Opp. at 35-37.[11] Apparently *Bodner v. Oreck Direct, LLC*, No. C 06-4756 MHP, 2007 U.S. Dist. LEXIS 30408, at \*6 (N.D. Cal. Apr. 25, 2007), is the best support the City could find for the proposition that Coombs' contacts make Plaintiffs inadequate. In *Bodner*, however, the plaintiff was inadequate because of his "undeniable and overwhelming ignorance regarding the nature of this action, the facts alleged, and the theories of relief against defendant." *Id.* at 5; *see also id.* at 3 ("Plaintiff met his attorney in person for the first time the day before his deposition … [and] did not read the complaint before it was filed.").

The City has not and cannot make similar arguments against the Plaintiffs here. The testimony of two example Plaintiffs shows: they met with class counsel before the Complaint was filed, Ex. 65 at 167:8-168:17 (A. Richardson); Ex. 63 at 168:14-18 (Bowman); they are

---

[10]     The analysis is virtually identical to the analysis in Plaintiffs' opposition to summary judgment against Ms. Richardson on standing grounds. ECF No. 88, at 5-13.

[11]     This argument presumably does not apply to Erica Richardson, who heard of the lawsuit from her sister-in-law Plaintiff Annette Richardson. Ex. 66 at 51:22-52:20 (E. Richardson).

aware of their claims and their duties as class representatives, Ex. 65 at 175:17-179:15 (A.

Richardson); Ex. 63 at 169:2-170:18, 173:9-17 (Bowman); and they regularly communicate with

class counsel, Ex. 65 at 175:11-14, 179:16-180:19 (A. Richardson); Ex. 63 at 173:18-23

(Bowman). They are ideal representatives, not pawns of John Coombs.[12]

## C.    Plaintiffs Satisfy the Requirements of Rules 23(b)(2) and 23(b)(3).

Rule 23(b)(3).  To certify the proposed classes under Rule 23(b)(3), the Court must find

that common issues predominate and that a class action is superior to other procedures for

resolving the dispute. As to the predominance standard, the City ignores recent authority that

predominance merely requires that common issues are "more prevalent or important than…

individual issues," including "important matters [that] will have to be tried separately, such as

damages or some affirmative defenses peculiar to some individual class members." *Tyson Foods,*

*Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016) (citations omitted).

Plaintiffs' pattern-or-practice disparate treatment claims meet this standard. Plaintiffs

typically establish their prima facie case through common statistical evidence, possibly

supported by evidence of "instances of discrimination against particular employees." *Chen-*

*Oster*, 325 F.R.D. at 82-83. The employer may attempt to rebut through its own common

evidence by "attacking the accuracy or adequacy of Plaintiffs' statistics" or "'producing non-

statistical evidence to show that it lacked such an intent [to discriminate].'" *Id.* at 83 (quoting

*United States v. City of New York*, 717 F.3d 72, 85 (2d Cir. 2013)). If the Plaintiffs prevail, they

are entitled to class-wide injunctive relief and a series of mini-trials governed by a "rebuttable

---

[12]     Notwithstanding the adequacy of the Plaintiffs generally, Plaintiffs Annette Richardson and Stephanie
Thomas no longer represent the Employee Class or Compensation Subclass insofar as they seek injunctive relief
because they recently retired without intent to return to FDNY.  Similarly, Plaintiff Dino Riojas does not represent
the Employee Class claiming denied promotions because he did not seek a promotion during the liability period.

inference" that "any particular employment decision ... was made in pursuit of that [discriminatory] policy." *City of New York*, 717 F.3d at 87-88 (quoting *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 362 (1977)).

The City hypothesizes three types of individual issues that supposedly would have to be resolved. Opp. at 38. Two of them – whether a Rejected Applicant "took a DCAS examination or applied directly to the FDNY" and whether a Compensation Subclass member "had performed additional duties to be eligible for [a discretionary pay] raise" – are "affirmative defenses peculiar to some individual class members," *Tyson Foods,* 136 S. Ct. at 1045, that would be addressed, if at all, in the mini-trial stage after class-wide issues are determined. *See McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 672 F.3d 482, 490, 491 (7th Cir. 2012) (even if "hundreds of separate trials may be necessary," "[t]he only issue at this stage is whether the plaintiffs' claim of disparate impact is most efficiently determined on a class-wide basis rather than in 700 individual lawsuits"). And the third issue will not exist; the City assumes incorrectly that "selections are made at the bureau level." Opp. at 38.[13]

The *Chen-Oster* analysis of superiority, 325 F.R.D. at 84, also applies. Indeed, this case will be easier to manage because the classes are smaller and localized; *Chen-Oster* involved a nationwide class of over 1,700 women. *Chen-Oster v. Goldman, Sachs & Co.,* No. 10 Civ. 6950 (AT) (JCF), 2015 U.S. Dist. LEXIS 117865, at *27 (S.D.N.Y. Mar. 10, 2015). The City suggests otherwise because "plaintiffs have not identified common procedures akin to 360 reviews, cross-ruffing, and quartiling that make a single trial superior to individual proceedings." *Id.* But *Chen-Oster* never mentions these procedures in its discussion of superiority; even if they were relevant to manageability of the disparate impact claims, they would be irrelevant to the manageability of

---

[13]     The staging of proceedings will be similar for the disparate impact claims.

the disparate treatment claims; and centralized decision-making is the primary factor making class litigation of both types of claims manageable.

The City also argues that Plaintiffs could file individual discrimination lawsuits, as Plaintiff Thomas did. It has not identified one class member who has filed an individual action during the liability period; Thomas filed her action nine years ago. More important, the court criticized her counsel's filings as "murky," "vague," and "amorphous." *Thomas v. City of New York*, 953 F. Supp. 2d 444, 456, 458 (E.D.N.Y. 2013). An individual promotion or pay claim does not give rise to sufficient damages for a lawyer to commit the resources that Plaintiffs' counsel have devoted to this case. Class members have no good reason to proceed individually.

Rule 23(b)(2).  The City opposes certification under Rule 23(b)(2) by criticizing Plaintiffs' proposed relief. This is premature:

> it is not necessary to speculate about the precise contours of such relief. All that matters is that the Court has the equitable power and the practical ability to fashion some form of injunctive or declaratory relief that would apply to all members of the proposed (b)(2) class. There is no reason to believe that the Court will be unable craft such an appropriate remedy if and when it reaches that stage.

*Houser,* 28 F. Supp. 3d at 249.

## II.  CONCLUSION

For the reasons set forth in Plaintiffs' initial brief and above, the Court should: certify the proposed classes proposed in the initial brief with the modification set out in footnote 9 above; appoint the Plaintiffs as class representatives with the modifications set out in footnote 12; and appoint the counsel listed below as class counsel. Plaintiffs will be available for a hearing on the class certification motion, either in person or remotely, if the Court believes it will be helpful.

Respectfully submitted,

_/s/ Michael D. Lieder_

**VALLI KANE & VAGNINI LLP**          **MEHRI & SKALET PLLC**

Robert J. Valli, Jr.                          Cyrus Mehri
Sara Wyn Kane                             Michael D. Lieder
Matthew Berman                          Aisha Rich (*pro hac vice* to be applied for)
600 Old Country Road, Suite 519     1250 Connecticut Ave., NW, Suite 300
Garden City, New York 11530          Washington, DC 20036
Telephone: (516) 203-7180            Telephone: (202) 822-5100
Facsimile: (516)706-0248             Facsimile: (202) 822-4997
rvalli@vkvlawyers.com                cmehri@findjustice.com
skane@vkvlawyers.com                 mlieder@findjustice.com
mberman@vkvlawyers.com               arich@findjustice.com

## CERTIFICATE OF SERVICE

I hereby certify that on July 10, 2020, I electronically filed the foregoing with the Clerk of

the Court by using the CM/ECF system, and I certify that all participants in the case are registered

CM/ECF users and that service will be accomplished by the CM/ECF system.

_/s/ Michael D. Lieder_
Michael D. Lieder

16